UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| CTIA – The Wireless Association, | ) ) | |
| Plaintiff, | ) ) | Case. No. 3:20-cv-00043-GFVT |
| V. | ) ) ) | **OPINION** |
| KENTUCKY 911 SERVICES BOARD, *et al.*, | ) ) ) ) | **&** **ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For many low-income Kentuckians, limited phone services are provided free of charge as a benefit. Though the phone companies provide this service, it is paid for by Kentucky and federal taxpayers by way of subsidies.

When it comes to 911 service, all phone customers use and help pay for this benefit. A quick review of an old phone bill reveals a seventy-cent monthly fee which helps fund 911 services. That fee was previously paid by all standard Kentucky phone customers through payment of phone bills. Though low-income Kentuckians were also required to pay this fee to phone companies, they were required to send their fee payment directly to phone companies who collected it on behalf of the government. That is until Congress decided that phone companies could not be required to collect that fee from low-income Kentuckians. In response, the Kentucky legislature said, fair enough, phone companies, you no longer have to collect that fee, but you now have to pay it "on behalf of the end users." As a result, the phone companies themselves now owe the fee instead of low-income Kentuckians.

Not so fast said the phone companies. We believe federal law controls and preempts. Hence, this lawsuit. Ultimately, because the phone companies are correct in at least one of their arguments, the Board's Motion to Dismiss [R. 7] is **GRANTED IN PART**.[1] Further, CTIA's requests for permanent injunction, declaratory action, and attorney's fees are **GRANTED**.

**I**

The federal Lifeline program was established in 1985 by the Federal Communications Commission and makes it possible for low-income families to have access to phone and communication services. [R. 10 at 3.] Kentuckians enrolled in the Lifeline program receive "free" basic services consisting of a cellular phone connection, text messaging, and a specified amount of broadband internet access. [R. 10 at 4.] Several major telephone service providers, including TracFone Wireless, Inc. and T-Mobile USA, Inc., offer and provide Lifeline services at no cost to qualifying, low-income customers. *Id.* at 3. Although eligible participants do not pay any consideration for Lifeline services, both the federal and Kentucky state government provide subsidies to service providers enrolled in the Lifeline program.[2] [R. 7-1 at 2; R. 10 at 4.] Moreover, several Lifeline providers are members of CTIA—The Wireless Association, a non-profit organization which styles itself as an organization that "vigorously advocates at all levels of government for policies that foster continued wireless innovation and investment." [R. 1 at 4.]

Separately, every Kentuckian has access to 911 emergency services. 911 services are funded by federal and state subsidies and the payment of a seventy-cent monthly fee charged to each person enrolled in a phone plan in the state. [R. 7-1 at 3; KRS 65.7635(1).] This seventy-cent monthly fee is charged to the phone bill of those enrolled in a traditional cell phone service

---

[1] Though there are multiple Defendants in this case, including many state officials in their official capacities, the Court refers to Defendants as "the Board" throughout this Opinion.
[2] The federal government pays up to $9.25 per month per eligible customer, while the Kentucky government pays an additional $3.50 per month per eligible customer. [R. 7-1 at 2; R. 10 at 4.]

2

contract and is collected at the point-of-sale for those who purchase prepaid cell phone plans. [R. 10 at 5.] Prior to 2020, those enrolled in a Lifeline plan were required to independently pay the seventy-cent fee. *Id.* To permit payment, Kentucky law allowed wireless service providers to act as a "conduit or 'collection agent'" to collect the fees but mandated that providers "had 'no obligation to take any legal action to enforce the collection of the service charge' against the end user." [R. 10 at 5.] Upon the failure of a party to pay the fee, "the State, on behalf of Defendants, was statutorily authorized to pursue a collection against end users." *Id.*

In 2018, however, Congress Enacted 47 U.S.C § 1510, the Wireless Telecommunications Tax and Fee Collection Fairness Act. The Fairness Act, in relevant part, limits the ability of a State to require an out-of-state person to collect from, or remit on behalf of, any other person a state or local tax, fee, or surcharge. *See* 47 U.S.C. § 1510.

