**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | |
|---|---|
| CTIA - THE WIRELESS ASSOCIATION | ) |
| | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. 3:20-CV-00043-GFVT |
| KENTUCKY 911 SERVICES BOARD; | ) |
| JOSIAH KEATS, in his official capacity as | ) |
| Chair of the Kentucky 911 Services Board; | ) |
| MIKE SUNSERI, in his official capacity as | ) |
| administrator of the Kentucky 911 Services | ) |
| Board; and | ) |
| UNKNOWN BOARD MEMBERS, in their | ) |
| official capacity as board members of the | ) |
| Kentucky 911 Services Board | ) |
| | ) |
| Defendants | ) |
| | ) |

## PLAINTIFF CTIA – THE WIRELESS ASSOCIATION'S
## MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, Plaintiff, CTIA – The Wireless Association ("CTIA"), by counsel, moves this Court for summary judgment against Defendants, Kentucky 911 Services Board ("Board"), Josiah Keats, in his official capacity as Chair of the Board, Mike Sunseri, in his official capacity as administrator of the Board, and the unknown board members, in their official capacity as members of the Board (collectively "Defendants"). CTIA should be awarded summary judgment as a matter of law because KRS 65.7636 as amended by 2020 Ky. Acts c. 37 § 1 (2020 HB 208) ("HB 208") is preempted by federal law. By uniquely shifting the burden of Kentucky's 911 emergency services fee directly onto Lifeline providers, the Kentucky statute conflicts with the universal service objectives and purposes of Sections 151, 254 and 1510 of the Communications Act, as well as FCC decisions implementing that Act. Indeed, for providers seeking to offer only free Lifeline services, compliance with state and federal law is simply impossible, which provides further grounds for

22991546

preemption. In addition, because it specifically targets Lifeline carriers for different treatment, KRS 65.7636, as amended, violates the Equal Protection Clause, the Takings Clause, and due process.

## **INTRODUCTION**

As the non-profit advocate and voice for our nation's wireless communications industry, CTIA is committed to enabling Americans to lead a 21st century, connected life. CTIA's members and member-affiliates provide a range of wireless services to end users, including commercial mobile radio service ("CMRS").

For decades, the U.S. federal government has recognized the importance of promoting the objective of universal communications service for all Americans; indeed, providing for a Nationwide telecommunications system for "all of the people of the United States" was one of the founding purposes of the Federal Communications Commission ("FCC"). 47 U.S.C. § 151. Over the years, one of the ways in which Congress and the FCC have pursued this critical national objective is by enacting and funding the Lifeline program, which provides a subsidy from the United States Treasury to Lifeline carriers for each participating low-income household in order to assist with the purchase of basic communications services. Congress and the FCC have enacted federal legislation and issued decisions, respectively, to ensure that the accompanying subsidy stretches as far as possible to further universal service. 47 U.S.C. §§ 151 & 254. As a result, Lifeline funds may only be used for providing Lifeline services, and have historically been intended to offset only very specific costs.

Lifeline plans are singularly important to vulnerable and disadvantaged customers, who may not have access to bank accounts or other financial products, and who may not even have a fixed address to which bills could be sent. In Kentucky, over 100,000 households receive CMRS service through Lifeline.[1] This subsidy allows Lifeline providers to offer affordable plans, including offerings

---

[1]   Doc. # 53 (Agreed Stipulations), ¶ 8 (recognizing that in 2020 "CMRS providers, including multiple CTIA members and member affiliates, provided wireless Lifeline service to (Continued…)

that impose no cost at all on the end user, and for which no service initiation fee or subsequent billing relationship is necessary for the end user to receive service ("Free Lifeline Only Service").

The Lifeline program, and especially Free Lifeline Only Service plans, represent a critical – and uniquely effective – tool for achieving universal service. In 2018, Congress recognized the importance of these plans by enacting the Telecommunications Tax and Fee Collection Fairness Act of 2018 ("Fairness Act"). The Fairness Act helped ensure the continued availability of Free Lifeline Only Service by forbidding states from imposing charges on telecommunications customers that would require carriers to establish a billing relationship with each individual customer. The stated objective of the Fairness Act was thus to "limit[] excessive and needless obstacles to wireless".[2]

While Kentucky's provision of 911 services also serves important public interest objectives, the state has sought to do so at the expense of the Lifeline program. Kentucky's 911 fee statutes (statutorily named "CMRS service charges") have historically required providers to serve as a "collection agent" of 911 fees on end users. KRS 65.7621, *et seq*. In response to the Fairness Act, which preempted fees of this kind, the Kentucky legislature amended KRS 65.7636 in 2020 to: (1) remove the "collect from" aspect of KRS 65.7636 that was expressly at odds with the Fairness Act in an admitted attempt to circumvent the Fairness Act; (2) require Lifeline providers to pay a monthly $0.70 per Lifeline end user CMRS service charge (911 fee); **and**, (3) prohibit Lifeline providers from using Lifeline funds to pay that 911 fee in an attempt to circumvent arguments that the fee undercut the federal Telecommunications Act's goal of universal service.[3]

---

approximately …100,000 … Kentuckians); Doc. # 53, ¶ 18 (recognizing that as of December 2022, "the number of mobile Lifeline subscribers in Kentucky was approximately 125,000").

[2]   *See* US Code Title 47, Chapter 14 (entitled "making opportunities for broadband investment and limiting excessive and needless obstacles to wireless").

