**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**
**CASE NO. 3:20-CV-00043-GFVT**
*Electronically Filed*

**CTIA – THE WIRELESS ASSOCIATION**                                   **PLAINTIFF**

**v.**

**KENTUCKY 911 SERVICES BOARD, et al.**                               **DEFENDANTS**

---

**DEFENDANTS' RESPONSE IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

The Defendants, the Kentucky 911 Services Board, Josiah Keats in his official capacity as Chair of the Kentucky 911 Services Board, Mike Sunseri, as Administrator of the Kentucky 911 Services Board, and Unknown Board Members of the Kentucky 911 Services in their official capacities (collectively, "the Board"), submit this response in opposition to CTIA – The Wireless Association's motion for summary judgment.

CTIA argues that 2020 HB 208, which imposes a 911 service charge on Lifeline providers, stands as an obstacle to Congress's purposes and objectives and is thus impliedly preempted by federal law, and that it violates the Equal Protection, Takings, and Due Process Clauses of the U.S. Constitution. CTIA's claims fail. Its implied-conflict-preemption claims depend on an overly broad reading of federal statutes to postulate expansive federal objectives that are not supported by any congressional enactment. Even then, HB 208 raises no material obstacle to Congress's purposes and objectives and thus is not impliedly preempted. CTIA's equal-protection claim fails because Lifeline providers are not similarly situated to other wireless providers; thus, they are not treated disparately. The claim also fails because CTIA failed to plead that HB 208 lacks a rational basis, and it has multiple rational bases. CTIA's taking's claim fails because a prospective

regulatory fee does not implicate the Takings Clause. The due-process claims fails because HB
208 has a rational basis, and the Kentucky cases cited by CTIA do not require a direct benefit
between a payor and a beneficiary of a fee. For these reasons, CTIA's motion for summary
judgment should be denied.

## ARGUMENT

### I.  CTIA makes unjustified claims about Congress's purposes and objectives that do not support preemption.

CTIA hopes to show implied conflict preemption by postulating expansive Congressional
purposes and objectives. It makes sweeping claims about the purported objectives and purposes of
Congress in enacting 47 U.S.C. §§ 151, 254, and 1510. Its claims are unfounded.

#### A.  CTIA attempts to knit together separate Acts of Congress in error.

When statutes govern different subjects, it is error to read them together. *See Wachovia
Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (holding "Court of Appeals erred in interpreting"
statutes on different subjects "*in pari materia*"); *see also* Def's. Motion (DN 58) at 16. Yet CTIA
attempts to do just this in its motion.

For example, CTIA attempts to tie the Wireless Telecommunications Tax and Fee
Collection Fairness Act, 47 U.S.C. § 1510, to universal service, claiming the act was an attempt to
"ensure the continued availability of Free Lifeline Only Service by forbidding states from
imposing charges on telecommunications customers that would require carriers to establish a
billing relationship with each individual customer." Pl's. Motion (DN 62) at 3. CTIA then states:
"The stated objective of the Fairness Act was thus to 'limit[] excessive and needless obstacles to
wireless'." *Id.* But the quoted language is not an objective of, nor does it concern, the Fairness Act.

Instead, that language is part of the title of a *different* act: "This title may be cited as the
'Making Opportunities for Broadband Investment and Limiting Excessive and Needless Obstacles

to Wireless Act' or the 'MOBILE NOW Act'." *Consol. Approprs. Act, 2018*, Pub. L. No. 115-141, Div. P, Title VI, § 601, 132 Stat. 348 (March 23, 2018).[1] The MOBILE NOW Act expands broadband and 5G infrastructure, partly by making more spectrum available for private sector use, *id.* §§ 603–05 (partly codified at 47 U.S.C. §§ 1502–03), and by reducing red tape limiting communications facilities on federal property, *id.* § 606 (codified at 47 U.S.C. § 1455).[2]

The Fairness Act, however, addresses when and how states may require wireless providers to collect and remit fees and taxes imposed on wireless users. Although it was enacted as part of the same division and title of the *Consolidated Appropriations Act, 2018* as the MOBILE NOW Act, it is nonetheless, by its own terms, a separate act of Congress. *See id.* § 620(a) ("This section may be cited as the 'Wireless Telecommunications Tax and Fee Collection Fairness Act'.") (codified at 47 U.S.C. § 1510(1)). In fact, a version of the act had been introduced as a separate bill in 2015. *See* 161 Cong. Rec. S2729-06, S2730 (May 7, 2015) (introducing *Wireless Telecomms. Tax and Fee Collection Fairness Act of 2015*, S. 1261, 114th Congress (Sen. Manchin)).[3] The Fairness Act was one of many unrelated acts and bills consolidated into an omnibus bill, with the MOBILE NOW Act being consolidated into the larger RAY BAUM's Act of 2018,[4] which was added as Division P of the *Consolidated Appropriations Act, 2018*. The

---

[1]    This provision was not codified as part of the U.S. Code and was, instead, included as a statutory note to 47 U.S.C. § 1501. Additionally, the Board's citation to the *Consolidated Appropriations Act, 2018* in its motion (DN. 58, at 3), inadvertently omitted the division and title. That citation should read: "*Consol. Approprs. Act, 2018*, Pub. L. No. 115-141, Div. P, Title VI, § 620, 132 Stat. 348 (2018) (47 U.S.C. § 1510)."

[2]    *See also PSSI Glob. Servs., L.L.C. v. F.C.C.*, 983 F.3d 1, 5 (D.C. Cir. 2020); John W. Mayo, *Will Ideology Block Opportunity? Regulatory Reform in the Infrastructure Industries*, 70 Fed. Comm. L.J. 199, 207–08 (2018) (summarizing act as reducing regulatory hurdles to placing wireless infrastructure on federal property and expanding spectrum available to private industry).

[3]    *Available at* https://www.congress.gov/bill/114th-congress/senate-bill/1261/text.

[4]    As noted in Division P, Section 1(a): "This division may be cited as the 'Repack Airwaves Yielding Better Access for Users of Modern Services Act of 2018' or the 'RAY BAUM'S Act of 2018'." *Consol. Approprs. Act, 2018*, Pub. L. No. 115-141, Div. P, § 1(a) (March 23, 2018).