In response to the Fairness Act, the Kentucky legislature amended KRS 65.7636 through HB 208. The amendment, signed into law in 2020, mandates that "Lifeline providers (1) are [now] directly liable for the charge, (2) may not pass the charge on to users, and (3) do not remit the charge on behalf of anyone else." [R. 7-1 at 4; KRS 65.7636(1)-(4).] Additionally, Lifeline providers are not permitted to use any part of the federal Lifeline subsidy to pay the service charge. KRS 65.7636(5).

Now, CTIA, on behalf of its members, has filed suit against the Kentucky Services 911 Board, alleging that the amended KRS 65.7636 is preempted by various federal statutes and violates the Equal Protection, Due Process, and Takings Clauses. [R. 1.] CTIA seeks a declaratory judgment that KRS 657636 is invalid and a permanent injunction barring enforcement of the statute. [R. 1 at 21-23.] Additionally, CTIA seeks an award of attorneys' fees under 42 U.S.C. § 1988. *Id.* at 21. In response, the Board seeks dismissal under Rule 12.

3

Specifically, the Board alleges that CTIA lacks and improperly pled associational standing, that a clause found in 47 U.S.C. § 615a-1 prevents preemption, that no statute CTIA references conflicts with KRS 65.7636, that CTIA's constitutional claims were improperly pled, and that attorneys' fees are improper. [R. 7-1; R. 13.] The Court will address each argument in turn.

A

The Court first turns to the Board's arguments that CTIA lacks associational standing to bring its claims and that CTIA improperly pled associational standing. [R. 7-1 at 5-8.] "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union v. Brock*, 477 U.S. 274, 281 (1986). To have associational standing, an association must show that (1) one of its members would have standing to sue in its own right, (2) the relief it seeks is germane to its purpose, and (3) none of its members need to participate in their individual capacity. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As to the first element, like any Article III standing inquiry, an association must show that one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). "The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements." *Whitmore v. Arkansas*, 495 U.S. 149 (1990).

The Board first argues that CTIA failed to plead facts that its members would suffer an "injury in fact." [R. 7-1 at 7.] Though the Board states that CTIA pled an "overarching conclusion that at least one member would have standing," it argues that this statement, alone, is insufficient to survive a Motion to Dismiss. Next, the Board states that CTIA "also insufficiently pleads the second and third associational standing elements" and that CTIA simply recites the

4

elements of associational standing in its Complaint without supporting its legal conclusions with facts. *Id.* Finally, the Board argues that, regardless of any insufficiency of the pleadings, CTIA does not have associational standing because one of its members, TracFone, needs to participate in its individual capacity. *Id.* at 7-8. The Board state that, when TracFone applied for Kentucky Universal Service Funds, the company "agreed to 'contribute to appropriate 911 emergency service authority in accordance with current Kentucky law, specifically KRS 65.7634, governing support for funding of 911 services." *Id.* As a result, the Board argue that TracFone has "waived all challenges to the charges CTIA might bring on their behalf"[3] and, that TracFone's participation in this litigation is therefore necessary.[4]

In opposition, CTIA argues that it has sufficiently pled each element of associational standing. [R. 10 at 8-11.] Regarding injury in fact, CTIA states that it pled that T-Mobile and TracFone are both out-of-state service providers and that both companies "are subject to the CMRS[5] service charge amended by HB 208 and will suffer an 'injury in fact' due to the Board's enforcement of HB 208 without judicial intervention." *Id.* at 9. Next, CTIA argues that it has sufficiently pled that the relief it seeks, a declaratory judgment and permanent injunctive relief, are germane to its purpose and that no individual member needs to be present in this litigation. [R. 10 at 10.] Finally, CTIA argues that any potential waiver of claims by TracFone cannot impact this litigation because KRS 65.7636, the statute challenged in this litigation, had not even

---

[3] However, the Board acknowledges that, in 2017 when TracFone agreed to contribute to 911 emergency services, KRS 65.7636, the statute at issue in this litigation, had not yet been signed into law; instead, the relevant legislation that TracFone allegedly agreed to follow was KRS 65.7634, which governs prepaid service charges. *See id.* The Board does not argue that any other member of CTIA has signed similar waivers; instead, it argues that all members' individual participation is necessary to determine whether any additional waiver of claims has occurred.
[4] The Board also asserts that the individual participation of all the members of CTIA is necessary to determine whether any other members have "waived" their claims. [R. 7-1 at 8.]
[5] Parties occasionally refer to the 911 service charge as the CMRS service fee, which stands for the Commercial Mobile Radio Service fee. [*See* R. 1 at 4.]

been enacted at the time TracFone allegedly waived its claims. *Id.* at 10. Moreover, CTIA argues that TracFone could not have agreed to follow a state law in conflict with federal law because the conflicting state law "cannot be considered law at all." *Id.* at 1 (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("a legislative act contrary to the constitution is not law […]").