[3]   KRS 65.7636(5)'s prohibition on a Lifeline provider's use of Lifeline funds to pay 911 fees raises serious questions. First, money is fungible. *See AEP Indus., Inc. v. B.G. Props., Inc.*, 533 S.W.3d
(Continued…)

22991546

The Defendants' lobbied-for revisions to KRS 65.7636 were necessary to avoid, in form, the express preemptive effect of these two federal Acts, but they cannot save HB 208 from the preemptive effect of the whole of the federal Acts and their policy objective – universal service. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992). KRS 65.7636's $0.70 per Lifeline end user CMRS service charge (911 fee) imposed on Lifeline providers directly increases the cost of providing Lifeline service to each and every Lifeline end user in Kentucky and thus erects an obstacle to the Telecommunications Act's universal service goals [47 U.S.C. §§ 151 & 254] as supported by the Fairness Act [47 U.S.C. § 1510], which requires the existence of a financial transaction in order to allow a state to impose a collection obligation for a telecommunications tax, fee or surcharge. Likewise, KRS 65.7636 also makes it impossible for a provider to solely offer Free Lifeline Only Service without violating 47 U.S.C. § 254(e)'s express direction to use Lifeline funds only for the provision of Lifeline services or KRS 65.7636's requirement that Lifeline providers pay a $0.70 per Lifeline end user 911 fee; a provider offering solely Free Lifeline Only Service cannot do both.

Furthermore, because KRS 65.7636, as amended, specifically targets Free Lifeline Only Service providers and imposes fees that it forbids them from offsetting or collecting, it violates the Equal Protection Clause, the Takings Clause, and due process.

## STATEMENT OF FACTS AND BACKGROUND

The parties have stipulated to material background facts of this case (Doc. #53).

I. **The FCC Creates and Congress Expands and Codifies the Federal Lifeline Program.**

The FCC was created by the Communications Act of 1934 "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States … a rapid, efficient, Nation-wide, and world-wide wire

---

674, 682 (Ky. 2017) (discussing a "fungible sum of money"). Not only does KRS 65.7636(5) impose prohibitions on a Lifeline provider's use of fungible sums of money, it fails to address what funds a Lifeline provider may use, especially if the provider only receives Lifeline subsidies.

4

and radio communication service with adequate facilities at reasonable charges" and "for the purpose of promoting safety of life and property through the use of wire and radio communication", among others. 47 U.S.C. § 151. The FCC has long interpreted these statutory purposes to encompass "a universal service goal" to ensure that telecommunications services are reasonably available to all Americans at all income levels and regardless of where they live. *MTS & WATS Mkt. Structure,* Third Report and Order, 93 FCC.2d 241, ¶ 83 (1983).

After the breakup of AT&T made traditional implicit subsidies unworkable, this universal service goal embodied in the Communications Act led the FCC, in 1985, to establish the federal Lifeline program to ensure that Americans of limited means could access telecommunications services. *MTS and WATS Market Structure, and Establishment of a Joint Board, Amendment*, Report and Order, 50 Fed. Reg. 939-01 (1985); Doc. #53, ¶ 1. Initially, the Lifeline program was created to offset a new "subscriber line charge" ("SLC") that the FCC established following the separation of AT&T interexchange company from AT&T local exchange companies to enable competition in the long-distance market. *Id*. The SLC was an end user charge to reduce the level of access charges that long distance companies had been paying to local exchange carriers ("LEC") for the use of local networks to terminate long-distance calls. *Id.* Recognizing that "[i]n many cases, particularly for the elderly, poor, and disabled, the telephone is truly a lifeline to the outside world," the FCC determined that the SLC should be offset for low-income households, thus establishing the Lifeline program. *Id*. at 941 ¶ 9. The FCC specifically acknowledged that the subsidy for telecommunications providers was necessary because "[a]ccess to telephone service has become crucial to full participation in our society and economy," and "an increase in fixed charges for telephone service" could "cause a significant number of subscribers to cancel service." *Id*. at 941 ¶¶ 8, 9. Establishing Lifeline was "necessary … to ensure the preservation of universal service" and "to prevent degradation of universal service and the division of our society into information 'haves' and 'have nots.'" *Id.* at 941 ¶¶ 9, 11.

22991546

A little over a decade later, Congress adopted the Telecommunications Act of 1996 ("Telecommunications Act"), which was designed to promote competition in telecommunications services. Doc. #53, ¶ 2. The 1996 Act added Section 254 to the Communications Act, which articulated federal universal service principles and imposed requirements for a statutorily codified universal service program, in order to ensure that these universal service programs were explicit, transparent, and competitively neutral. These federal universal service principles include, among others, that "[q]uality services should be available at just, reasonable, and affordable rates," that "[a]ccess to advanced telecommunications and information services should be provided in all regions of the nation," and that "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services[.]" 47 U.S.C. § 254(b)(1)-(3). Section 254 charged the FCC with "establishing … the definition of the services that are supported by Federal universal service support mechanisms." 47 U.S.C. § 254(c)(1). The statute further directed that to fund the universal service program, "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] … to preserve and advance universal service." 47 U.S.C. § 254(d). The FCC has a detailed process in place for assessing contributions to the universal service fund by telecommunications carriers. *See* 47 C.F.R. §§ 54.706-54.713.

In implementing Section 254, the FCC "transformed" the initial Lifeline program into a formal, stand-alone universal service program, using the federal universal service fund ("USF") as the source of the federal subsidy. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019). The FCC administers the Lifeline program through the Universal Service Administrative Company ("USAC"). Doc. #53, ¶ 5; *see* FCC, Universal Service Support Mechanisms, www.fcc.gov/consumers/guides/universal-service-support-mechanisms (listing Lifeline as the first of

four universal service support mechanisms) (last updated December 30, 2019) (a copy of the website is attached as Ex. A). Under the FCC's direction, USAC administers data collection and maintenance, support calculation, disbursements from the U.S. Treasury, and assists consumers with Lifeline eligibility and enrollment. Doc. #53, ¶ 5; *see* FCC, *Lifeline Support for Affordable Communications,* www.fcc.gov/consumers/guides/lifeline-support-affordable-communications (last visited July 28, 2023) (a copy of the website is attached as Ex. B).

To provide Lifeline or other services supported by the USF, a carrier must be "designated as an eligible telecommunications carrier" by the relevant State commission or, as applicable, by the FCC. 47 U.S.C. § 214(e). A "Lifeline provider" under the relevant Kentucky CMRS service charge statutes that fund Kentucky 911 service is a "CMRS provider that the Kentucky Public Service Commission has deemed or deems eligible to participate in the wireless low-income Lifeline program and to receive reimbursement from the universal service fund managed by the [FCC] pursuant to the federal Telecommunications Act of 1996, 47 U.S.C. secs. 151 et seq." KRS 65.7636(1); *see* KRS 65.7621(18).