MOBILE NOW Act's title has no bearing on Congress's objectives in enacting the Fairness Act; it concerns a different subject and cannot be used to read the Fairness Act expansively.

CTIA's attempt to tie the Fairness Act to the Communications Act of 1934 and the Telecommunications Act of 1996 similarly fails. CTIA acknowledges that the Fairness Act is separate from the 1934 and 1996 acts.[5] *See* Pl's. Motion (DN 62) at 4 (discussing "effect of the whole of the federal *Acts*" and that § 1510 "support[s]" the other acts (emphasis added)); *id.* at 15 (claiming the "federal Telecommunications Act's universal service goals" are "supported by the Fairness Act"). The 1934 and 1996 acts concern a different subject than the Fairness Act and thus cannot be read with the Fairness Act. Nothing in § 1510's text supports universal service.

## B. CTIA's preemption claims rely on a hypothetical Free Only Lifeline Service provider that CTIA admits does not exist, and which Congress never intended.

CTIA's motion relies on a hypothetical provider offering solely Free Lifeline Only services, yet it admitted its members are not such providers. The central premise of CTIA's argument is the hypothetical that "federal funding for Lifeline end users may be the only revenue that a Free Lifeline Only Service provider receives." Pl's. Motion (DN 62) at 12; *see also id.* at 14 ("KRS 65.7636 also makes it impossible for a provider to solely offer Free Lifeline Only Service") (Point I); *id.* at 16 ("FCC regulations implementing the Lifeline program contemplate that a Lifeline provider may choose to provide exclusively Lifeline service offerings") (Point I.A.); *id.* at 20 ("Yet, for providers offering solely Free Lifeline Only Service plans, it is not possible ….")

---

[5]     That said, the 1934 and 1996 acts are a single "act" for purposes of reading the enacting bills together (or when referenced, as in 47 U.S.C. § 615a-1). The 1996 act amended the 1934 act through in-line textual amendments and by adding provisions (e.g., § 254). The FCC and courts agree that § 254 is part of the 1934 act. *See In re Universal Serv. Contribution Methodology Fed.-State Joint Bd. on Universal Serv.*, 25 F.C.C. Rcd. 10861, 10862 (2010) ("Section 254(d) of the Communications Act of 1934, as amended (the Act) …."); *Virgin Mobile USA, L.P. v. Keen*, 447 F. Supp. 3d 1071, 1086 (D. Kan. 2020) ("Congress enacted the Telecommunications Act of 1996, amending the Federal Communications Act of 1934 ('FCA') ….").

(Point I.B.). CTIA tries to twist the limited objective and purpose that can be derived §§ 151 and 254—universal service—by focusing on "Free Only Lifeline Service," which it claims is a "critical—and uniquely effective—tool for achieving universal service." Pl's. Motion (DN 62) at 3. CTIA's Counts I, II, and III rely on the premise that HB 208 "makes it impossible for a provider to solely offer Free Lifeline Only Service." *Id.* at 4.

But the idea of a free-only Lifeline business model is fantasy. None of CTIA's members operate under that business model. *See* First Disc. (DN 58, Ex. A), Interrog. 9; *id.* Admis. 11–14. In CTIA's own words, "all of CTIA's members who offer federally subsidized Free Lifeline Only Service plans generally offer optional incremental (add-on) prepaid wireless services, such as additional minutes or broadband data, for an additional cost." Supp. Disc. Letter (DN 58, Ex. B), Interrog. 9.

Even if CTIA could show that its hypothetical provider existed—which it cannot, as argued in the Board's motion for summary judgment[6]—*Free* Lifeline Only Service has never been a goal of Congress or the FCC. CTIA claims that 47 C.F.R. § 54.201(a) "contemplate[s] that a Lifeline provider may choose to provide exclusively Lifeline service offerings, and that those offerings may be exclusively Free Lifeline Only Service plans." Pl's. Motion (DN 62) at 16. But the regulation does nothing of the sort. Instead, it anticipates that some providers may be designated as "eligible telecommunications carriers" for purposes of providing support to low-income customers under "Subpart E"—that is, Lifeline—without also providing support under "Subpart D," which is the "high cost" program. Section 54.201(a) says nothing about encouraging providers to offer only *free* Lifeline with no other revenue.

---

[6] "CTIA's claim in this regard depends on the false notion that Congress intended for providers to be able to operate under an impossible business model: that of providing free-only Lifeline service." Def's. Motion (DN 58) at 16.

CTIA's claim that Congress intended for providers to operate under a free-only Lifeline business model assumes that such a model can and should be profitable. But that assumption is mistaken. Lifeline, like other universal service programs, provides a subsidy that allows for discounted service. "The program originally was designed to allow companies to be made whole for foregone revenues associated with discounts provided to eligible Lifeline/Link Up consumers. **The program was never intended to provide a profit for service providers.**" *In re Lifeline & Link Up Reform & Modernization*, Notice of Proposed Rulemaking, 26 F.C.C. Rcd. 2770, 2776 (2011) [hereinafter "*2011 Notice*"] (emphasis added). Indeed, it is entirely possible—and legally permissible—for the Lifeline subsidy to not even cover providers' costs. *See In re Lifeline & Link Up Reform & Modernization*, Third Report and Order, Further Report and Order, and Order on Reconsideration, 31 F.C.C. Rcd. 3962, ¶¶ 115–16 (2016) [hereinafter "*2016 Order*"] (acknowledging argument "that the current $9.25 support level may be insufficient to cover the total cost of the supported service [i.e., broadband]" and noting the FCC "take[s] no position on whether $9.25 will be sufficient to support the entire cost of supported service").