The Court agrees that standing exists here. Although CTIA's pleading does not allege facts related to associational standing in the most organized manner, the Court is able to connect CTIA's pled facts to its argument that it has associational standing. First, CTIA sufficiently pleads that one of its members would have standing to sue in its own right. CTIA's Complaint indicates that its members would be subjected to an unconstitutional financial burden and that, without the Court's intervention, its members will suffer irreparable injury. [*See* R. 1 at ¶¶ 58, 74, 83, 92, 99; *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an interion to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.")

Second, although CTIA weakly connects its organization's purpose to the relief it seeks, a link between the two is not difficult to ascertain. CTIA clearly states that its purpose is to "vigorously advocate[] at all levels of government for policies that foster continued wireless innovation and investment." [R. 1 at ¶ 9.] The relief it seeks is declaratory action and a permanent injunction against a law which requires providers to pay money that otherwise would be invested into innovation. *See id.* Thus, CTIA's pled purpose and the relief it seeks are rationally connected. *Id.* at ¶ 58.

6

Finally, CTIA has sufficiently pled that an injunction will benefit its members and that no individual member's participation is necessary in this litigation. *See id.* Additionally, the Court is unpersuaded that TracFone's alleged "waiver" of claims, which occurred before the statute in dispute was signed into law, requires TracFone and each member of CTIA to participate in this matter. Though TracFone may have agreed to help provide funding for 911 services, KRS 65.7636 now requires Lifeline providers to personally pay 911 fees instead of acting as a conduit through which end users could pay the fee. Thus, TracFone, and any other provider, could not have agreed to abide by a system of fee payment which did not yet exist at the time of "waiver." As a result, the Court finds that CTIA has sufficiently pled associational standing as to withstand dismissal. Consequently, upon analysis of each pled factor, the Court finds that CTIA has associational standing on behalf of its members to bring forth this challenge.

B

Next, the Court turns to the Board's arguments that dismissal under Rule 12(b)(6) is appropriate because KRS 65.7636 is not preempted by any federal statute. [R. 7-10 at 10-22.] A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a plaintiff's complaint. In reviewing a Rule 12(b)(6) motion, the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all inferences in favor of the plaintiff." *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The Court, however, "need not accept as true legal conclusions or unwarranted factual inference." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).

The Supreme Court has explained that in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868

7

(2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). *See also Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 ( 6th Cir. 2009). Stated otherwise, it is not enough for a claim to be merely possible; it must also be "plausible." *See Courie*, 577 F.3d at 630. According to the Court, "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

When, at the Motion to Dismiss Stage, one party alleges that state law is preempted by federal law and, in response, the opposing party alleges that relief cannot be granted because preemption is not present, the Court must make a legal determination as to the existence of preemption. Federal preemption derives from the Supremacy Clause of the United States Constitution. The Constitution establishes the laws of the United States as "the Supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl.2. Thus, state laws that conflict with federal laws or regulations are preempted. *E.g., Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S. Ct. 1185, 55 L. Ed. 2d 443 (1978). A court considering a preemption challenge "is not to pass judgment on the reasonableness of state policy," but "is instead to decide if a state rule conflicts with or otherwise stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the federal law." *Livadas v. Bradshaw*, 512 U.S. 107, 120, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994) (citations omitted).