Since 2012, the FCC has administered the Lifeline program through a uniform per-household subsidy paid to Lifeline providers for non-Tribal subscribers of either $5.25 (for voice-only Lifeline plans) or $9.25 (for plans including broadband), which reflected the average monthly benefit issued for Lifeline subscribers at that time, *i.e.*, in 2012. 47 C.F.R. § 54.403; Doc. #53, ¶ 3; Doc. #53, ¶ 4. The ***federal Lifeline subsidy covers Lifeline providers' monthly service charges*** – ***not*** state or local charges for 911 services.[4] Thus, each month wireless Lifeline providers receive either $5.25 or $9.25

---

[4]   *See* 47 U.S.C. §§ 151 & 254; *Reference Book of Rates, Price Indices, & Household Expenditures for Tel. Serv.*, 2007 WL 2791095, at *3 (OHMSV 2007) ("In addition to monthly charges for basic service and calling charges, customers pay a number of other charges for telephone service. The federal subscriber line charge is a line item that local exchange carriers are authorized to charge to recover a portion of the interstate costs of providing local phone service….Lifeline subsidizes lower-income households' monthly service charges."); *Eliminating Ex Ante Pricing* (Continued…)

for each eligible end user recorded in the National Lifeline Accountability Database, and the Lifeline providers "in turn pass through the subsidy to provide their services to low-income consumers at reduced costs." *Nat'l Lifeline*, 921 F.3d at 1107; 47 C.F.R. § 54.407; 47 C.F.R. § 54.403(a)(1).

Section 254 and the FCC rules require that Lifeline providers receiving universal service support "shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e); 47 C.F.R. § 54.7. A Lifeline provider need not provide cost-to-the-end-user plans to participate in the Lifeline program. In other words, a Lifeline provider that exclusively provides Free Lifeline Only Service plans is compliant with all Communications Act provisions and FCC rules. Indeed, the FCC has repeatedly acknowledged the value to low-income consumers of free Lifeline Only Service plans [Lifeline: 47 U.S.C. §§ 151 & 254] that do not require a contract or financial transaction with the Lifeline provider [Fairness Act: 47 U.S.C. § 1510].[5]

A number of CTIA's members and member-affiliates offer and provide Lifeline service at no cost to qualifying, low-income Lifeline customers, *i.e.*, a Free Lifeline Only Service plan.[6] Doc. #53,

---

*Regul. & Tariffing of Tel. Access Charges, Notice of Proposed Rulemaking*, 35 FCC Rcd 3165, ¶ 26 (2020) ("As described in our consumer education materials, a typical phone bill includes a 'base' charge for local service; line items for local, state, and federal taxes; *additional charges to pay for 911 services*, federal USF, and Local Number Portability Administration; *the Subscriber Line Charge* [*i.e.*, SLC]; and various other charges.") (emphasis added).

[5]   *See, e.g., Lifeline & Link Up Reform & Modernization Lifeline & Link Up Fed.-State Joint Bd. On Universal Serv. Advancing Broadband Availability Throughout Digital Literacy Training,* Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656, ¶ 378 (2012).

[6]   A Lifeline customer may opt to purchase additional wireless service above and beyond the service included in a Free Lifeline Only Service plan. When a Lifeline customer does this, the customer gives consideration to the Lifeline provider, and the additional wireless service is not considered Free Lifeline Only Service. When subscribers purchase additional wireless services, either from a provider or from independent retailers, they pay the CMRS service charge. *See, e.g.,* Plaintiff's Responses to Defendants' First Set of Interrogatories, Requests for Admission, and Requests for Production of Documents, Answer to Interrogatory No. 9, attached hereto as Ex. C.

22991546

¶ 7. For these plans, the Lifeline customer need not give any cash, credit or other monetary value or consideration to the Lifeline provider for basic Lifeline service, which generally consists of a CMRS connection, voice, broadband wireless internet access, and text messaging. *See* Doc. #53, ¶ 8.

## II.   Kentucky's 911 Fee Statutes Originally Applied Only to End Users.

Defendants oversee the collection and disbursement of money for Kentucky's wireless 911 emergency telephone service. Doc. #53, ¶ 11; KRS 65.7621 *et seq.*; KRS 65.7621(8) and (10). Specifically, the 911 Board has the power and duty to "collect the CMRS service charge from each CMRS connection," a term that is statutorily defined as "a mobile handset telephone number assigned to a CMRS customer", which is in turn defined as "an end user to whom a mobile handset telephone number is assigned and to whom CMRS is provided in return for compensation ….." KRS 65.7629(3); KRS 65.7621(6)&(7). Prior to 2020, Defendants collected a CMRS service charge (*i.e.*, a 911 fee) from each Kentucky end user, including those who received Lifeline service. KRS 65.7629(3)(a); KRS 65.7621(6)&(7). These CMRS services charges (*i.e.*, 911 fees) fund wireless 911 emergency telephone service in Kentucky. KRS 65.7621 *et seq.*; KRS 65.7631.

The "CMRS Act clearly puts the burden of the CMRS service charge [*i.e.*, 911 fee] on the CMRS [end] user." *Virgin Mobile U.S.A., L.P. v. Com. ex rel. Commercial Mobile Radio Serv. Telecomms. Bd.*, 448 S.W.3d 241, 247 (Ky. 2014) ([ ] supplied). *See also* KRS 65.7629(3)(a); KRS 65.7621(6)&(7). The 911 Board collects 911 fees in different ways. *See, e.g.*, KRS 65.7635 (traditional postpaid via monthly bills); KRS 65.7634 (prepaid via retailers). "This statutory scheme for assessing and collecting the CMRS service charge was obviously designed and intended to integrate seamlessly" into traditional cell phone service contract arrangements, and "[a]dding the CMRS service charge of $0.70 per month as a separate item on each monthly bill was a simple, almost natural, way to collect the service charge" from the end user. *Id.* at 244. The applicable CMRS service charge is either a postpaid service charge, a prepaid service charge, or a charge levied under KRS

22991546

65.7636. KRS 65.7621(10). Prior to the 2020 amendments by HB 208, the wireless provider acted only as a conduit or "collection agent" to collect the applicable CMRS service charge from end user customers. In all scenarios, the wireless provider had "no obligation to take any legal action to enforce the collection of the service charge" against the end user customer. *See* KRS 65.7634; KRS 65.7635(1)&(2); KRS 65.7636 (prior to amendment). Rather, the Commonwealth, on behalf of the Defendants, was statutorily authorized to pursue a collection action against end users.