CTIA also misreads language from an FCC order to claim that free Lifeline Only Service is *the* goal of Lifeline, and CTIA fails to account for other FCC statements that belie this interpretation. CTIA claims the "FCC has repeatedly acknowledged the value to low-income consumers of free Lifeline Only Service plans." Pl.'s Motion (DN 62), at 8 n.5 (citing *In re Lifeline & Link Up Reform & Modernization*, Report and Order and Further Notice of Proposed Rulemaking, 27 F.C.C. Rcd. 6656, 6815, ¶ 378 (2012) [hereinafter "*2012 Order*"]).[7] Although a

---

[7]     As discussed below, this same order acknowledged that aspects of Lifeline had been subject to a minimum charge in the past, which could be reconsidered going forward. Regardless, the FCC's policy decisions about how to implement universal service are not evidence of Congress's intent to preempt state law. The FCC is given discretion—by Congress—to choose among various legal options; the FCC's choice among those options (including allowing free-only

federal agency may have acknowledged the value to customers of free service, that is not evidence of Congress's intent behind § 254, which has never been to provide primarily free service. Even then, the FCC disagrees with CTIA: "[W]e emphasize that Lifeline was created to provide affordable, *rather than free service*, and past Commission decisions have emphasized this point." *2016 Order*, 31 F.C.C. Rcd. 3962, ¶ 116 (emphasis added, footnote omitted).

Indeed, § 254 itself says nothing about *free* service and instead refers to *affordable* service: "Quality services should be available at just, reasonable, and *affordable rates*." 47 U.S.C. § 254(b)(1) (emphasis added). And § 151 notes that the FCC was created, in part, to "make available, *so far as possible*, to all the people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at *reasonable charges*." 47 U.S.C § 151 (emphasis added). Even the authorities on which CTIA relies recognize this. *See In re MTS & WATS Mkt. Structure*, 93 F.C.C.2d 241, 267 (1983) (stating language in § 151 "does contemplate that telephone exchange service should be made available at *reasonable rates*"), *cited in* Pl's. Motion (DN 62) at 5.

There is no evidence that any universal service objective has ever included providing *free* services. The FCC has four groups of universal-service programs: (1) the low-income programs, which include Lifeline and Link-up; (2) the E-rate Program, which provides support for schools and libraries, 47 CFR § 54.505; (3) the Rural Health Care Program, which provides support for rural health care providers, 47 CFR § 54.602; and (4) the High Cost Program, which supports the cost of network deployment and maintenance in rural areas, 47 CFR § 54.302. Unlike Lifeline and Link-Up, these "other universal service support programs all require beneficiaries or support

---

Lifeline) does not expand Congress's universal-service purposes and objectives to mandate that such services be free and thus preempt state law.

recipients to pay a portion of the costs of the supported service." *In re Bridging the Digital Divide for Low-Income Consumers*, Fourth Report and Order, Order on Reconsideration, Memorandum Opinion and Order, Notice of Proposed Rulemaking, and Notice of Inquiry, 32 F.C.C. Rcd. 10475, ¶ 112 (2017) [hereinafter "*2017 Lifeline Order*"].[8] At most, these other programs provide a discount on service, not free service.

### C. CTIA's contention that Congress intended for universal service to be free ignores history and is incorrect.

The notion of completely free service plans is a recent development in Lifeline's 38 years of operation and cannot support CTIA's claim it was part of Congress's objectives in enacting §§ 151 and 254. *See* Statement of Comm'r Pai, FCC, *Hearing Before the Senate Appropriations Subcommittee on Financial Services and General Government*, 2015 WL 2236269, at *3 (May 12, 2015) (noting "the *recent* shift to free wireless service plans" (emphasis added)).[9] The shift was driven by the unique characteristics of mobile phones, which created opportunities for "service providers [to] engage in fraud or abuse by using no-cost Lifeline offerings to increase their Lifeline customer numbers when the customers do not value or may not even realize they are purportedly receiving a Lifeline-supported service." *2017 Lifeline Order*, 32 F.C.C. Rcd. at 10513–14, ¶ 114. The shift also appears to have been related to the "proliferation of Lifeline resellers in 2009." *Id.* at 10475, ¶ 68; *see also id.* at 10559–60 (Statement of Comm'r O'Rielly) ("Lifeline was intended to be a discount program. Many of the problems with waste, fraud, and abuse in the program stem from the fact that, when wireless service was added to the program, the subsidized voice service

---

[8]   This order was later vacated because the FCC "depart[ed] from its prior forbearance policy without reasoned explanation and fail[ed] to consider key aspects of the program," and a failure to follow Administrative Procedures Act in implementing "Tribal Facilities Requirement and Tribal Rural Limitation." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1106 (D.C. Cir. 2019). The decision, however, does not implicate the parts of the order cited in this Response.

[9]   Available at http://www.appropriations.senate.gov/imo/media/doc/hearings/051215%20 Commissioner%20Pai%20Testimony%20-%20FSGG.pdf.

became free to end users, along with the phone and even a data allowance. Requiring a minimum contribution would also be consistent with rules for other federal assistance programs.").[10]

Yet Lifeline has not always been able to be provided for free, with parts of the program previously including a minimum charge to customers. Lifeline includes an enhanced subsidy of up to $25 per month for users on Tribal lands. 47 C.F.R. § 54.403(3). In the past, that service was not free: The FCC's rules "require[d] all qualifying low-income individuals on tribal lands to pay a minimum monthly Lifeline rate of $1." *In Re Fed.-State Joint Bd. on Universal Serv.*, 15 F.C.C. Rcd. 12208, 12230 ¶ 42. (2000). Eventually, the FCC rescinded this minimum charge, but it did so because "some carriers d[id] not collect the $1 from their Tribal subscribers," and the rules "d[id] not require the ETC to bill or collect such amounts." *2012 Order*, 27 F.C.C. Rcd. at 6774. This was merely a policy decision by the FCC and is not evidence of Congress's intent about how universal service must operate. Thus, the FCC left open the possibility of "revisit[ing] this issue in the future if necessary." *Id.* ¶ 270.

And the FCC has, in fact, revisited that issue in the broader Lifeline context. For example, when the minimum charge applied to Tribal service, the FCC considered whether to "adopt a rule requiring all ETCs in all states to collect some minimum monthly amount from participating households" for Lifeline service. *2011 Notice*, 26 F.C.C. Rcd. at 2799, ¶ 86.