Preemption can be either express or implied. When Congress declares a clear intent to preempt state law, express preemption is found. *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985); *see also State Farm Bank, FSB v. Reardon*, 539 F.3d 336, 341-42 (6th Cir. 2008) (explaining that express preemption exists

8

"where either a federal statute or regulation contains explicit language indicating that a specific type of state law is preempted"). Implied preemption contains both conflict preemption and field preemption. *Reardon*, 539 F.3d at 342. Conflict preemption is present "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Field preemption exists when "the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.*

1

CTIA's Complaint alleges that KRS 65.7636 is preempted by three federal statutes: 47 U.S.C. § 254(f), 47 U.S.C. § 332(c)(3), and 47 U.S.C. § 1510(c)(1). [R. 1 at 12-19.] In response, the Board argues that KRS 65.7636 does not conflict with those statutes and that "[s]tate 911 charges are exempt from any preemptive effect of the Communications Act of 1934, other federal telecommunications statutes, and FCC regulations" under 47 U.S.C. § 615a-1(f)(1). [R. 7-1 at 10-11.] The Court first turns to the Board's argument that state 911 charges are exempted from preemption under Section 615a-1(f)(1).

47 U.S.C. § 615a-1(f)(1) reads as follows:

> Nothing in this Act, the Communications Act of 1934 (47 U.S.C. 151 et seq.), the New and Emerging Technologies 911 Improvement Act of 2008, or any Commission regulation or order shall prevent the imposition and collection of a fee or charge applicable to commercial mobile services … specifically designated by a State … for the support or implementation of 9-1-1 or enhanced 9-1-1 services, provided that the fee or charge is obligated or expended only in support of 9-1-1 and enhanced 9-1-1 services, or enhancements of such services, as specified in the provision of State or local law adopting the fee or charge.

47 U.S.C. § 615a-1(f)(1). The Board states that this provision "expressly allows state 911-service charges and bars their preemption" and that, because "[t]he service charge

imposed by HB 208 is solely for the support or implementation of 911 and enhanced 911-services," it falls under the purview of the provision.[6]  [R. 7-10 at 10.]

In response, CTIA argues that the Board "cite[s] to no cases applying § 615a-1(f)(1) as broadly as they propose here to override specific preemption provisions" and further argue that Section 615a-1(f)(1) is simply a savings clause included in Chapter 47 "to ensure parity between IP-enabled voice services subscribers and telecommunications subscribers with regard to 9-1-1 charges." *Id.* at 16.  Additionally, CTIA states that the Board's rationale that Section 615a-1(f)(1) is designed to completely prevent service providers from limiting a state's ability to collect 911 fees is too broad and would allow states to require service providers to pay large portions of their subsidies in fees.  Finally, CTIA argues that Section 615(a)-1(f)(1) is not in conflict with Sections 254(f), 332(c)(1), and 1510(c)(1) because the federal provisions do not "prevent the imposition and collection of a […] charge applicable to commercial mobile services […] for support of […] 911 services," and, instead, only require states to adhere to federal standards when implementing a process by which 911 fees are collected.[7]  [R. 10 at 18.]

The Court agrees that Section 615(a)-1(f)(1) has no impact on its preemption claims. First, the Board has cited to no case law which indicates that Section 615(a)-1(f)(1) is to be read

---

[6] The Board concedes, however, that this argument likely only applies to 47 U.S.C. § 254(f) and 47 U.S.C. § 332(c)(3) because 47 U.S.C. § 1510(c)(1) "may technically constitute an act separate from the Communications Act […]."  [R. 7-10 at 11 n.8.]

[7] CTIA also argues at length that the Court should minimize the scope of the savings clause and that canons of statutory interpretation require the Court to limit the impact of Section 615a-1(f)(1) because it is a "general" statute which cannot override "specific" statutes (which CTIA alleges Section 254(f), 332(c)(1), and 1510(c)(1) to be).  [R. 10 at 16-18.]  In response, the Board argues that the clause is not a savings clause but is a "notwithstanding clause" and that the clause's inclusion in Chapter 47 was designed to prevent any unintended impact on a state's ability to collect 911 fees by other legislation in the Chapter.  [R. 13 at 6-8.]  The Court declines to address these arguments because it finds Section 615-1(f)(1) to have no impact on this dispute based on the plain language of the statute.

broadly to prevent subsequent federal law from limiting how a state collects its 911 service fees. Additionally, the Court agrees that a broad reading of Section 615a-1(f)(1), as the Board proposes, would allow states to impose extreme requirements, like the taking of large portions of the service providers' subsidies, in the name of "collecting fees for 911 services." Finally, a clear reading of 615a-1(f)(1) indicates that the purpose of the clause is to clarify that no further clause in Chapter 47 is intended to prevent the collection of 911 fees. However, a complete prevention of the collection of fees is not the equivalent of forbidding federal law from placing limitations and guidelines upon the collection process itself. Overall, the Court finds that Section 615a-1(f)(1) has no impact on the preemption analysis in this dispute.