### III.   Due to the Fairness Act, Defendant's Did Not Enforce Kentucky's 911 Fee on Lifeline Providers.

In 2018, Congress enacted the Fairness Act, which provides, in relevant part, that:

A State, or a local jurisdiction of a State, may not require a person who is neither a resident of such State or local jurisdiction nor an entity having its principal place of business in such State or local jurisdiction to collect from, or remit on behalf of, any other person a State or local tax, fee, or surcharge imposed on a purchaser or user with respect to the purchase of any wireless telecommunications service within the State unless the collection or remittance is in connection with a financial transaction.

47 U.S.C. § 1510(c)(1)(emphasis supplied).

The Fairness Act prohibits a state, including Kentucky, from requiring an out-of-state Lifeline provider to collect from, or remit on behalf of any other person, any fee, surcharge or tax (including the CMRS service charge) unless the collection or remittance is tied to a financial transaction. A number of CTIA's wireless provider members and their member affiliates who provide Free Lifeline Only Service are such out-of-state providers. Doc. #53, ¶ 7.

Defendants acknowledge that to the extent KRS 65.7636 previously "allowed, but did not require" these out-of-state wireless Lifeline providers to "collect from or remit on behalf of" Free Lifeline Only Service customers, it "arguably conflicted" with the federal Fairness Act. (Doc. # 7, p. 4). Defendants further acknowledge that in September of 2019, they suspended the collection of 911 charges on wireless Lifeline subscribers to avoid confusion over the matter of whether KRS 65.7636

22991546

conflicted with the Fairness Act. *Id*.; Doc. #53, ¶ 11. Defendants intentionally "sought amendment of the statute to avoid future confusion." Doc. # 7, p. 4.

**IV.   HB 208 Imposes a Monthly Per Lifeline End User 911 Fee on Lifeline Providers, Rather than Lifeline Customers.**

Since its adoption in 2017, the KRS 65.7636 CMRS service charge (911 fee) is and has been "equal to the product of the following factors: [i] The amount of the postpaid CMRS service charge levied under KRS 65.7629; and [ii] The number of unique end users with Kentucky addresses for which the Lifeline provider received reimbursement from the universal service fund during the immediately preceding month." KRS 65.7636(2).

On March 27, 2020, Kentucky enacted 2020 HB 208 to amend KRS 65.7636. Doc. #53, ¶ 13. Notably, HB 208 does not substantively alter the postpaid or prepaid CMRS service charge statutory scheme. Rather, it amends KRS 65.7636, governing only the CMRS service charge levied on Lifeline. The Kentucky Legislative Research Commission's Fiscal Note Statement for 2020 HB 208 explains:

> The Lifeline Program, established by the Federal Communications Commission (FCC) provides federal funding for discounted monthly telephone service and internet access to eligible low-income consumers in every state. This includes cellular and landline phone services provided by commercial mobile radio service (CMRS) providers. The Kentucky 911 Services Board receives $.70 per month per CMRS connection, including Lifeline connections, to pay for various expenses necessary to provide wireless 911 services to people across the state. **As a result of this measure, Lifeline service providers would be required to remit the postpaid rate of $.70/month <u>on behalf of</u> Lifeline customers to the Kentucky 911 Services Board.**

Doc. #53, ¶ 13, *quoting* Ky. Legislative Research Comm'n Fiscal Note Statement (2020 HB 208) (attached as Ex. D).

Specifically, in an attempt to resolve the conflict with the express terms of the Fairness Act, 2020 HB 208 leaves the calculation and basis of the KRS 65.7636 CMRS service charge intact but removes the requirement from KRS 65.7636 that "[e]ach Lifeline provider shall act as a collection agent of the service charge levied by this section for the CMRS fund" and that "[a] Lifeline provider has no obligation to take any legal action to enforce the collection of the service charge levied by this

11

section. Collection actions to enforce the collection of the service charge against any CMRS customer may, however, be initiated by the state, on behalf of the board ….” Further, even though the federal funding for Lifeline end users may be the only revenue that a Free Lifeline Only Service provider receives, HB 208 adds the requirement that “a Lifeline provider shall not use moneys received for participation in the wireless low-income Lifeline program … to pay for any portion of the CMRS service charge levied on the lifeline provider under this section” – citing the federal Telecommunications Act of 1996.

KRS 65.7636 now uniquely holds Lifeline providers liable for the CMRS service charge, and Defendants intend to enforce KRS 65.7636 as amended against all Lifeline providers, including out-of-state providers of Free Lifeline Only Service plans. (Doc. # 7, p. 4).

**V.      The Procedural History of CTIA's Preemption and Constitutional Claims.**

CTIA initiated this action to challenge the validity of HB 208 as KRS 65.7636 negatively impacts its members and detracts from wireless innovation and investment in the Lifeline program. The District Court favorably redressed the issue of express federal preemption provisions and determined that CTIA was eligible to recover attorney's fees under 42 U.S.C. § 1988. *See generally*, Op. & Order, Doc. 14. In doing so, the Court declined to address the merits of the remaining 1983 claims based on the doctrine of constitutional avoidance.  *Id*. Ultimately, this ruling was reversed and remanded by the Sixth Circuit on appeal. Case No. 21-5435, Doc. 25-2, Order dated December 3, 2021; Doc. 31-2, Order dated January 28, 2022.