Although the FCC did not re-adopt a minimum-charge approach, that was a policy decision, not a legal decision. The FCC found it "unnecessary to impose a federal minimum charge

---

[10]   For example, T-Mobile, one of CTIA's members identified in its amended complaint, paid a $200 million civil penalty for the conduct of its subsidy, Assurance Wireless USA, LP, for providing service to ineligible customers and claiming duplicative support (i.e., more than one account per household). *In re Assurance Wireless USA, LP, f/k/a Virgin Mobile USA, L.P., Sprint Corp., and T-Mobile US, Inc.,* Order and Consent Decree at 5, ¶¶ 11 & 24 (Nov. 4, 2020), *available at* https://docs.fcc.gov/public/attachments/DA-20-1295A1.pdf.

requirement in light of the other significant steps we take here to reform the Lifeline program. We therefore choose not to implement such a requirement at this time." *2012 Order*, 27 F.C.C. Rcd. at 6773. But the FCC noted that its order did not "preclude[] states from requiring state-designated ETCs to assess and collect a minimum charge from Lifeline subscribers." *Id.* at 6773 n.739.

The FCC has continued to explore imposing minimum charges on basic Lifeline support. For example, in 2017, it "sought comment on whether it should impose a maximum discount level for Lifeline services, which would require customers to pay a portion of the costs of the supported service." *In re Bridging the Digital Divide for Low-income Consumers Lifeline and Link Up Reform and Modernization Telecomms. Carriers Eligible for Universal Serv. Support*, Fifth Report and Order, Memorandum Opinion and Order and Order on Reconsideration, and Further Notice of Proposed Rulemaking, 34 F.C.C. Rcd. 10886, 10951–52, ¶ 158 (2019). The FCC expressed concern "that under the current model where providers offer 'free-to-the-end-user' Lifeline service, 'service providers may engage in fraud or abuse by using no-cost Lifeline offerings to increase their Lifeline customer numbers when the customers do not value or may not even realize they are purportedly receiving a Lifeline-supported service.'" *Id.* at 10951–52, ¶ 158 (quoting *2017 Lifeline Order*, 32 F.C.C. Rcd. 10475, ¶ 114). Thus, it "proposed to adopt a maximum discount level as a way to further reduce waste, fraud, and abuse in the program." *Id.* The FCC considered the minimum-charge approach again in 2019 when it examined whether "requiring ETCs to assess a regular fee on subscribers for the Lifeline supported service [would] mitigate any problems associated with providing in-person free handsets[.]" *Id.*

The FCC's decision not to adopt minimum fees does not evince a congressional intent preferring free universal-service programs. More importantly, the FCC's repeated consideration of that option shows that it has never discerned a congressional intent to mandate or prefer free-

only Lifeline or other universal services.

Nothing in § 151 or § 254 requires that any universal service, including Lifeline, be provided for free—or that providers be able to do so. That the FCC's current rules allow such practice *in theory* does not make providing free service an objective or purpose of Congress.

## II.  CTIA cannot show that HB 208 is an obstacle to any congressional purpose or objective.

The Board has addressed CTIA's claim that HB 208 is an obstacle to various congressional purposes or objectives in its own motion for summary judgment. Def.'s Motion (DN 58) at 9–23. Instead of repeating that argument, the Board addresses only points raised in CTIA's motion that have not previously been addressed or that need further response. That said, because CTIA does not address it in its motion, it is worth reiterating that CTIA bears the burden of proving that Congress intended to preempt state law, and that it must overcome a strong presumption that Congress generally does not intend to preempt state law. Def.'s Motion (DN 58) at 10–14.

CTIA's motion focuses on HB 208's purported obstacle to Congress's "universal service goals." Pl's. Motion (DN 62) at 14. There is little doubt that Congress created some universal service goal as evidenced by § 254 (though CTIA reads that goal overbroadly, as discussed above). Yet CTIA cannot show that HB 208 stands as an obstacle to that goal. CTIA's argument in this respect depends upon a false premise: namely, that carriers should be able to "provide *exclusively* Lifeline service offerings, and that those offerings may be exclusively Free Lifeline Only Service plans." *Id.* at 16. CTIA further argues that HB 208 essentially bars this business model and, as a result, "functionally re-directs a portion of the federal Lifeline subsidy to support 911 service in the Commonwealth." *Id.* at 17. The "obstacle" then arises, CTIA claims, because HB 208 "directly increas[es] the cost of providing Lifeline service to each and every Lifeline end user in Kentucky," *id.*, and threatens to drive Lifeline providers out of Kentucky, *id.* at 18.

CTIA's preemption argument depends heavily on the assertion that the HB 208 service

charge will increase carriers' costs of providing Lifeline, which it claims creates an obstacle to Congress's objectives and purposes. *See* Pl's. Motion (DN 62) at 4, 15 (complaining that HB 208 "increase[es] the cost of providing Lifeline service"). As discussed above, however, Congress's universal service objectives do not extend to allowing providers to profit or even to necessarily recover their costs. And an "inability to profit … does not establish conflict-object preemption." *Parsad v. Granholm*, 2009 WL 10677876, at *10–11 (W.D. Mich. 2009). At worst, HB 208 increases providers' costs in a de minimis fashion and could have at most an incidental effect on Congress's objectives. But "[c]onflict preemption requires that the state or local action be a material impediment to the federal action, or thwart[ ] the federal policy in a material way." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 (10th Cir.1998) (brackets in original, citation and quotation marks omitted). Thus, courts routinely uphold state statutes against preemption attacks, even in express-preemption cases, when the state statute has only an incidental effect on costs. *See De Buono v. NYSA-ILA Med. and Clin. Servs. Fund*, 520 U.S. 806, 816 (1997); *CTIA v. FCC*, 168 F.3d 1332, 1336 (D.C. Cir. 1999) (upholding state action even though it "may increase the cost of doing business"). HB 208 is no more an obstacle to Congress's objectives than countless other state laws that increase business costs—such as income and other taxes, worker safety and employment regulations, etc.—none of which are preempted by §§ 151, 254, or 1510.