2

Next, the Court turns to the Board's argument that 47 U.S.C. § 254(f) does not preempt KRS 65.7636, as CTIA alleges in its Complaint. [R. 1 at 14-17; R. 7-10 at 15-20.] Section 254(f), a provision of the Communications Act of 1934, "allows states to create and fund their own universal service programs[8] as a complement to the federal program." [R. 7-1 at 15 (citing *WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1277 (10th Cir. 2007); *AT&T Corp. v. Pub. Util. Comm'n of Texas*, 373 F.3d 641, 644 (5th Cir. 2004)). Section 254(f) states as follows:

> **(f) State authority.** A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

---

[8] Both federal and state universal service programs are designed to collect fees from those enrolled in phone plans to fund subsidized phone plans for low-income citizens through programs such as Lifeline. [R. 7-1 at 2; R. 10 at 4.]

11

47 U.S.C. § 254(f). In its Complaint, CTIA splits Section 254(f) into four requirements: that state regulations "(i) 'do not rely on or burden Federal universal service mechanisms,' (ii) require contributions on an 'equitable and nondiscriminatory basis,' (iii) [are] 'not inconsistent with the [FCC's] rules to preserve and advance universal service,' and (iv) adopt 'predictable' mechanisms for supporting universal service. Any state law or regulation that is inconsistent with any one of these four requirements is preempted." [R. 1 at ¶ 64.] Although the Board agrees with CTIA's characterization of Section 254(f)'s requirements, it argue that the scope of Section 254(f) does not cover KRS 65.7636. Instead, the Board states that Section 254(f) is designed to prevent a state's universal service program from interfering with the federal universal program and because KRS 65.7636 "concerns only a 911-service charge" and does not dictate how Kentucky's universal service program functions, Section 254(f) has no preemptive effect.[9] [R. 7-1 at 15.] Alternatively, the Board argues that none of the four requirements Section 254(f) imposes are impacted by the amendments to KRS 65.7636.[10] *Id.* at 16-20.

---

[9] The Board essentially argues that KRS 65.7636 is about the collection of a fee, not the manner by which Kentucky's universal service program functions. The Board characterizes Section 254(f) as only requiring state law to require state's universal service programs to co-exist with the federal program without disruption. [*See* R. 7-1 at 15.]

[10] Although both parties argue at length about whether KRS 65.7636 violates the four requirements of Section 254(f), the Court declines to analyze this argument because Section 254(f) only limits a state's ability to pass laws that burden the federal universal service program system. While the passage of a law which requires service providers to pay a .70 fee per user does create a financial "burden" on a service provider and may consequently impact its ability to contribute to the federal universal fund system, Section 254(f) cannot be read so broadly as to forbid the passage of any law, including the passage of taxes and fees, which may incidentally burden a service provider's ability to contribute. Instead, Section 254(f) is clearly intended to prevent a state's regulations from running afoul of the operations of the federal universal fund system. If a regulation were to severely limit the ability of a service provider to contribute to the federal fund, an argument could potentially be made that the regulation would be preempted. Here, however, the burden is not so strong as to rise to the type of legislation that Section 254(f) was designed to forbid.

In response, CTIA references case law describing the purpose of Section 254 as "the preservation and advancement of universal service" and describes the 911 service fee requirement as a state regulation that "diverts support" from the Lifeline program. [R. 10 at 21-22. (citing *Virgin Mobile USA, L.P. v. Keen*, WL 1166228, at *13 (D. Kan. Mar. 11, 2020).] Additionally, CTIA argues at length that each of the four proscriptions found in Section 254(f) are violated by Kentucky's amendment of KRS 65.7636. [R. 10 at 23-27.]