While the District Court and Sixth Circuit addressed CTIA's express preemption arguments, the decisions did not reach the broader conflict preemption claims. CTIA was granted leave to amend its Complaint in June of 2022 to clarify and set forth the issue of conflict preemption by 47 U.S.C. §§ 151, 254 & 1510 of HB 208's $0.70 per Lifeline end user CMRS service charge (911 fee) on Lifeline

providers, which was not previously adjudicated by the courts. Order, R. 35. CTIA now seeks summary judgment as to the issue of preemption, as well as its constitutional claims.

## STANDARD OF REVIEW

Plaintiffs are entitled to summary judgment as a matter of law if "there is no genuine dispute as to any material fact … ." FED. R. CIV. P. 56(a); *Mickler v. Nimishillen & Tuscarawas Ry. Co.*, 13 F.3d 184, 186 (6th Cir. 1993), *cert. denied*, 511 U.S. 1084 (1994). The only consideration is *material* facts; a dispute or controversy as to immaterial facts will not bar entry of summary judgment. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), quoting FED. R. CIV. P. 56(c). Once this initial showing is satisfied, the nonmoving party cannot defeat the summary judgment motion without producing "specific facts showing that there is a genuine issue for trial." *Id.*, quoting FED. R. CIV. P. 56(e).

## ARGUMENT

I.     **The Communications Act Preempts KRS 65.7636's Fee on Lifeline.**

While express preemption has been previously addressed by this Court and the Sixth Circuit, preemption is a multi-faceted legal doctrine, and this motion concerns CTIA's claims of conflict preemption by 47 U.S.C. §§ 151, 254 & 1510 of HB 208's $0.70 per Lifeline end user CMRS service charge (911 fee) on Lifeline providers. Preemption "'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). Express preemption asks whether Congress used "explicit statutory language" to "define the extent to which its enactments pre-empt state law", *i.e.*,  the question this

Court previously answered. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299-300 (1988). On the other hand, preemption also "occurs 'where compliance with both federal and state regulation is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *State Farm Bank v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008) (quoting *Gade*, 505 U.S. at 98). In this regard, preemption extends beyond the literal language of a statute to "the provisions of the whole law, and to its object and policy". *Gade*, 505 U.S. at 88 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)).

The whole of the federal Telecommunications Act and the Fairness and their object and policy – universal service – have a preemptive effect on KRS 65.7636. *Gade*, *supra*. This preemptive effect derives from the federal Telecommunications Act's universal service goals [47 U.S.C. §§ 151 & 254] as supported by the Fairness Act [47 U.S.C. § 1510], which allows a state to impose a collection obligation only where there is a pre-existing financial transaction (*i.e.*, an existing billing relationship).

The substance and effect of KRS 65.7636 is to erect an **obstacle** to the federal Telecommunications Act's universal service goals as supported by the Fairness Act's financial transaction requirement, in the form a $0.70 per Lifeline end user 911 fee which directly increases the cost of providing Lifeline service to each and every Lifeline end user in Kentucky. In addition, and in the alternative, KRS 65.7636 also makes it **impossible** for a provider to solely offer Free Lifeline Only Service without violating either 47 U.S.C. § 254(e)'s directive to use Lifeline funds only for the provision of Lifeline services or KRS 65.7636's directive to not use Lifeline funds to pay the Kentucky 911 fee, because such a provider's only source of funds would be Lifeline funds. Under either theory, the federal law preempts the $0.70 per Lifeline end user CMRS service charge on Lifeline providers imposed by KRS 65.7636.

14

**A. KRS 65.7636 Is an Obstacle to the Federal Universal Service Goal.**

Congress and the FCC share the fundamental objective of ensuring that universal telecommunications services are reasonably available to all Americans, regardless of income level or location. Congress uses the monthly Lifeline subsidy to incentivize wireless providers to participate in the federal Lifeline program at no cost to the end users that receive Free Lifeline Only Service plans. The universal service program is funded by required contributions of carriers based on interstate revenues, with such funds earmarked solely for supporting the provision of Lifeline service. Funding a state's 911 program has never been, and is not now, a permissible use of the Lifeline subsidy. 47 U.S.C. § 151. HB 208's amendments to KRS 65.7636 create an obstacle to the universal service objective by directly increasing the cost of providing Lifeline service for wireless carriers in the form of a monthly $0.70 911 fee for each and every Lifeline end user in Kentucky that Lifeline providers must now pay.

As the text of KRS 65.7636(5) recognizes, KRS 65.7636 is subject to the preemptive effect of "federal Telecommunications Act of 1996, 41 [sic] U.S.C. secs. 151 et seq.", *i.e.*, the whole federal Act. The federal Communications Act explicitly states that it was enacted "for the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges," and "for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151. The advancement of universal service is a federal objective and goal omnipresent in the Communications Act. *See* 47 U.S.C. §§ 151 & 254.

Congress reaffirmed this federal objective and its importance when it enacted Section 254 of the Communications Act in 1996 and required the FCC to establish universal service contribution and support mechanisms and affirmatively articulated "universal service principles" on which the FCC

15

22991546

must base universal service policies. 47 U.S.C. § 254. These "universal service principles" include making "quality services … available at just, reasonable, and affordable rates" and ensuring "access to telecommunications and information services" by low-income consumers. 47 U.S.C. § 254(b)(3).

To serve and fulfill this federal objective, the FCC administers a federal universal service program that includes the Lifeline program. This federal program is funded through Section 254's requirement that telecommunications carriers contribute on an equitable and non-discriminatory basis to a federal universal service fund, which in turn provides support for universal service mechanisms, including the Lifeline program subsidy. 47 U.S.C. § 254(d)-(e). The subsidy serves as the incentive for participation in the program and ensures that carriers receive adequate compensation for providing services to low-income subscribers. Federal law requires that Lifeline providers "**<u>shall</u>** use that support **<u>*only*</u>** for … services for which the support is intended." 47 U.S.C. § 254(e) (emphasis added); *see also* 47 C.F.R. § 54.7. Notably, in enacting or implementing the Lifeline program, neither Congress nor the FCC included any provision to fund state 911 emergency costs or fees, and historically the amounts that the Lifeline subsidy was designed to offset do not include such fees. Moreover, the FCC regulations implementing the Lifeline program contemplate that a Lifeline provider may choose to provide *exclusively* Lifeline service offerings, and that those offerings may be *exclusively* Free Lifeline Only Service plans. *See* 47 CFR § 54.201(a).