CTIA also suggests that HB 208 creates an obstacle to congressional objectives because it incentivizes providers to decrease the amount of service they provide. Pl's. Motion (DN 62) at 18. This claim fails because providers must offer a minimum level of service to participate in Lifeline. *See* 47 C.F.R. § 54.408 (setting "minimum service standards"). The goal of universal service is not to subsidize luxury wireless plans; it is, instead, to offer access to "quality service," 47 U.S.C. § 254(b)(1), which is accomplished by meeting the minimum service standards.

CTIA's suggestion that HB 208 could drive providers out of the Lifeline market in Kentucky is speculative and does not demonstrate an obstacle to congressional objectives. CTIA acknowledges that no provider ceased offering Lifeline service in Kentucky when they previously were required to collect and remit the fee from 2017 to 2019 under the pre-HB 208 version of KRS 65.7636. *See* First Disc. (DN 58, Ex. A), Admis. 1 ("CTIA is unaware of any member ceasing to provide Lifeline service in Kentucky from January 1, 2017 to March 27, 2020 because of KRS 65.7636."); *see also id.* at Admis. 3–4 (same). Further, "[n]o CTIA member ceased providing Lifeline service in Kentucky between January 1, 2017 and December 31, 2022." Agreed Stips. (DN 53), ¶ 15. In short, CTIA's claim that providers will be driven away is belied by the admitted historical facts.[11] And the argument that costs will increase and profits will decrease, as noted above, does not give rise to preemption. *See also Parsad*, 2009 WL 10677876, at *11 ("The Supreme Court has never held that a state law affecting a business's revenues is preempted merely because the law would make it unprofitable to operate a business in accordance with federal requirements.").[12]

CTIA also incorrectly suggests that this is a "new fixed charge." Pls'. Motion (DN 62) at 18. Although the charge on providers is new, a charge related to Lifeline is not new. The 2016 version of the statute imposed a charge on users that providers were to collect and remit to the

---

[11]    CTIA hedges its "claims" in its admissions by couching them in terms of its very limited knowledge of its members' finances and operations. *See*, *e.g.,* First Disc. (DN 58, Ex. A), Admis. 1 ("CTIA is unaware …."). This simply supports the Board's argument that CTIA lacks sufficient knowledge about its members to represent them here. Def's Motion (DN 58), at 6–7, 20 n.7.

[12]    There is also little reason to believe that even a limited exit of Lifeline providers from the Kentucky market would significantly contract universal service. As the FCC has recognized, "87.5% of Lifeline subscribers could afford and would subscribe to telephone service even without a subsidy." *In re Bridging the Digital Divide for Low-income Consumers*, 33 F.C.C. Rec. 6353, 6363 n.64 (2018) (quoting *2016 Lifeline Order*, 31 F.C.C. Rcd. at 4166 (dissenting statement of then-Commissioner Ajit Pai)).

Board. *See* KRS 65.7626 (2016). HB 208 simply shifted direct responsibility for the charge from users to the providers.

In addition, CTIA's claim that HB 208 will undermine congressional objectives by diverting the Lifeline subsidy is simply false. This argument assumes the existence of (or federal preference for) independent, free-only Lifeline providers, because only such fictional entities would lack non-Lifeline funds to pay the service charge. As discussed above and in the Board's own motion, no such entities exist, and Congress never intended for them to be the primary means of providing universal service. And KRS 65.76.36(5) prohibits providers from paying the service charge from the Lifeline subsidy. (CTIA tries to evade this provision by stating that money is fungible, but that only means providers cannot co-mingle their Lifeline subsidy with other funds.)

Finally, CTIA's reliance on supposed "practical effects" of HB 208 to claim an obstacle undermines its putative facial challenge because CTIA lacks evidence of how HB 208 would affect its members, rendering inapposite summary judgment based on such hypothetical impact. Pl's. Motion (DN 62) at 18-20; *see, e.g.,* Am. Compl. ¶¶ 110, 119; Supp. Disc. at 1 (DN 58, Ex. B) ("CTIA's action is a facial challenge to HB 208 and amended Kentucky statutes; it is not an as applied challenge to the law that would require the application of facts specific to a particular Lifeline wireless provider.... CTIA makes it an affirmative practice not to collect information about its members' or their affiliates' specific operations, revenues, taxes, costs, and other sensitive information; and CTIA's members do not share such information with CTIA."); *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Not only do CTIA's claims about HB 208 fail as a matter of law, but in making its claims, CTIA shows it cannot prove an actual obstacle.

### III. CTIA's first-time claim that compliance with federal law and HB 208 is impossible should be dismissed because it failed to plead that claim, and because the claim fails as a matter of law.

In its motion for summary judgment, CTIA claims for the first time that HB 208 is preempted because compliance with it and federal law are impossible. Pl's. Motion (DN 62) at 20–22. CTIA failed to claim impossibility preemption in its amended complaint and it cannot add a claim at the summary judgment stage. Alternatively, CTIA's claim fails as a matter of law.

### A. CTIA's amended complaint makes only an objectives-and-purposes preemption claim and does not make an impossibility preemption claim.

CTIA attempts to raise for the first time in its motion a claim of impossibility conflict preemption. CTIA cannot raise this claim for the first time—in essence, amending its complaint—in motion practice, especially at the summary judgment stage. *Cf. Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that new legal claim cannot be raised in response to motion for summary judgment).[13]

When CTIA sought to amend its complaint, it did so to purportedly add an implied conflict-preemption theory based on HB 208's supposed conflict with the objectives and purposes of Congress. *See, e.g.*, Pl's. Memo. (DN 31-1) at 7–8 (seeking to raise "'objects and purposes' conflict preemption"); Pl's. Reply (DN 34) at 1 ("CTIA's Motion for Leave seeks to amend its pleading to assert new legal arguments regarding conflict preemption and 'objects and purposes' preemption …."); *id.* at 4 ("Counts I and II of the First Amended Complaint are based on arguments that HB 208 frustrates the federal purposes and objectives of [various federal statutes].")). The amended

---

[13]   Similarly, CTIA argues in passing in footnotes 7 and 12 of its motion that KRS 65.7636(5) is somehow unintelligible, yet it failed to plead such a claim. Pl's. Motion (DN 62) at 19 n.7 & 25 n.12; *compare* Am. Compl. (DN 36). The Board objects to CTIA's insertion of such a new claim. Without waiving this objection, the Board notes that KRS 65.7636(5) is perfectly intelligible and contains a prohibition with an express predicate in "language that the people upon whom it is designed to operate or whom it affects can understand." *Folks v. Barren Cnty.*, 232 S.W.2d 1010, 1013 (Ky. 1950).

complaint bears this out, with each preemption count being based on "objects and purposes" conflict preemption. *See* Am. Compl. ¶ 3 (alleging HB 208 "conflicts with the federal objectives and purposes of multiple laws"); *id.* ¶¶ 85–86, 110, 125 (alleging HB 208 frustrates Congress's objectives).