Again, the Court agrees that preemption is not at work here. The plain language of Section 254(f) allows a state to establish its own universal service program as a compliment to the federal system but forbids any state from enacting regulations which conflict with and interrupt the processes of the federal system. *See* 47 U.S.C. § 254(f). Although the parties argue at length whether KRS 65.7636 violates any of the four proscriptions, the Court need not analyze these arguments because Section 254(f) only concerns regulations relating to the processes by which a state's universal system fund operates. In this case, Kentucky has enacted a statute which requires Lifeline providers to pay a fee to support 911 services. This fee, while perhaps impacting the pocketbook of service providers, has no relation to the manner by which Kentucky operates its universal service fund. CTIA's argument that, by requiring service providers to pay a fee to support 911 services, Kentucky therefore burdens the ability of service providers to contribute to the federal universal service fund, is too broad and would encompass any requirement Kentucky decides to place onto service providers which arguably impact the providers' finances. Section 254(f) cannot be read this broadly. As a result, Count II of CTIA's Complaint is **DISMISSED**.

**3**

The Court now turns to the Board's argument that 47 U.S.C. § 332(c)(3) does not preempt KRS 65.7636, as is alleged in Count III of CTIA's Complaint. [R. 7-1 at 20-22; R. 1 at 17-19.] Section 332(c)(3) is a "broad preemption clause" that "wholly preempts state regulation of the rates and entry of mobile wireless providers." [R. 10 at 27 (citing *McKinney v. Google, Inc.*, 2010 U.S. Dist. LEXIS 144800 at *28 (N.D. Cal. 2010))]. Section 332(c)(3) states that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service […]." 47 U.S.C. § 332(c)(3). CTIA alleges that "[b]ecause KRS 65.7636 as amended by 2020 HB 208 requires each Lifeline provider to remit the CMRS service charge of $0.70 per month per unique end user of the Lifeline program […] but prohibits the use of any moneys received for participation in the Lifeline program to pay for any portion […]" the law "improperly regulates the rates charged by a mobile service and regulates entry by imposing a burden to entry." [R. 1 at 18 ¶¶ 81-82.]

In opposition, the Board first states that "HB 208 in no way regulates entry of any service provider into the Kentucky market." [R. 7-1 at 21.] It argue that "[i]f that were the case, then all 911-service charges would be a barrier to entry. Indeed, any tax, fee, or other regulation that affected wireless providers would affect entry into the market under that theory, because it would increase the costs of doing business in Kentucky." *Id.* Moreover, the Board state that CTIA's theory is undermined by both Congress and the FCC's express approval for states to recovery enhanced-911 costs through the collection of fees and permission for states to require Lifeline providers to contribute to universal service funds. *Id.* at 21-22. Finally, the Board argues that HB 208 does not regulate the rates Lifeline providers can charge because it requires the providers themselves to pay 911 fees, not that providers must require end users to pay the fee and

14

that, moreover, if any fee imposed on a provider is deemed a regulation of the rates a provider must charge, a state could not tax providers in any scenario. *See id.*

In response, CTIA argues that KRS 65.7636 does regulate the entry of service providers into Kentucky and regulates the rates service providers charge in the state because, by requiring providers to cover the $0.70 fee per end user in the state, providers are forced to increase their rate which "imposes a burden to entry as prohibited by Section 332(c)(3)(A)." [R. 10 at 27-28.] Additionally, CTIA states that all case law the Board references is irrelevant. *Id.* at 28-29.

Here, too, preemption does not frustrate the Kentucky statute. Section 332(c)(3) is designed to prevent a state from creating a barrier to entry or regulating the rates that a service provider can charge end users. *See* 47 U.S.C. § 332(c)(3). Despite CTIA's thoughtful argument, the Court is not convinced that Section 332(c)(3) can be read so broadly as to prevent any incidental effects on entry or rates that a statue might impose. KRS 65.7636 is not designed to regulate entry into the Kentucky service provider market or the rates that a provider can charge in the state. Instead, the statute requires service providers to pay a fee to support 911 services in the state. Though the payment of a fee, like the payment of any fee or tax, might incidentally affect whether a provider decides to enter into the state or the rates that a provider may need to charge to recover the cost of the fee, Section 332(c)(3) cannot be read as to broadly prevent any effect in these areas. If the Court were to find as such, any tax or regulation with an incidental effect on service providers' cost of operation would be deemed preempted under 332(c)(3). Accordingly, Count III of CTIA's Complaint is **DISMISSED**.