Likewise, Congress's intent to advance and not burden Free Lifeline Only Service Plans is further evidenced by the 2018 enactment of the Fairness Act, which insulates non-resident users and providers of no-cost-to-end-user services from remitting or collecting state and local jurisdiction taxes, fees, and surcharges imposed on wireless telecommunications services. 47 U.S.C. § 1510(c)(1). Section 1501, forbids a state or locality from requiring a nonresident "to collect from, or remit on behalf of, any other person a [charge] imposed on a purchaser or user with respect to the purchase or use of any wireless telecommunications service within the State unless the collection or remittance is

16

in connection with a financial transaction." 47 U.S.C. § 1510(c)(1). The Fairness Act evidences the objectives of Congress that a financial transaction between a provider and a purchaser/user is required in order to allow a state or locality to impose a collection obligation for a telecommunications charge and that providers should be able to offer services to consumers without requiring that consumers enter into a financial transaction with the provider. *Id.*

HB 208's amendments to KRS 65.7636 did three things relevant to this action: (1) removed the "collect from" aspect of KRS 65.7636 that was expressly at odds with the Fairness Act in Defendants' admitted attempt to circumvent the federal Fairness Act; (2) imposed a unique burden on the federal Lifeline program by requiring Lifeline providers to pay a monthly $0.70 per Lifeline end user CMRS service charge; **and**, (3) prohibited those providers from using Lifeline funds to pay that charge in an attempt to circumvent preemption by the federal Telecommunications Act of 1996's universal service goal, which is pervasive in that Act. The substance and effect of these amendments is that despite its ostensible prohibition on using federal funds for this purpose, HB 208 functionally re-directs a portion of the federal Lifeline subsidy to support 911 service in the Commonwealth.

As such, KRS 65.7636 conflicts with the Communications Act and Fairness Act because it erects an **obstacle** (a monthly $0.70 per Lifeline end user 911 fee) to the federal goal of universal service by directly increasing the cost of providing Lifeline service to each and every Lifeline end user in Kentucky. KRS 65.7636 places the burden of Kentucky's statutory 911 fee for these Free Lifeline Only Service plans onto the Lifeline provider, which undermines the effectiveness of congressional incentive and disrupts the economics of both the universal service contribution and subsidization framework established by the FCC.

Requiring Lifeline providers to pay a fixed charge such as the monthly $0.70 per Lifeline end user CMRS service charge (911 fee) imposed by HB 208's amendments to KRS 65.7636 is an obstacle to the federal universal service goal that the FCC has previously recognized, in the context

of subscribers, that could have a significant detrimental effect including the reduction or cancellation of service. *See MTS and WATS*, 50 Fed. Reg. at note 1, 941-42.

There are several different practical effects that this new fixed charge could have on the provision of Lifeline service. The most extreme would be to incentivize Free Lifeline Only Service providers to cease doing business in Kentucky, *i.e.*, cease providing service to Lifeline end users [*see MTS and WATS*, 50 Fed. Reg. at note 1, 941-42.]. This incentive is clearly the opposite of Lifeline's goal of universal service.

Short of ceasing business entirely in the Commonwealth of Kentucky, HB 208's imposition of per Lifeline end user 911 fees on Lifeline providers incentivizes carriers to substantially revise their business models by, for example, providing more plans that have a cost to end users and increasing the costs to those paying end users. This would inevitably impede and burden the goal of universal service, as the FCC has previously recognized, because subscribers would cancel their plans due to the additional costs. *Id.*

HB 208 also logically incentivizes Lifeline providers to reduce the level of service provided to Free Lifeline Only customers to offset HB 208's per Lifeline end user 911 fee, by *inter alia*, reducing the services offered by decreasing minutes and data. But, as discussed above, such a reduction in services undermines the quality of service in direct contravention of the universal service principles articulated in Section 254 of the Communications Act and the "elimination of discrimination." *Id.* Further, as noted, these "universal service principles" include making "quality services … available at just, reasonable, and affordable rates" and ensuring "access to telecommunications and information services" by low-income consumers. 47 U.S.C. § 254(b)(3). HB 208's creation of an incentive to reduce the quality of service in the form of decreased minutes and data as a logical response to the additional direct cost that HB 208 imposes on Lifeline providers puts up a direct obstacle to the federal goal of universal service because decreasing minutes and data

18

reduces the quality of service and reduces access to telecommunication and information services. The imposition of this 911 fee on carriers also imperils the Lifeline provider's ability to satisfy the FCC's minimum service requirements that all Lifeline plans must offer to customers. *See* Doc. #53, ¶ 8.

The cost-shifting that HB 208's amendments to KRS 65.7636 mandate is incompatible with the basic tenets of the FCC that (1) fair market competition is critical for both universal service and telecommunications services generally, and (2) the goal to promote universal service through funding subsidies so that **all** Americans have access to telecommunications services. *In the Matter of Mts & Wats Mkt. Structure*, 93 F.C.C.2d 241 (F.C.C. 1983) (recognizing the FCC's decision focused on the "primary goals of promoting competition and eliminating discrimination" but was "bounded by two very strong considerations. The first is the abiding concern of this Commission and the Congress that the concept of universal service not be sacrificed.").