CTIA did not plead impossibility conflict preemption, which is distinct from "objects and purposes" conflict preemption. *See Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021) (holding implied conflict preemption "occurs 'where compliance with both federal and state regulations is a physical impossibility, **or** where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)) (emphasis added)).

CTIA uses the term, "impossible" two times in its amended complaint, but in each instance, it is not alleging a congressional purpose or objective identified in its amended complaint. According to CTIA, HB 208 "make[s] it impossible to operate as a Lifeline-only, no-cost-to-end user provider in Kentucky." Am. Compl. (DN 36) ¶¶ 83, 101. But it outlines the purportedly preempting congressional "purposes and objectives" elsewhere. *See id.* ¶¶ 75–78, 91–95, 115–116. At most, CTIA's use of "impossible" in its amended complaint is a premise of its claims. Even then, as discussed above, there is no evidence that Congress intended for Lifeline or any other universal service program to be free to end users. Instead, such programs are to be provided "at just, reasonable, and affordable rates." 47 U.S.C. § 254(b)(1).

If CTIA tries to argue that it already has pleaded impossibility conflict preemption—much like it previously admitted to having raised its conflict preemption claims in its original

complaint[14]—that would further support this Court's reconsidering the decision to allow amendment of the complaint in light of the Sixth Circuit's mandate, as the Board has asked it to do. *See* Def's. Motion (DN 58) at 24.

**B. Although there is no legal basis to allow CTIA to bootstrap a new claim into its complaint with its summary-judgment motion, CTIA's impossibility claim also fails as a matter of law.**

CTIA's impossibility argument depends on the fictitious claim that Lifeline providers will have no revenue or source of funds other than the federal Lifeline subsidy from which to pay the HB 208 service charges and will thus be forced to pay the Lifeline charges form the federal Lifeline subsidy. But CTIA merely speculates that providers will have to do so. It offers *no* proof, with its motion or in discovery, that its members will, in fact, have no other sources of revenue or funds, and will thus be forced to pay the Lifeline charge from the federal Lifeline subsidy. Without proof that the charge will come from the forbidden Lifeline subsidy, CTIA is left with nothing but speculation. Such speculation is insufficient to make a case for preemption, especially given the strong presumption *against* such preemption, under precedent cited in the Board's motion. Def's. Motion (DN 58) at 10–12.

CTIA bears the burden of showing preemption. It has failed to meet its burden, and thus its claim should be dismissed. CTIA admitted in discovery that none of its members operates solely on a free-only Lifeline business model. *See* First Disc. (DN 58, Ex. A), Admis. 13. (admitting to knowing of no "member who receives no (zero) revenue other than the federal Lifeline subsidy"). Thus, the premise of their claim is belied by reality.

As a matter of law, other sources of funds are available to pay the Lifeline charge. For

---

[14]     *See* Pl's. Motion to Amend Compl. (DN 32), at 2 ("Plaintiff's conflict preemption claims, although raised in the Complaint); Pl's. Memo. in Support (DN 32-1), at 4 (admitting that the implied "preemption claims … were already raised in the original Complaint").

example, providers could participate in the Kentucky Universal Service Fund, which currently pays "$6.00 per month per Lifeline customer for [carriers] that provide unlimited voice service in Kentucky." *In re An Inquiry into the State Universal Serv. Fund*, No. 2016-00059, 2021 WL 1338507, at *1 (Apr. 6, 2021). CTIA claims that very few providers participate in this program, yet they offer no proof of that. Pls' Motion (DN 62) at 20 n.8. Public records, however, show that at least one of the providers CTIA identified in its complaint—Tracfone—receives the KUSF subsidy. *See In re Elec. Pet. of Tracfone Wireless, Inc. to Amend Its Desig. as an ETC to Receive Ky. Universal Serv. Support for Lifeline Serv.*, No. 2019-00185, 2020 WL 509123, at *2 (Jan. 28, 2020) ("TracFone shall be eligible to receive KUSF support for each qualified Lifeline customer beginning in the first full month after the date of this Order.").

Regardless of whether CTIA's members currently receive the KUSF, it is available to them. The PSC noted in 2016 that "[s]ince its inception, 52 carriers have, at some point, received disbursements from the KUSF," though it also noted that some have since stopped receiving the KUSF subsidy. *In re An Inquiry into the State Universal Serv. Fund*, No. 2016-00059, 2016 WL 427091, at *3 (Feb. 1, 2016). Providers that CTIA identified in discovery have received the KUSF in the past. *See, e.g.*, *In re App. of Global Connection Inc. of America D/B/A Stand Up Wireless for Desig. as an ETC*, Case No. 2013-00051, Order at 16 (Ky. P.S.C. Aug. 7, 2013).[15] And recently, there has been "an increased demand on the KUSF caused by an increase in support for carriers that provided unlimited voice service," which led the PSC to increase the surcharge to support the KUSF. *In re An Inquiry into the State Universal Serv. Fund*, No. 2016-00059, 2022 WL 4958086, at *1 (Sept. 27, 2022).

CTIA states that "any funds received from the KUSF are subject to Section 254's

---

[15]    Available at https://psc.ky.gov/order_vault/orders_2013/201300051_08072013.pdf.

restrictions," but this assertion is incorrect. Pl's. Motion (DN 62) at 20–21 n.8. Although § 254(f) limits the PSC in designing its KUSF program, it does not a limit how the KUSF subsidy paid to a provider may be used. Section 254's limit on the use of Lifeline subsidies applies only to the *federal* subsidy. *See* 47 U.S.C. § 254(e) (identifying the "specific Federal universal service support" and limiting the use of those funds by a "carrier that receives such support").