**4**

The Board next argues that the Wireless Telecommunications Tax and Fee Collection Fairness Act of 2018, 47 U.S.C. § 1510, does not preempt KRS 65.7636, as alleged in Count I of CTIA's Complaint. [R. 7-1 at 11-15; R. 1 at 12-14.] The Fairness act, in relevant part, states:

> **(1)** In general. A State, or a local jurisdiction of a State, may not require a person who is neither a resident of such State or local jurisdiction nor an entity having its principal place of business in such State or local jurisdiction to collect from, or remit on behalf of, any other person a State or local tax, fee, or surcharge imposed on a purchaser or user with respect to the purchase or use of any wireless telecommunications service within the State unless the collection or remittance is in connection with a financial transaction.

47 U.S.C. § 1510(c)(1). In its Complaint, CTIA alleges that Section 1510(c)(1) is controlling because "end users participating in the Lifeline program who are enrolled in the Free Lifeline Only Service Plan give no consideration to the Lifeline provider." [R. 1 at ¶ 51.] CTIA argues that "[b]ecause KRS 65.7636, as amended by HB 208, requires each Lifeline provider to remit the CMRS charge […] on behalf of the CMRS users […] despite the absence of a financial transaction in a Free Lifeline Only Service plan" the law conflicts with Section 1510(c)(1) and is therefore preempted. *See id.* at ¶ 55.

In opposition, the Board argues that the purpose of HB 208's amendments to KRS 65.7636 was to comply with Congress's enactment of the Fairness Act. [*See* R. 7-1 at 11.] Though the Board agrees that Lifeline users enrolled in the Free Lifeline Only Service Plan[11] do not engage in a financial transaction and that Section 1510 is controlling, it disagrees that service providers are "collecting from, or remitting on behalf of" end users by paying the $0.70 fee per user themselves. *See id.* at 12. The Board states that the previous version of KRS 65.7636

---

[11] Though some end users participate in the prepaid and postpaid services plan, the fees those users pay are not in dispute here because the users themselves, not the service providers, pay the 911 fee. Postpaid and prepaid users are distinct from the users enrolled in the Free Lifeline Only plan. *See* KRS 65.7621(10).

16

"allowed Lifeline providers to pass the charge on to users" and that each provider acted as "'a collection agent of the service charge.'" [R. 7-1 at 12 (citing KRS 65.7636(3) (2016)).] As a result of HB 208, the Board argues that service providers no longer "collect from" "remit on behalf of" of end users because the service providers themselves are liable for the fee, not the end users.[12] [R. 7-1 at 13.

      CTIA responds that it is inconsequential that Lifeline service providers are now required to pay the 911 fee instead of end users because, regardless of who pays the fee, the end users receive the benefit of the payment and have thus been "remit[ed] on behalf of." [*See* R. 10 at 19.] CTIA states that, although "[t]he Fairness act does not define the phrase 'on behalf of,'" other courts interpreting similar regulations state the plain meaning of "on behalf of" to mean "an act by a representative, or an act for the benefit of, another." [R. 10 at 19 (citing *United States v. Dish Network, L.L.C.*, 667 F.Supp.2d 952, 963 (C.D. Ill. 2009)); *see also* on behalf of someone, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary (last visited March 12, 2021) (defining "on behalf of" as "a representative of someone" or "for the benefit of someone").] CTIA argues that a service provider paying 911 fees on behalf of an end user clearly provides a benefit to the end user who no longer must pay the fee. [R. 10 at 19.]

      Here, CTIA is correct. Though the Board alleges that Kentucky's intention in enacting HB 208's amendments to KRS 65.7636 was to comply with Section 1510, the state has failed to do so. Prior to enacting these changes, KRS 65.7636 simply allowed Lifeline service providers

---

[12] Additionally, the Board argues at length that the legislative history behind HB 208 indicates that the purpose of the statute was to make Lifeline service providers liable for 911 fees instead of end users, thereby establishing that the service providers are not "collecting from" or "remitting on behalf of" end users. [R. 7-1 at 14-15.] The Court need not analyze the legislative history behind the amendment to KRS 65.7636, however, because it is clear from the plain language of the statute that service providers are "remitting on behalf of" end users, even if the service providers themselves are required to pay 911 fees in place of end users.

to act as a conduit through which end users could pay 911 service fees; it did not require service providers to collect the fee from end users nor did it require service providers to engage in collection practices if end users failed to pay 911 service fees. See KRS 65.7636 (2016). Now, however, KRS 65.7636 requires Lifeline service providers to "remit on behalf of" end users by paying 911 service fees on behalf of end users enrolled in the Lifeline Free Only Service Plans, without the presence of a financial transaction. This payment clearly provides a benefit to end users because end users do not have to pay a fee that, until KRS 65.7636 was enacted, they were required to pay.[13] As a result, the Court finds that, because KRS 65.7636 conflicts with the Fairness Act, the law is preempted. Accordingly, CTIA's requests for Declaratory Action, Judgment, and Permanent Injunction are **GRANTED**.