Nor can the Defendants argue that KRS 65.7636 is consistent with federal law because it mandates that Lifeline providers use money *other* than the Lifeline subsidy to pay the fees. Each month the wireless Lifeline providers receive either $5.25 or $9.25 for each eligible household, and the Lifeline providers "in turn pass through the subsidy to provide their services to low-income consumers at reduced costs." *Nat'l Lifeline*, 921 F.3d at 1107; 47 C.F.R. § 54.407; 47 C.F.R. § 54.403(a)(1). While KRS 65.7636(5) on its face purports to preclude providers from using Lifeline subsidies to cover the CMRS fee (in an effort to evade express preemption by the Communications Act), the practical effect reduces the total revenue available to the Lifeline provider associated with serving each Lifeline subscriber. It further ignores the reality that money is fungible. *See AEP*, 533 S.W.3d at 682.[7] Shifting the burden onto Lifeline providers only serves to divert resources that are

---

[7]   This begs the question of whether KRS 65.7636(5) is unintelligible since there is no guidance on how to comply, and thus, this provision is void. *See Bd. of Trs. of Judicial Form Ret. Sys. v. Attorney General*, 132 S.W.3d 770, 781 (Ky. 2003) ("Obviously, an attempted exercise of legislative power is simply ineffective if the legislative product is unintelligible. In that event, no
(Continued…)

22991546

intended to pass through to the subscriber as part of the provision of the federal universal service and to undermine the federal contribution and subsidization framework established by the FCC.

Accordingly, CTIA should be granted summary judgment since KRS 65.7636 imposes unrecoverable costs on Lifeline providers and places the financial burden on the Lifeline program, which conflicts with the federal objectives and purposes of the Sections 151 and 254 of the Communications Act as it is implemented and interpreted by the FCC, as well as the Fairness Act.

**B.  It Is Impossible for Lifeline Only Service Providers to Comply with Both Federal Law (*i.e.*, the Communications Act and the Fairness Act) and HB 208's KRS 65.7636(5).**

Free Lifeline Only Service plan offerings in Kentucky are critical for advancing the universal service goal and were plainly contemplated and intended to be safeguarded by both the Communications Act and the Fairness Act. Foreclosing Lifeline providers from offering solely Free Lifeline Only Service thus stands in direct opposition to federal goals and objectives of universal service and the Fairness Act. ***Yet, for providers offering solely Free Lifeline Only Service plans, it is not possible to comply with both these federal Acts and KRS 65.7636.*** Under HB 208, a Lifeline provider offering solely Free Lifeline Only Service plans would face a charge of $0.70 for each of its subscribers but would have no source of revenue from providing Lifeline service that may be legally used to pay the charge under Kentucky law. Section 254 is clear: Lifeline providers receiving universal service support such as the Lifeline subsidy ***are not permitted*** to use the funds for anything other than for providing Lifeline services.[8] 47 U.S.C. § 254(e). Participating Lifeline providers are

---

legislative power has been exercised."). If KRS 65.7636(5) is void, then, KRS 65.7636's monthly $0.70 per Lifeline end user CMRS service charge imposed on Lifeline providers would undoubtedly violate and thus would be expressly preempted by the Fairness Act [47 U.S.C. § 1510(c)(1)].

[8]  Defendants have previously insinuated that Lifeline providers may use funds received from Kentucky's Universal Service Fund ("KUSF") to offset the CMRS charge. First, not all Lifeline providers receive KUSF funds; indeed, very few providers do. And, KUSF was created pursuant to 47 U.S.C. § 254; so, any funds received from KUSF are subject to Section 254's restrictions.

(Continued…)

additionally precluded from using the Lifeline subsidy for any purpose other than as permitted by FCC rules. 47 C.F.R. § 54.7. Indeed, KRS 65.7636 recognizes these federal limitations and attempts to draft around them by prohibiting wireless providers from using the Lifeline subsidy to pay the CMRS charge it imposes. KRS 65.7636(5).

Thus, carriers seeking to offer only Free Lifeline Service plans are faced with an impossible choice: they are obligated under Kentucky law to pay the CMRS service charge, but they are precluded by both a different section of Kentucky law and by federal law from using their only source of revenue to pay it. Moreover, because the charge amount under KRS 65.7636 is tied directly to the number of customers served by Free Lifeline Only Service plans, the more customers that a Lifeline provider serves with Free Lifeline Only Service, the bigger the impermissible burden on the Lifeline provider's CMRS service.

While this funding conundrum undoubtedly creates an obstacle to providing Lifeline service and discourages wireless providers from offering exclusively Free Lifeline Only plans in Kentucky, it is also a clear example of "where compliance with both federal and state law is in effect physically impossible." *Louisiana PSC v. FCC*, 476 U.S. 355, 368 (1986), citing *Florida Lime Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963). In such a case, "[a] holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design, *Florida Avocado Growers*, 373 U.S. at 142, because the Supremacy Clause dictates that federal law must control. Thus, KRS 65.7636,

---

*See*, Doc. #53, ¶ 14; *in re: An Inquiry Into Universal Service and Funding Issues,* Ky. P.S.C. Admin. Case No. 360 (May 22, 1998), available at https://psc.ky.gov/order_vault/Orders_1998/19000360_05221998.pdf  (a copy of which is attached as Ex. E); 47 U.S.C. § 254(f) (granting states with authority to "adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. … A state may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.")

as amended by HB 208, renders compliance impossible, frustrates the purpose of the Lifeline program, and creates an obstacle to the goal of universal service.

Accordingly, CTIA should be granted summary judgment.

## II.      HB 208 Violates the Equal Protection Clause.

The Fourteenth Amendment to the Constitution provides that "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause confers upon CTIA's wireless provider members who provide Lifeline services equal protection under the laws and protects them from governmental action that subjects them to disparate, unequal and discriminatory treatment. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by the 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

There is no difference between Lifeline wireless providers and other wireless providers. As evidenced in Section 254, Congress contemplates only one class of wireless providers ("every telecommunications carrier"), and statutorily requires any contribution from a wireless provider to be on an "equitable and nondiscriminatory basis." KRS 65.7621(9) similarly recognizes only one class of wireless provider, "CMRS provider," and defines it as "a person or entity who provides CMRS to an end user." Before the enactment of HB 208, all wireless providers acted as a "collection agent" or conduit to pass through the CMRS service charge (911 fee). Indeed, Defendants represent that "all three types of service – postpaid, prepaid and subsidized Lifeline – impose a similar burden on the 911-service infrastructure." (Doc. #7, p. 26). Historically, this burden was "clearly put[] … on the CMRS [end] user" regardless of the type of service. *Virgin Mobile U.S.A., L.P.*, 448 S.W.3d at 247.