Frankly, CTIA's argument that its members will not have sufficient non-federal Lifeline revenue to pay the charge depends on a hypothetical carrier that receives only revenue from free Lifeline service. CTIA's own discovery response debunked that hypothesis. As CTIA acknowledges, all its members offering Lifeline are for-profit entities and provide additional services at a cost to the customer. *See* First Disc. (DN 58, Ex. A), at Interrog. 9; *id.* Admis. 11–15; Supp. Disc. (DN 58, Ex. B), Interrog. 9. As discussed above, universal service programs, including Lifeline, were never intended to provide *free* service or even to provide a profit to the carriers. At most, Lifeline subsidies are "intended to 'offset' … lost revenue in servicing … low-income users, so that the recipients can provide and expand universal service while remaining competitive in the telecommunications market." *AT&T, Inc. v. United States*, 629 F.3d 505, 514 (5th Cir. 2011).

CTIA's argument is essentially that *no* state regulation that affects its costs—whether directly, such as a tax or fee, or indirectly, such as workplace-safety regulations—would be permissible, because they would cut into the federal Lifeline subsidy. But that cannot be the case. Following CTIA's logic, any Lifeline provider would then be free from income tax, since paying such taxes is not the "the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e). Yet federal universal-service revenues are, in fact, taxable income. *See AT&T, Inc.*, 629 F.3d at 507 (affirming decision that "taxpayer was not entitled to a refund of income taxes paid on the funds because the 'universal service' support payments

were income rather than capital contributions"). That HB 208 may have a minor effect on the businesses of carriers offering Lifeline simply does not give rise to implied conflict preemption. *See Parsad*, 2009 WL 10677876, at *11.

Rather, there are other sources of revenue or funding from which the HB 208 charge could be paid, while leaving intact federal Lifeline funds. *See* Def's. Motion (DN 58) at 17–20. For example, customers pay for non-Lifeline service, such as fees for added minutes or data or fees paid by traditional post-paid customers. *Id.* Many of CTIA's "members" that provide Lifeline— specifically those identified in its amended complaint (T-Mobile/Assurance Wireless and TracFone)—are parts of large, closely related businesses that operate as single enterprises and have tens of billions of dollars in annual revenue, as shown by publicly available filings on government websites, from which the charge could be paid. *Id.* at 18–19.[16]

CTIA's claim that subsidiaries of huge wireless carriers lack a source of funds other than the federal subsidy to pay the HB 208 charge is simply beyond the pale. As explained here and in the Board's motion, numerous sources of money other than the federal Lifeline subsidy are available to pay the HB 208 charge. Complying with HB 208 and federal law is not impossible.

## IV.  HB 208 does not violate the Equal Protection Clause.

The Board addressed CTIA's equal protection claim in depth it is motion for summary judgment. Def's. Motion (DN 58) at 25–28. The Board incorporates its argument as if restated here; CTIA's Lifeline providing members are not similarly situated to other wireless providers and, even if they were, HB 208, as economic legislation, need only be supported by a rational basis, of which there are many. CTIA's motion fails to address the rational basis question, just as

---

[16]     The authenticity of publications on government websites was stipulated by the parties. Agreed Stips. (DN 53) ¶ 21.

it failed to plead the lack of a rational basis in its amended complaint. This alone is fatal to the equal protection claim. *See* Def's. Motion (DN 58) at 26.

CTIA's motion, instead, discusses only the disparate-treatment aspect of an equal-protection claim. Pl's. Motion (DN 62) at 22–24. This is the "threshold element of an equal protection claim." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). Disparate treatment exists only when the government treats a person disparately as compared to similarly situated persons. *Id.*

CTIA's argument is built on the notion that federal and state law only recognize one category of wireless provider, and thus Lifeline providers are similarly situated to non-Lifeline providers for purposes of equal protection. This is simply incorrect. For example, CTIA cites 47 U.S.C. § 254, which discusses "every telecommunications carrier" and requires that contributions to any state universal service fund be on an "equitable and non-discriminatory basis." This provision concerns the funding mechanisms for universal service, not equal protection. As this Court has recognized, HB 208 has nothing to do with universal service funding. *See* Op. & Order (DN 14) at 13 ("This fee, while perhaps impacting the pocketbooks of service providers, has no relation to the matter by which Kentucky operates its universal service fund."); *see also CTIA – The Wireless Ass'n v. Keats*, No. 21-5435, 2021 WL 7209356, at *5 (6th Cir. Dec. 3, 2021) ("HB 208 requires Lifeline providers to pay 911 service charges; it bears no relation to Kentucky's operation of its universal service fund.").

CTIA also cites Kentucky statutes defining "CMRS provider" and discusses how service charges were collected in the past. But this does not mean that Kentucky law recognizes a single, monolithic category of wireless provider. In fact, by imposing different 911 service charges on the

three types of wireless service—prepaid, postpaid, and Lifeline—Kentucky law recognizes different categories of differently situated providers. In other words, there is no disparity because a Lifeline provider is treated by Kentucky law the same as any other Lifeline provider.

All providers, through their users, impose a similar burden on the Commonwealth's 911 infrastructure. But the providers differ in other ways that make them not similarly situated. Unlike regular providers, Lifeline providers offer a subsidized service to their customers. And unlike regular providers, Lifeline providers' service imposes a burden on the 911 system because providers cannot be required to recover from Lifeline users without a financial transaction—a difference mandated by 47 U.S.C. § 1510(c)(1). Thus, the service that Lifeline carriers provide differs from that of regular wireless providers, making them not similarly situated.

Nevertheless, CTIA argues that its members are like the litigants in *GTE Sprint Communications Corp. v. Wisconsin Bell*, *Inc.*, but that case differs substantially from this one. 454 N.W.2d 797 (Wis. 1990). In that case, a retail sales tax was applied to some communications providers but not others, despite their engaging in the same transactions, and the Wisconsin Supreme Court held that the tax violated equal protection. *Id.* But CTIA's members are not facing a retail sales tax, and that court's logic does not match this case. First, that court found no rational basis for the disparate treatment. As discussed in the Board's motion, ample rational bases exist for a fee on Lifeline providers that differs from the fees on prepaid and postpaid service.