### C

The Court now turns to CTIA's arguments that KRS 65.7636 violates the Constitution's Equal Protection Clause, Takings Clause, and Due Process Clause, and CTIA's request for attorney's fees under § 1988. [R. 1 at 19-21.] The Board opposes each argument and states that an award of attorney's fees would be improper in this matter because no claim CTIA brings gives rise to the violation of a federal right under § 1988 [R. 7-10 at 8-9, 22-30.] Having determined that KRS 65.7636, as amended by HB 208, is preempted by federal law, the Court need not determine the merits of CTIA's remaining claims because declaratory action and a permanent injunction has already been granted and CTIA does not seek damages. However, the

---

[13] Moreover, although parties do not define the term "remit," the Merriam-Webster Dictionary defines one usage of the term as "to send (money) to a person or place especially in payment of a demand, account, or draft. See Remit, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/remit (last visited March 12, 2021). Thus, "to remit on behalf of" means to make a payment on behalf of.

Court can still analyze CTIA's request for attorney's fees because it has found KRS 65.7636 to be preempted by federal law.

The Board argues that, because no federal right has been violated in this case and preemption under the Supremacy Clause does not give rise to a §1983 claim, attorneys' fees under § 1983 are improper. [R. 7-1 at 8-9.] CTIA responds that "Defendants skipped over CTIA's assertion of claims for violation of its federal equal protection and due process rights (and Takings Clause rights)" and that "[t]hese constitutional claims pled by CTIA undoubtedly come within § 1983." [R. 10 at 12.] Although the Court agrees that a finding of preemption under the Supremacy Clause does not give rise to a §1983 claim, the Court can still award attorney's fees because it has found KRS 65.7636 to be preempted by federal law and CTIA has pled constitutional claims. As the Fifth Circuit explains,

> We have previously addressed situations where a plaintiff brought a § 1983 claim that supports a grant of attorney's fees and another claim that does not, and the court found in favor of the plaintiff on the non-fee bearing claims but did not address the § 1983 claim. Recognizing that courts will often justifiably refrain from addressing a constitutional question where it can be avoided, we have held that such a plaintiff may obtain attorney's fees even though the § 1983 claim was not decided "provided that 1) the § 1983 claim of constitutional deprivation was substantial; and 2) there successful pendant claims arose out of a common nucleus of operative fact.

*Planned Parenthood v. Sanchez*, 480 F.3d 734, 739 (5th Cir. 2007); *see also Rogers Group, Inc. v. City of Fayetteville*, 683 F.3d 903, 913 (8th Cir. 2012) ("we hold that Rogers Group is a 'prevailing party' entitled to an award of attorneys' fees pursuant to § 1988, even though the district court never reached its § 1983 claims.'"). Here, because CTIA's claims of constitutional deprivation were substantial, (alleging that providers would be subjected to excessive fees arising to the level of an unconstitutional taking without equal protection or due process) and

arose out of common nucleus of operative fact as its Supremacy Clause claims, attorney's fees can be properly awarded.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Board's Motion to Dismiss [R. 7-1] is **GRANTED IN PART** and **DENIED IN PART**;

2. Count II and Count III of CTIA's Complaint are **DISMISSED**;

3. CTIA's request for a declaration and judgment that 2020 HB 208 conflicts with and is preempted by federal law is **GRANTED**;

4. CTIA's request for a permanent injunction and restraint against the E911 Board, its administrator, and its board members from enforcing or authorizing third-parties to enforce 2020 HB 208 is **GRANTED**;

5. A judgment and scheduling order regarding attorney's fees will follow the filing of this Order.

This the 29th day of March, 2021.

Gregory F. Van Tatenhove
United States District Judge