22

The three types of CMRS service charges (911 fees) exist only because the statutorily designed collection method of collecting the fees from the end users differ, not because of any real distinction or difference among CMRS providers.

Under KRS 65.7629(3)(a) and KRS 65.7621(6)&(7), however, the fees for prepaid and postpaid services remain imposed on the end user, but Lifeline is singled out in KRS 65.7636, and Lifeline providers are now treated differently within the class of CMRS providers. HB 208 requires only Lifeline providers to pay CMRS service charges (911 fees) in place of end users solely because they participate in the low-income Lifeline program and receive reimbursement from the federal universal service fund. The situation is akin to that of *GTE Sprint v. Wis. Bell*, 454 N.W.2d 797 (Wis. 1990), in which the Wisconsin Supreme Court found a retail sales tax to be an unconstitutional violation of the Equal Protection Clause because it applied only to one sub-category of communications provider.[9]

There is no inherent difference between Lifeline wireless providers and other wireless providers, and there is no justification for imposing CMRS service charge (911 fee) obligations upon Lifeline and its providers. Lifeline providers provide the same services as other providers, including voice minutes, text messaging, and data packages. There is nothing inherently different in the service rendered. Lifeline providers compete in the marketplace based on services offered, and they certainly remain subject to market forces.[10]

---

[9]   *GTE*, 454 N.W.2d at 804 ("[T]o tax the transfer of access services to inter-LATA carriers but not the same transfer to local exchange carriers and resellers denies inter-LATA carriers the constitutional guarantee of equal protection of the laws. We therefore declare unconstitutional the tax imposed upon the transfer of access services to an inter-LATA carrier."); *cf. AT&T Corp. v. Pub. Util. Comm'n of Texas,* 373 F.3d at 645-47 (holding that "burden[ing] multijurisdictional carriers more severely than pure interstate or intrastate carriers" resulted in inequitable and discriminatory treatment in violation of 47 U.S.C. § 254(f)).

[10]   *See* Doc. #53, ¶ 9 (acknowledging "[t]here are multiple CMRS providers offering Lifeline in the Kentucky marketplace.").

22991546

Defendants have argued that CTIA's members are simply trying "to avoid paying their fair share for these essential services …." This is patently false. As Defendants concede, no other wireless providers pay any "share"; the end users pay.[11]

Requiring Lifeline providers to pay the CMRS service charge (911 fees) singles them out and places them at a distinct disadvantage over other wireless providers and penalizes them for offering Lifeline, in contravention of equal protection.

**III.   HB 208 Violates CTIA's Rights Under the Federal Due Process and Takings Clauses.**

The Fourteenth Amendment to the Constitution further provides that no "State [shall] deprive any person of life, liberty, or property without the process of law." Kentucky's due process is aligned with federal due process rights. *See Pigeons' Roost, Inc. v. Commonwealth*, 10 S.W.3d 133 (Ky. App. 1999). As Kentucky courts recognize, the "validity of special assessments and user fees depends on an analysis of the charge and the benefit received." *Ky. River Auth. v. City of Danville*, 932 S.W.2d 374, 376 (Ky. App. 1996). Assessments and fees charged without a relationship to a benefit received by the payor are arbitrary and capricious. *Id*. Thus, they violate due process and the constitutional prohibition against the taking of private property without just compensation. *Id*.

Lifeline providers (especially out-of-state providers) obviously receive no 911 services, *i.e.*, no benefit, despite the fact that KRS 65.7636 obligates providers to pay the 911 fee in lieu of the end users; rather, 911 service is provided to Kentuckians in Kentucky and not to those out-of-state. Defendants argue that HB 208 does not implicate the Takings Clause because "it does not touch an

---

[11]   Defendants ignore that they have other options for funding the state's 911 services. To the extent Defendants need additional funding, they are free to lobby and seek additional state or federal funding. There is no necessity for Defendants to single out Lifeline and its providers, or to otherwise siphon from the Lifeline program.

identifiable fund of money." (Doc. #7, p. 27).[12] This, however, is directly contrary to HB 208's language in KRS 65.7636(5), which requires the Lifeline provider to pay a charge calculated and based upon the number of Kentucky Lifeline end users "for which the Lifeline provider received reimbursement from the universal service fund during the immediately preceding month." HB 208's 911 fee is directly tied to a Lifeline provider's receipt of funds in connection with Lifeline and to the payment of funds sought by the 911 Board, *i.e.*, an unequivocally identified fund of money that Defendants seek to take. Thus, HB 208 violates the Fourteenth Amendment.

## <u>CONCLUSION</u>

HB 208's imposition on Lifeline providers of a monthly $0.70 per Lifeline end user 911 fee erects an obstacle to the universal service goals of Section 151, 254 and 1510 of the Communications Act and implementing FCC decisions and is thus preempted. It also violates the Equal Protection Clause, the Takings Clause, and due process. Accordingly, for the foregoing reasons, CTIA's motion for summary judgment should be granted.

Dated: July 28, 2023.

Respectfully submitted,

*/s/ Mark A. Loyd*
Mark A. Loyd
Lauren R. Nichols
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Ste. 3500
Louisville, Kentucky 40202
(502) 587-3552
COUNSEL FOR PLAINTIFF
CTIA – THE WIRELESS ASSOCIATION

---

[12]  If there is no identifiable fund of money, then KRS 65.7636(5) is unintelligible since there is no guidance on how to comply, and thus, this provision is void. *See Bd. of Trs. of Judicial Form Ret. Sys*, 132 S.W.3d at 781. And, if KRS 65.7636(5) is void, then KRS 65.7636's monthly $0.70 per Lifeline end user CMRS service charge imposed on Lifeline providers would clearly violate and thus would be expressly preempted by the Fairness Act [47 U.S.C. § 1510(c)(1)].

22991546

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of July, 2023, I electronically filed the foregoing with the clerk of the court of using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Mark A. Loyd*
COUNSEL FOR PLAINTIFF

22991546