Second, the transactions in that case—the transfer of access services—were the "same" for all providers. *Id.* at 804. Here, while the services provided by the carrier to customers are similar (wireless voice and data), the transactions by which that is accomplished differ substantially among the different types of providers. Postpaid providers sell their services under a contract and bill their customers monthly. Prepaid providers sell devices and units of service (minutes or data)

22

in unpredictable retail point-of-sale transactions. Because the transactions differ, the service charge differs ($.70 per month for postpaid and $.93 per transaction for prepaid). Lifeline falls in a third distinct category: It has no monthly contract and no retail transaction; instead, the transaction is subsidized by the federal universal service fund (and possibly the state universal service fund).

Finally, in its motion, CTIA takes issue with the Board's contention that its members will not pay their fair share for 911 services if HB 208 is struck down, claiming other providers do not pay 911 fees. But Lifeline providers would place a unique burden on 911 infrastructure if they do not pay any service charge, because under the express language of § 1510(c)(1), they cannot be required to collect or remit a charge from their users absent a financial transaction. Yet the FCC expressly allows states to recover their 911 costs, even if providers cannot. *See In re Revision of the Comm'n's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Sys.*, 14 F.C.C. Rcd. 20850, ¶¶ 19–23 (1999) (removing the requirement for a provider cost-recovery mechanism while keeping requirement that PSAPs be able to recover their costs, without "dictat[ing] the funding approach to be used"). If CTIA's motion is granted, Lifeline providers in Kentucky would burden the 911 infrastructure without the state being able to recover that cost— despite the FCC's express decision to allow states to recover those costs.

## V.  HB 208 does not violate the Takings or Due Process Clauses.

Like the equal-protection claim, the Board addressed CTIA's takings and due-process claims in its own motion for summary judgment. Def's. Motion (DN 58) at 29–31. Instead of repeating that argument here, the Board addresses only certain aspects of CTIA's argument as presented in CTIA's motion.

Contrary to CTIA's position, calculating a service charge does not implicate the Takings Clause. The Takings Clause is implicated only when the government "seize[s] or otherwise

impair[s] an identifiable fund of money." *McCarthy v. City of Cleveland*, 626 F.3d 280, 286 (6th Cir. 2010). CTIA argues that calculating the Lifeline service charge creates an "identifiable fund of money," Pl.'s. Motion (DN 62) at 24, but that is not what is meant by that phrase. It refers to things like pension funds. *McCarthy*, 626 F.3d at 286. Even then, the Takings Clause is implicated only by a retroactive impact on a property interest. *Id.* But the service charge at issue here is not retroactive. Instead, HB 208 is a "regulatory action[] requiring the payment of money." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339–40 (Fed. Cir. 2001). Such actions "are not takings. … [T]he mere imposition of an obligation to pay money … does not give rise to a claim under the Takings Clause of the Fifth Amendment." *Id.*

As for the due process claim, although the Board has already raised this point in its motion, it worth pointing out again that HB 208 need only be supported by a rational basis to survive a due-process challenge. Ample rational bases support HB 208. *See* Def's. Motion (DN 58) at 26–30. CTIA never pleaded a lack of rational basis, and its motion does not claim there is none.

In addition, CTIA's due process claim, as now argued, depends on a Kentucky case purportedly requiring any fee to have a relationship to the benefit received to avoid violating due process. Pl.'s. Motion (DN 62) at 24 (citing *Ky. River Auth. v. City of Danville*, 932 S.W.2d 374, 376 (Ky. App. 1996)). This case is inapplicable for three reasons.

First, the case at most requires that "special assessments and user fees" have a relationship to a benefit received. *Id.* But the charge here is neither a special assessment nor a user fee.

Second, although *Kentucky River Authority* couched its rule as one of "due process," it does not appear to be one arising from *federal* due process, which is the basis of the claim CTIA brought in its amended complaint. At best, this "right" to a relationship between the fee and the benefit received is an element of state law, which cannot be the basis for a federal due-process

24

claim. *Young v. Twp. of Green Oak*, 471 F.3d 674, 684 (6th Cir. 2006).

Third, even if *Kentucky River Authority*'s rule applied here, there is no requirement that the payor of a fee and the beneficiary be the same person or entity. *See McGlone v. Womack*, 111 S.W. 688, 689–90 (Ky. 1908) (concerning license fee on dogs to benefit sheep owners); *Klein v. Flanery*, 439 S.W.3d 107, 120 (Ky. 2014) (holding that specific fees did "not exist for the benefit of the [persons] … who pay fees and fines to the funds" and "instead … exist for the physical safety and the economic security of the public at large"). For that reason, the Kentucky Supreme Court approved 911 fees imposed on real-property owners, as opposed to 911 users who will benefit directly from 911 service. *See Greater Cincinnati/N. Ky. Apartment Assoc., Inc. v. Campbell Cnty. Fiscal Ct.*, 479 S.W.3d 603, 606 (Ky. 2015). The court specifically held that the "the nexus required to sustain a fee … need not necessarily be direct." *Id.* at 607. The relationship in that case is identical to the one here, and thus HB 208 is neither arbitrary nor capricious.

## CONCLUSION

HB 208 is not impliedly preempted by federal law and does not violate the Equal Protection, Due Process, or Takings Clauses. For these reasons, and for those reasons set forth in the Defendant's summary-judgment motion, the Court should deny CTIA's motion and enter judgment for the Defendants.

Respectfully submitted,

/s/Shawn D. Chapman
Shawn D. Chapman (KBA No. 89499)
August L. Pozgay (KBA No. 99173)
Jacob C. Walbourn (KBA No. 93870)
Public Protection Cabinet
500 Mero St., 218NC
Frankfort, Kentucky 40601
Telephone: (502) 782-1868

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2023, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

/s/Shawn D. Chapman
*Counsel for Defendants*