**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | | |
|---|---|---|
| CTIA - THE WIRELESS ASSOCIATION | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENTUCKY 911 SERVICES BOARD; | ) | CIVIL ACTION NO. 3:20-CV-00043-GFVT |
| JOSIAH KEATS, in his official capacity as | ) | |
| Chair of the Kentucky 911 Services Board; | ) | |
| MIKE SUNSERI, in his official capacity as | ) | |
| administrator of the Kentucky 911 Services | ) | |
| Board; and UNKNOWN BOARD | ) | |
| MEMBERS, in their official capacity as | ) | |
| board members of the Board | ) | |
| | ) | |
| Defendants | ) | |

---

**PLAINTIFF CTIA – THE WIRELESS ASSOCIATION'S**
**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, CTIA – The Wireless Association ("CTIA"), by counsel, submits this Response in Opposition to the Motion for Summary Judgment (Doc. #58) ("Motion") filed by Defendants, Kentucky 911 Services Board ("Board"), Josiah Keats, in his official capacity as Chair of the Board, Mike Sunseri, in his official capacity as administrator of the Board, and the unknown board members, in their official capacity as members of the Board (collectively "Defendants").

The federal government has long recognized the importance of promoting universal communication services to all Americans. A founding purpose of the Federal Communications Commission ("FCC") was to ensure telecommunications services are available to "all of the people of the United States". 47 U.S.C. § 151. One of the ways in which Congress and the FCC have worked to achieve this federal objective has been the creation and funding of the Lifeline program, which economically incentivizes wireless telecommunications carriers to provide basic minimum telecommunication services to participating low-income households. Congress and the FCC have

23051548

enacted federal legislation and issued decisions, respectively, to ensure that the accompanying subsidy stretches as far as possible to further universal service. Accordingly, Lifeline funds may only be used to provide Lifeline services and have historically been intended to offset only specific costs.

In contrast to universal service, Congress established 911 as a universal emergency services number and obligated carriers to provide connectivity to 911 call centers (a/k/a public safety answering points ("PSAPs")). Successfully providing 911 services requires investments by stakeholders across the telecommunications ecosystem. States must build and staff PSAPs, and carriers must ensure that their networks can carry 911 traffic, even in circumstances when the person making a 911 call is not their customer or is using a handset without a service plan. But, Congress does not provide funding to carriers for furnishing 911 connectivity as it does for Lifeline, so carriers bear their share of 911 connectivity costs without government compensation.

States have established their own mechanisms for recouping their portion of the costs of 911 services. Typically, including in Kentucky until recently, state 911 funding schemes placed the obligation on customers to pay a fee for PSAPs, and count on carriers to collect this fee from customers and pass it along to the government. So, across the country, the paying customers of carriers (traditional monthly billed users and prepaid users), pay charges that the carriers (and retailers) collect and remit to states and entities like the Board that serve as a source of funding for local PSAPs.

But, this funding structure does not work for customers receiving free-to-them service using federal Lifeline funds, because they have no billing relationship with the carrier. Without a billing relationship, the carrier cannot collect and the federal Fairness Act prohibits requiring the collection of such a fee from these customers. In any event, customers receiving services entirely covered by the federal Lifeline subsidy may not be able to afford to pay a 911 service fee.

Rather than have the state absorb the cost of providing 911 to these low income customers (as the carriers do with their own 911 related costs), KRS 65.7636, as amended, seeks to ensure that the

2

state will get paid – by uniquely shifting the burden of covering the state's 911 costs onto Lifeline providers, thus funding the state's 911 fund at the expense of the federal Lifeline program. In 2020, the Kentucky legislature amended KRS 65.7636 in 2020 Ky. Acts c. 37 § 1 (2020 HB 208) ("HB 208") to: (1) remove the "collect from" aspect of KRS 65.7636 that was expressly at odds with the Fairness Act in an admitted attempt to circumvent the Fairness Act; (2) *require Lifeline providers to pay a monthly $0.70 per Lifeline end user CMRS service charge (911 fee)* – at issue here; *and*, (3) prohibit Lifeline providers from using Lifeline funds to pay that 911 fee in an attempt to circumvent arguments that the fee undercuts the federal Telecommunications Act's goal of universal service.

In short, Defendants claim that invalidating HB 208 will cause Lifeline providers to "not pay their fair share" of 911 fees. But, what is actually going on is that Kentucky has attempted to create a system to ensure recovery of its own 911 costs by diverting limited Lifeline funds away from their intended purpose in conflict with, and imposing an obstacle to, the federal goal of universal service.

Defendants' Motion should be denied and CTIA awarded summary judgment as HB 208 is preempted by federal law – Sections 151, 254 and 1510 of the Communications Act, as well as FCC decisions implementing it – and specifically targets Lifeline carriers for different treatment in violation of the Equal Protection Clause, the Takings Clause, and due process.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL BACKGROUND

The parties stipulated to the material facts of this case (Doc. #53). While CTIA does not substantively disagree with Defendants' Statement of Facts, Defendants leave out important facts, *e.g.*, concerning legislative history and the federal Lifeline program, unlike CTIA's recitation of facts in its Motion for Summary Judgment. CTIA reiterates certain facts below for the Court's convenience.

## I.   The Federal Lifeline Program.

The FCC has long interpreted the statutory purposes identified in the Communications Act of 1934 to encompass "a universal service goal" to ensure that telecommunications services are

reasonably available to all Americans at all income levels and regardless of where they live. *MTS & WATS Mkt. Structure,* Third Report and Order, 93 FCC 2d 241, ¶ 83 (1983).[1]

This universal service goal embodied in the Communications Act led the FCC, in 1985 (after the breakup of AT&T made traditional implicit subsidies unworkable), to establish the federal Lifeline program to ensure that Americans of limited means could access telecommunications services. *MTS and WATS Market Structure, and Establishment of a Joint Board, Amendment,* Report and Order, 50 Fed. Reg. 939-01 (1985); Doc. #53, ¶ 1. Initially, the Lifeline program was created to offset a new "subscriber line charge" ("SLC") that the FCC established following the separation of AT&T interexchange company from AT&T local exchange companies to enable competition in the long-distance market. *Id.* The SLC was an end user charge to reduce the level of access charges that long-distance companies had been paying to local exchange carriers ("LEC") for the use of local networks to terminate long-distance calls. *Id.* Recognizing that "[i]n many cases, particularly for the elderly, poor, and disabled, the telephone is truly a lifeline to the outside world," the FCC determined that the SLC should be offset for low-income households, thus establishing the Lifeline program. *Id.* at 941 ¶ 9. The FCC specifically acknowledged that the subsidy for telecommunications providers was necessary because "[a]ccess to telephone service has become crucial to full participation in our society and economy," and "an increase in fixed charges for telephone service" could "cause a significant number of subscribers to cancel service." *Id.* at 941 ¶¶ 8, 9. Establishing Lifeline was "necessary … to ensure the preservation of universal service" and "to prevent degradation of universal service and the division of our society into information 'haves' and 'have nots.'" *Id.* at 941 ¶¶ 9, 11.

---

[1]   The FCC was created by the Communications Act of 1934 "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States … a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges" and "for the purpose of promoting safety of life and property through the use of wire and radio communication", among others. 47 U.S.C. § 151.

23051548

Congress then adopted the Telecommunications Act of 1996 ("Telecommunications Act") to promote competition in telecommunications services. Doc. # 53, ¶ 2. The 1996 Act added Section 254 to the Communications Act, which articulated federal universal service principles and imposed requirements for a statutorily codified universal service program, to ensure these universal service programs were explicit, transparent, and competitively neutral. These federal universal service principles include, among others, that: "[q]uality services should be available at just, reasonable, and affordable rates," that "[a]ccess to advanced telecommunications and information services should be provided in all regions of the nation," and "[c]onsumers in all regions … including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services[.]" 47 U.S.C. § 254(b)(1)-(3). Section 254 charged the FCC with "establishing … the definition of the services that are supported by Federal universal service support mechanisms." 47 U.S.C. § 254(c)(1). To fund the program, Section 254 requires "[e]very telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the [FCC] … to preserve and advance universal service." 47 U.S.C. § 254(d).

The FCC has a detailed process for assessing telecommunications carriers' contributions to the universal service fund ("USF"). *See* 47 C.F.R. §§ 54.706-54.713. The FCC administers the Lifeline program, *i.e.*, data collection and maintenance, support calculations, disbursements from the U.S. Treasury, and assistance to consumers with Lifeline eligibility and enrollment, through the Universal Service Administrative Company ("USAC").[2]

---

[2]   Doc. # 53, ¶ 5, *see* FCC, Universal Service Support Mechanisms, www.fcc.gov/consumers/guides/universal-service-support-mechanisms (listing Lifeline as the first of four universal service support mechanisms) (last updated December 30, 2019) (a copy of the website is attached as Ex. A) & FCC, *Lifeline Support for Affordable Communications,* www.fcc.gov/consumers/guide/lifeline-support-affordable-communications (last visited September 1, 2023) (a copy of the website is attached as Ex. B).

23051548

In implementing Section 254, the FCC "transformed" the initial Lifeline program into a formal, stand-alone universal service program, using the federal USF as the source of the federal subsidy. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019).

To provide Lifeline, a carrier must be "designated as an eligible telecommunications carrier" by a State commission or the FCC. 47 U.S.C. § 214(e). A "Lifeline provider" under the relevant Kentucky commercial mobile radio service ("CMRS") charge statutes that fund Kentucky 911 service is a "CMRS provider that the Kentucky Public Service Commission has deemed or deems eligible to participate in the wireless low-income Lifeline program and to receive reimbursement from the universal service fund managed by the [FCC] pursuant to the federal Telecommunications Act of 1996, 47 U.S.C. secs. 151 et seq." KRS 65.7636(1); *see* KRS 65.7621(18).

Since 2012, the FCC has administered the Lifeline program through a uniform per-household subsidy paid to Lifeline providers for non-Tribal subscribers of either $5.25 (for voice-only Lifeline plans) or $9.25 (for plans including broadband), which reflected the average monthly benefit issued for Lifeline subscribers at that time, *i.e.*, in 2012. 47 C.F.R. § 54.403; Doc. # 53, ¶¶ 3, 4. The *federal Lifeline subsidy covers Lifeline providers' monthly service charges – <u>not</u>* state or local charges for 911 services.[3] Thus, each month wireless Lifeline providers receive either $5.25 or $9.25 for each eligible end user recorded in the National Lifeline Accountability Database, and the Lifeline providers "in turn pass through the subsidy to provide their services to low-income consumers at reduced costs."

---

[3]   *See* 47 U.S.C. §§ 151 & 254; *Reference Book of Rates, Price Indices, & Household Expenditures for Tel. Serv.*, 2007 WL 2791095, at *3 (OHMSV 2007) ("In addition to monthly charges for basic service and calling charges, customers pay a number of other charges …. The federal subscriber line charge is a line item that local exchange carriers are authorized to charge to recover a portion of the interstate costs of providing local phone service …. Lifeline subsidizes lower-income households' monthly service charges."); *Eliminating Ex Ante Pricing Regul. & Tariffing of Tel. Access Charges, Notice of Proposed Rulemaking*, 35 FCC Rcd 3165, ¶ 26 (2020) ("[A] typical phone bill includes a 'base' charge for local service; line items for local, state, and federal taxes; *additional charges to pay for 911 services,* federal USF, and Local Number Portability Administration; the *Subscriber Line Charge* [*i.e.,* SLC]….") (emphasis added).

23051548

*Nat'l Lifeline,* 921 F.3d at 1107; 47 C.F.R. § 54.407; 47 C.F.R. § 54.403(a)(1).

Section 254 and the FCC rules require Lifeline providers receiving universal service support to "use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e); 47 C.F.R. § 54.7. A Lifeline provider need not provide cost-to-the-end-user plans to participate in the Lifeline program. The subsidy allows Lifeline providers to offer affordable plans, including offerings that impose no cost at all on the end user, and for which no service initiation fee or subsequent billing relationship is necessary for the end user to receive service ("Free Lifeline Only Service"). A Lifeline provider offering Free Lifeline Only Service plans is compliant with all Communications Act provisions and FCC rules. The FCC has repeatedly acknowledged the value to low-income consumers of Free Lifeline Only Service plans [47 U.S.C. §§ 151 & 254] with no contract or billing relationship with their carrier [47 U.S.C. § 1510].[4]

A number of CTIA's members and member-affiliates offer and provide Lifeline service at no cost to qualifying, low-income Lifeline customers; *i.e.,* a Free Lifeline Only Service plan.[5] Doc. #53, ¶ 7. For these plans, the Lifeline customer need not give any cash, credit, or other monetary value or consideration to the Lifeline provider for basic Lifeline service, which generally consists of a CMRS connection, voice, broadband wireless internet access, and text messaging. *See* Doc. # 53, ¶ 8.

## II.    <u>The Federal Fairness Act.</u>

In 2018, Congress enacted the Telecommunications Tax and Fee Collection Fairness Act of 2018 ("Fairness Act"). The Fairness Act prohibits a state (here, Kentucky) from requiring an out-of-

---

[4]    *See, e.g., Lifeline & Link Up Reform & Modernization Lifeline & Link Up Fed.-State Joint Bd. on Universal Serv. Advancing Broadband Availability Throughout Digital Literacy Training*, Report and Order and Further Notice of Proposed Rulemaking; 27 FCC Rcd 6656, ¶ 378 (2012).

[5]    Lifeline customers may opt to purchase additional wireless service beyond the service included in a Free Lifeline Only Service plan. When they do this, they pay the CMRS service charge. *See, e.g.,* Plaintiff's Responses to Defendants' First Set of Interrogatories, Requests for Admission, and Requests for Production of Documents, Answer to Interrogatory No. 9, attached as Ex. C.

state Lifeline provider to collect from, or remit on behalf of any other person, any fee, surcharge or tax (here, the Kentucky 911 fee) unless the collection or remittance is tied to a financial transaction.[6] The Fairness Act safeguards wireless carriers' ability to provide free to the customer Lifeline service, and prevents states from requiring out-of-state carriers to establish billing relationships with these customers. A number of CTIA's wireless provider members and their member affiliates who provide Free Lifeline Only Service are such out-of-state providers. Doc. # 53, ¶ 7.

**III.**   **Kentucky 911 Emergency Services Provided by CMRS Providers and PSAPs which Is Funded by Certain Users.**

When a wireless telephone user dials 9-1-1, "[a]ll telecommunications carriers" must "transmit all 911 calls to a PSAP" or other emergency service. 47 C.F.R. § 9.4. "CMRS providers" offering voice service must "transmit all wireless 911 calls without respect to their call validation process" pursuant to Section 9.4. To ensure wireless telephone users never have to wonder about whether they can reach 911, the rule requires CMRS providers to transmit *all* 911 calls to PSAPs, whether they originate from customer devices, customer devices with contracts with other CMRS providers, or "non-service-initialized" (NSI) devices, *i.e.*, mobile devices with no valid service contract with any CMRS provider.[7] Examples of NSI devices include prepaid cell phones with expired minutes, phones under an expired contract, donated phones, and certain "911-only" phones configured solely to make emergency calls. As such, wireless providers are obligated under federal

---

[6]   "A State, or a local jurisdiction of a State, <u>may not require</u> a person who is neither a resident of such State or local jurisdiction nor any entity having its principal place of business in such State or local jurisdiction <u>to collect from, or remit on behalf of, any other person</u> a State or local <u>tax, fee, or surcharge imposed on a purchaser or user</u> with respect to the purchase of any wireless telecommunications service within the State <u>unless the collection or remittance is in connection with a financial transaction</u>." 47 U.S.C. § 1510(c)(1) (emphasis supplied).

[7]   *In the Matter of 911 Call-Forwarding Requirements for Non-Service-Initialized Phones*, 30 F.C.C. Rcd. 3449, 3449-50 & n.2 (2015).

law to provide emergency connectivity even where they receive no compensation for doing so, and must bear their share of the burden in ensuring that all CMRS devices can connect to the 911 system.

Defendants oversee the collection and disbursement of money from Kentucky's wireless 911 emergency telephone service to local PSAPs. Doc. #53, ¶ 11; KRS 65.7621 *et seq.*; KRS 65.7621(8) and (10); Mot. p. 2. Specifically, the 911 Board has the power and duty to "collect the CMRS service charge from each CMRS connection," a term that is statutorily defined as "a mobile handset telephone number assigned to a CMRS customer," which is in turn defined as "an end user to whom a mobile handset telephone number is assigned and to whom CMRS is provided in return for compensation…." KRS 65.7629(3); KRS 65.7621(6)&(7). Thus, under these definitions, the 911 Board is to collect from each end user.[8] These CMRS service charges (*i.e.*, 911 fees) which are imposed on postpaid (traditional monthly billed) service users and prepaid service users, are collected by carriers and retailers and remitted to the state in order to offset the state's costs of establishing the services needed to respond to 911 calls in Kentucky.[9]  KRS 65.7621 *et seq.*; KRS 65.7631.

But, there is no way for carriers to collect the state's fee from a low-income customer that does not have a billing relationship with the carrier—and to the extent that state law requires collection, it would require carriers to establish such a billing relationship, something that the Fairness Act directly forbids. Defendants acknowledge that to the extent KRS 65.7636 previously "allowed,

---

[8]   "Local and state governments who are responsible for operating the nation's 911 system, pass laws that allow them to collect 911 fees through your telephone service or wireless service provider. The fees collected by service providers are distributed to 911 call centers by state and local governments, to help pay for the operation of 911 services." National Highway Traffic Safety Administration, *Frequently Asked Questions* (available at www.911.gov/calling-911/frequently-asked-questions/ (last visited Sept. 1, 2023) (attached as Ex. D).

[9]   Defendants essentially argue it is unfair that Lifeline users get the benefit of emergency services without someone being forced to pay for it and look to Lifeline providers to do so. This argument ignores that Lifeline providers already contribute to the provision of emergency services in kind by ensuring 911 connectivity as required by the federal mandate. Defendants thus seek to doubly burden Lifeline providers. Ironically, users with 911-only phones pay nothing for 911 service.

23051548

but did not require" out-of-state wireless Lifeline providers to "collect from or remit" on behalf of Free Lifeline Only Service customers, it "arguably conflicted" with the Fairness Act. (Doc. #7, p. 4). Defendants also acknowledge they suspended the collection of 911 charges on wireless Lifeline subscribers in September of 2019 to avoid confusion over the matter of whether KRS 65.7636 conflicted with the Fairness Act. *Id*.; Doc. #53, ¶ 11. Defendants intentionally "sought amendment of the statute to avoid future confusion." Doc. # 7, p. 4.

In March 2020, Kentucky enacted HB 208 to amend KRS 65.7636. Doc. # 53, ¶ 13. HB 208 does not alter the postpaid or prepaid CMRS service charge statutory scheme. Rather, it amends KRS 65.7636, governing only the Lifeline CMRS service charge, to: (1) remove the "collect from" Lifeline user aspect of KRS 65.7636 that was expressly at odds with the Fairness Act;[10] (2) **require __Lifeline providers__ to pay a monthly $0.70 per Lifeline end user CMRS service charge (911 fee)**; **and**, (3) prohibit Lifeline providers from using Lifeline funds to pay that 911 fee. 2020 Ky. Acts, c. 37, § 1.

KRS 65.7636 now shifts the burden of the state's costs for answering 911 calls to Lifeline providers by uniquely holding Lifeline providers liable for the 911 fee. Defendants intend (but have not yet begun) to enforce KRS 65.7636 as amended against all Lifeline providers, including out-of-state providers of Free Lifeline Only Service plans. Doc. # 7, p. 4.

## STANDARD OF REVIEW

Defendants have styled their Motion as seeking a judgment on the pleadings and summary judgment. As both parties present evidence and pertinent materials outside of the pleadings, the proper relief is summary judgment unless the Court rejects all extrinsic evidence. *Max Arnold & Sons, LLC v. W.L. Hailey & Co*., 452 F.3d 494, 502 (6th Cir. 2006). Regardless, the parties agree that there are

---

[10]   The Kentucky Legislative Research Commission's Fiscal Note Statement for HB 208 explains, "As a result of this measure, Lifeline service providers would be required to remit a postpaid rate of $.70 ***on behalf of*** Lifeline customers to the Kentucky 911 Services Board." Doc. #53, ¶ 13, *quoting* Ky. Legislative Research Comm'n Fiscal Note Statement (2020 HB 208) (emphasis supplied) (attached as Ex. E).

23051548

no genuine issues of material fact in dispute and that a determination by this Court is appropriate on all issues. However, as explained in this Response and CTIA's pending Motion for Summary Judgment, judgment is warranted in favor of CTIA, not Defendants.

## ARGUMENT

**I.    CTIA Has Article III Standing to Assert Its Claims.**

This Court and the Sixth Circuit have found that CTIA has sufficient associational standing to assert its claims that HB 208 is federally preempted and runs afoul of the Constitution. "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* at 281 (internal quotation omitted). CTIA has associational standing as: (1) multiple members would have standing to sue in their own right; (2) CTIA seeks to protect interests germane to its purpose; and (3) the relief sought does not require CTIA's members to participate in their individual capacity. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Defendants do not challenge the first prong. The second prong is intended to provide "assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555-556 (1996). Challenging the validity of a 911 fee unlawfully burdening wireless Lifeline providers and the Lifeline program for Kentuckians is certainly within CTIA's purview, and this litigation is wholly consistent with CTIA's organizational purposes of set forth in CTIA's Bylaws Articles 2(b) and 2(e). (Doc. #59). This action also directly furthers CTIA's mission and purpose of presenting, advocating and serving as a voice for the wireless communications industry and is specifically aimed to ensure CTIA's members can

23051548

reasonably continue to provide Free Lifeline Only Service to eligible households. *See, e.g.*, CTIA, *Our Mission*, https://www.ctia.org/about-ctia/our-mission, a copy of which is attached as Ex. F. As this Court has already recognized, CTIA is seeking a declaratory action and permanent injunctive relief against a law that requires its members to pay money that could otherwise be invested in providing Lifeline. (Op. & Order, Doc. 14, p. 6).

CTIA is patently adversarial to Defendants. CTIA has submitted amicus briefs in prior cases concerning CMRS service charges levied by Defendants: *Ky. Com. Mobile Radio Serv. Emergency Telecomms. Bd. v. TracFone Wireless, Inc.*, 712 F.3d 905 (6th Cir. 2013) and *Virgin Mobile U.S.A., L.P., v. Com. ex rel. Com. Mobile Radio Serv. Telecomms. Bd*., 448 S.W.3d 241 (Ky. 2014). Litigation is also obviously encompassed by "any other lawful trade association activity" authorized in CTIA's Bylaws and is contemplated by its mission.

Finally, CTIA's claims and relief sought do not require each individual member's participation. CTIA asserts a prima facie statutory challenge and seeks the uniform relief of a declaratory judgment concerning the validity of HB 208 and injunctive relief, which benefits all of CTIA's members providing Free Lifeline Only Service. When CTIA prevails, each of its members will inevitably benefit. *Hunt*, 432 U.S. at 342; *United Food*, 517 U.S. at 545 ("*Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members …"); *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (third factor met "because the declaratory and injunctive relief sought pertains to the state's policy as a whole").

The Motion also claims that CTIA is only seeking relief for carriers who exclusively provide Free Lifeline Only Service. This is not the case. CTIA is seeking relief on behalf of all members and member-affiliates who provide Free Lifeline Only Service in Kentucky, each of which will be subject to the fee imposed by HB 208, if it is not invalidated. CTIA is well-equipped to represent these

12

members, and contrary to Defendants' suggestions, minute details regarding its members' businesses are unnecessary and irrelevant to determine if HB 208 is federally preempted and unconstitutional.[11]

This is a classic example of associational standing, and this Court and the Sixth Circuit have previously correctly found that CTIA has associational standing. Defendants' challenge to CTIA's standing should again be denied.

## II.    **The Anti-Commandeering Doctrine Is Inapplicable.**

The Board wrongly suggests that 47 U.S.C. §§ 1510 and 254 violate the anti-commandeering doctrine. According to the Supreme Court, the anti-commandeering doctrine is meant to prevent Congress from "conscript[ing] state governments as its agents" and ensuring that "[w]hen Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent" so as to "prevent[] Congress from shifting the costs of regulation to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477-78 (2018) (internal citations omitted). Here, no such burden has been placed on the Board through either Section 1510 or Section 254. Rather, "[i]t is clear that this provision operates just like any other federal law with preemptive effect. It confers on private entities (*i.e.*, [wireless providers]) a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 1480.

Initially, the anti-commandeering doctrine is inapplicable here since these provisions of the Telecommunications Act "regulate[] the conduct of private actors, not the States." *Murphy*, 138 S. Ct. at 1481. Here, Section 254 and 1510 specifically govern the actions of private providers who receive federal subsidies and restrict what private Lifeline providers can do with the federal subsidy. HB 208 is preempted not because Congress has "issued[d] a direct order on state legislature" [Mot.

---

[11]    Defendants fault CTIA for lacking minute details regarding each member, such as their "specific business activities and business structures," "specific revenue streams," and "specific business plans." Such information is wholly irrelevant and unnecessary to this *prima facie* statutory challenge. Further, CTIA intentionally does not collect such detailed information regarding its members to ensure that it remains compliant with antitrust laws and its own antitrust compliance policy as set forth in Section 8 of its Bylaws. (Doc. #59).

23051548

at 8], but because HB 208 *itself* constitutes a burden on compliance with federal law. *See Murphy*, 138 S. Ct. at 1480 ("This language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased. … we do not require Congress to employ a particular linguistic formulation when preempting state law." (internal citation omitted)).

Moreover, Sections 254 and 1510 do not "direct the States either to enact or to refrain from enacting a regulation of the conduct of activities occurring within their borders." *Id.* at 1479. Indeed, Sections 254 and 1510 have "by no means commandeered the state legislative process" when "States were not compelled to enforce the federal standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever." *Murphy*, 138 S. Ct. at 1479 (internal quotation omitted). Section 254 expressly permits "regulations not inconsistent with the [FCC]'s rules to preserve and advance universal service" that "do not rely on or burden Federal universal service support mechanism." 47 U.S.C. 254(f). And, Section 1510  authorizes the Board to regulate parties within Kentucky's borders (*i.e.*, intrastate) *but **not** in interstate commerce* (*i.e.*, within Congress's jurisdiction): "A state, or a local jurisdiction …, may not require a person who is neither a resident of such … nor an entity having its principal place of business in such State or local jurisdiction…" 47 U.S.C. § 1510 I(1). The Telecommunications Act restricts states from burdening Lifeline providers operating in ***interstate*** commerce. So*,* "It would … be a radical departure from long-established precedent … to hold that the Tenth Amendment prohibits Congress from displacing state … laws regulating private activity." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 292 (1981). The Board's attempt to use this doctrine to avoid the obvious conflict between HB 208 and Sections 254 and 1510 has no support in the law and should be rejected.

III.   **HB 208 Conflicts with the Federal Objective of Universal Service.**

"[I]n any preemption inquiry, the Supreme Court instructs that the "purpose of Congress is the ultimate touchstone," as "explicitly stated in the statute's language or implicitly contained in its

14

structure and purpose." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Practices Litig.*, 65 F.4th 851, 860 (6th Cir. 2023) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Thus, in addition to express preemption, preemption "occurs 'where compliance with both federal and state regulation is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *State Farm Bank v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). Preemption extends beyond the literal language of a statute to "the provisions of the whole law, and to its object and policy." *Gade*, 505 U.S. at 88 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)). "If the state law would cause the federal law's 'operation to be frustrated and its provisions to be refused their natural effect,' the state law 'must yield to the regulation of Congress.'" *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 492 (6th Cir. 2021) (quoting *Chrysler Grp. LLC v. Fox Hills Motor Sales, Inc.,* 776 F.3d 411, 424 (6th Cir. 2015)).

The presumption Defendants assert here is misplaced. "[A]n 'assumption' of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Congress and the FCC have historically regulated interstate telecommunications, including Lifeline service. Unsurprisingly, the asserted presumption was absent from the Sixth Circuit's opinion in which it held that the "TCA [the Telecommunications Act of 1996] impliedly preempts the Residents' claims based on the tower's expected radiofrequency emissions…." *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017). Thus, the presumption Defendants assert has no merit in this action.

A. **The Imposition of the CMRS Service Charge Is Not an Exercise of Police Power.**

Again, Defendants' asserted presumption against preemption does not apply here because of the historical comprehensive federal presence in interstate telecommunications. *Locke*, 529 U.S. at 108.

23051548

Defendants cite no on-point authority for their proposition that "funding state 911 service is also an exercise of the police power." Mot., p. 11. In fact, since the inception of the term "police power," courts have held that a State's imposition of a revenue-generating fee is **not** an exercise of its police power. Chief Justice Marshall coined the term "police power" in 1827 in the seminal case of *Brown v. Maryland*, 25 U.S. 419 (1827), involving a challenge to a fee imposed by the state. Maryland argued the fee was necessary to protect its citizens from dangerous imports, like gunpowder. The Supreme Court, however, found that the fee was unconstitutional. The Court distinguished the imposition of a revenue-generating fee from direct protective actions such as the "power to direct removal of gunpowder," which in contrast would be "a branch of the police power, which … remains … with the states." *Id*. at 443. As in *Brown v. Maryland*, the instant 911 fee imposed by HB 208 on Lifeline providers at a rate of $0.70 per month for each Lifeline user is simply, at its core, a revenue measure as it does nothing more than put money in the CMRS fund.

Defendants likewise argue that the KRS 65.7636 fee is the equivalent of a tax for federal preemption purposes, invoking *Thiokol Corp. v. Roberts*, 76 F.3d 751, 755 (6th Cir. 1996) for the proposition that "taxation is an 'area of traditional state regulation'". Mot., p. 11. However, Defendants are judicially estopped from arguing they are exercising the State's taxing power. "Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1217–18 (6th Cir. 1990). Defendants have repeatedly and successfully argued and represented to the courts that the CMRS service charges they collect are *not* taxes, but are instead fees – 911 fees; as such, it is not an exercise of state's taxing power.[12] This Court should not

---

[12]   *See, e.g., Virgin Mobile U.S.A., L.P.*, 448 S.W.3d at 250 ("The Board claims that the CMRS service charge is not a tax…."); *Ky. Com. Mobile Radio Service Emergency Telecoms. Bd. v. T-*
(Continued…)

permit Defendants "to feed one can of worms to [the state courts] and another to [this] court". *Sneed v. Univ. of Louisville Hosp.*, 600 S.W.3d 221, 228 (Ky. 2020). The 911 fee is a revenue fee, not a tax, and is not an exercise of the Commonwealth's police power.

**B.      Defendants' General Savings Clauses Have No Effect on CTIA's Preemption Claims.**

Defendants attempt to revive their argument that general savings clauses should operate to save the state's 911 service charges from federal preemption. Specifically, the Defendants cite to two such savings clauses: 47 U.S.C. 615a-1(f)(1), commonly known as the VoIP 911 Fee Parity Provision, which was added by the Net 911 Improvement Act of 2008, and 601(c) of the Telecommunications Act. The Sixth Circuit unequivocally held on appeal that "as the district court recognized, this provision [47 U.S.C. § 615a-1(f)(1)] merely clarifies that nothing in the referenced statutory provisions is intended to prevent the imposition and collection of fees or charges for 911 services and does not support a broad prohibition on preemption of state laws involving such fees or charges." Stated affirmatively, a state cannot be prevented from imposing and collecting a charge to support 911 emergency services, but such a charge must conform with federal laws and objectives.

The Sixth Circuit's analysis applies to any consideration of these general savings clauses against a claim of federal preemption, whether express or otherwise. A savings clause such as 47 U.S.C. 615a(1)(f)(1) or 601(c) "does not bar the ordinary working of conflict pre-emption principles." *Geier v. Am. Honda Motor Co*., 529 U.S. 861, 869 (2000). The Supreme Court "has repeatedly declined to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law." *Id*. at 870 (internal quotations omitted); *Locke*, 529 U.S. at 106 (construing the preemptive effect of federal laws as an exception to a savings clause, which begins

---

*Mobile South LLC*, 2018-CA-001614-MR, 2020 WL 4514940, at *4 (Ky. App. July 10, 2020) (copy of opinion attached at Ex. G) (arguing the CMRS service charge was a fee, *i.e.*, successfully arguing for reversal of circuit court's holding that the CMRS service charge was a tax).

23051548

by stating "Nothing in this Act, or the Act of ….."). Courts do not lightly presume Congress intends for a law to "defeat its own objectives." *Geier*, 529 U.S. at 870. Ultimately, "[w]hy, in any event, would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?" *Id*. at 871.

Defendants' reliance upon *GTE Midwest, Inc. v. F.C.C.*, 233 F.3d 341, 347 (6th Cir. 2000) is misplaced because it primarily analyzes 601(a) and 601(d), which are wholly unrelated to this litigation. *GTE Midwest* does not address – let alone analyze – preemption, and the Court cited 601(c) in *dicta* to generally support an argument that Congress "could have" chosen to (but did not) expressly include the relief plaintiffs therein sought in the other sections of 601. The limited reference to 601(c) in *ACA Connects v. Bonta*, 24 F.4th 1233, 1246 (9th Cir. 2022) was also *dicta*. Likewise, Defendants cite to *AT&T Commc'ns of Ill., Inc. v. Ill. Bell Tel. Co*., 349 F.3d 402, 410 (7th Cir. 2003). In *AT&T Commc'ns of Ill., Inc.,* the Seventh Circuit's analysis of 601 was in the context of field preemption, not conflict preemption. Specifically, that Court analyzed whether the "district judge [properly] thought that the 1996 Act bars state legislatures from playing any role in ratemaking." General savings clauses may be found to bar implied field preemption arguments, but not conflict and obstacle preemption arguments such as CTIA's claims here. *Geier,* 529 U.S. at 869 ("[T]he saving clause (like the express pre-emption provision) do not bar the ordinary working of conflict pre-emption principles."); 884-885 (contrasting savings clauses under field preemption and conflict preemption). Indeed, the Seventh Circuit ultimately found that the Illinois "state law, as the ICC [Illinois Commerce Commission] understood and applied it … conflicts with the 1996 Act and the TELRIC methodology and is therefore preempted." *Id.* at 411. The Defendants' final authority, *City of Dallas, Tx. v. F.C.C.*, 165 F.3d 341 (5th Cir. 1999), is similarly distinguishable in that it analyzes not conflict or obstacle preemption, but field preemption (*i.e.*, the FCC's assertion that it had exclusive authority over cable franchising).

18

Courts have repeatedly rejected Defendants' arguments here and have recognized the Telecommunications Act's preemptive effect on state laws, notwithstanding these savings clauses. *Robbins*, 854 F.3d at 320 (finding the Telecommunications Act preempted state law claims because allowing such claims would serve as an obstacle and "impair the federal government's ability to promote the TCA's goals"); *Farina v. Nokia Inc.*, 625 F.3d 97, 130 (3d Cir. 2010) (rejecting the argument that § 601(c)(1) limits the Telecommunications Act's preemptive effect to only express preemption and finding "such a reading would be odd" and incompatible with *Geier*); *CTIA v. City of Berkeley*, 487 F. Supp. 3d 821, 830 (N.D. Cal. 2020) ("The Court agrees with *Farina* that [Section 601(c) of] the TCA does not displace the application of conventional conflict preemption doctrine, including obstacle preemption."). In sum, HB 208 is subject to federal obstacle preemption, notwithstanding the general savings clauses of Sections 615a-1(f)(1) and 601(c).

### C.      HB 208's Fee on Lifeline Is Preempted.

HB 208 frustrates the purpose of the federal Lifeline program, creates an obstacle to the federal objective of universal service, and renders compliance with federal law impossible so that HB 208 is preempted under Counts I, II and III of CTIA's First Amended Complaint, as also explained in CTIA's Motion for Summary Judgment. Nothing in Defendants' Motion undercuts this conclusion.

Defendants cite *dicta* in *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) and *Kemp v. Medtronic, Inc.*, 231 F.3d 216 (6th Cir. 2000), which **each held state laws to be expressly preempted**, for the proposition that Section 1510 "shows an intent not to impliedly preempt state law". Mot., p. 15. But, actually, "if a federal law contains an express preemption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76–77 (2008). "Preemption is not a matter of semantics. A State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A.*

23051548

*ex rel. Johnson*, 568 U.S. 627, 636 (2013).

Defendants also argue that Courts must look only at an individual statute when determining intent, and that federal intent cannot be ascertained by considering Sections 151, 254 and 1510 together as separate statutes enacted at different times. Mot., pp. 15-16. Defendants point to the canon of *in pari materia*, but this canon addresses construction of ambiguous statutes; it is not a mechanism to determine federal policies and objectives. *See, e.g.*, IN PARI MATERIA, *Black's Law Dictionary* (11th ed. 2019) (defining *in pari materia* as "a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject.") Even under this doctrine, "statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006). Here, Sections 151, 254 and 1510 all relate to telecommunications, and thus evidence Congress's intent, policy and objectives relating to the federal goal of universal telecommunications service. Defendants' arguments fail because they rely upon an unnatural and too-narrow parsing of federal intent that is unsupported by the law.

Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982). In addition to express preemption, preemption "occurs 'where compliance with both federal and state regulation is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *State Farm Bank v. Reardon*, 539 F.3d at 342 (quoting *Gade*, 505 U.S. at 98). In this regard, preemption extends beyond the literal language of the statute to "the provisions of the whole law, and to its object and policy." *Gade*, 505 U.S. at 88.

The advancement of universal telecommunications service is omnipresent throughout the body of federal telecom law. The federal Communications Act explicitly states that it was enacted

23051548

"for the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, … a rapid, efficient, Nation-wide, and word-wide wire and radio communication service with adequate facilities at reasonable charges … ." 47 U.S.C. § 151. In 1996, Congress reaffirmed this federal objective and emphasized its importance when it enacted Section 254 and required the FCC establish universal service contribution and support mechanisms and affirmatively articulated "universal service principles" on which the FCC must base universal service policies. 47 U.S.C. § 254. These "universal service principles" include making "quality services … available at just, reasonable, and affordable rates" and ensuring "access to telecommunications and information services" by low-income consumers. 47 U.S.C. § 254(b)(3).

Congress created the Lifeline program to serve and fulfill this universal service objective. Lifeline is funded through Section 254's requirement that telecommunications carriers contribute on an equitable and non-discriminatory basis to a federal universal service fund, which in turn provides support for universal service mechanisms, including the Lifeline program subsidy. 47 U.S.C. § 254(d)-(e). The subsidy serves as the incentive for participation in the program and ensures that carriers receive adequate compensation for providing services to low-income subscribers. Federal law requires that Lifeline providers "shall use that support only for … services for which the support is intended." 47 U.S.C. § 254(e); *see* 47 C.F.R. § 54.7. In enacting and implementing the Lifeline program, neither Congress nor the FCC included any provision to fund state 911 emergency service, and historically the amounts the Lifeline subsidy was designed to offset have not included 911 fees.

HB 208's amendments to KRS 65.7636: (1) removed the "collect from" aspect of KRS 65.7636 that was expressly at odds with the federal Fairness Act in what Defendants admit was an attempt to circumvent it; (2) imposed a unique burden on the federal Lifeline program by requiring Lifeline providers to pay a monthly $0.70 per Lifeline end user CMRS service charge; and (3)

prohibited those providers from using Lifeline funds to pay that charge in an attempt to circumvent preemption by the pervasive federal universal service goal. The substance and effect of HB 208 is that despite its ostensible prohibition on using federal funds for this purpose, HB 208 functionally re-directs a portion of the federal Lifeline subsidy to fund 911 service in the Commonwealth.

Thus, as set forth in Counts I, II and III of the First Amended Complaint, HB 208 conflicts with both the Communications Act and the Fairness Act because it erects an obstacle (a monthly $0.70 per Lifeline end user 911 fee) to the federal goal of universal service by directly increasing the cost of providing Lifeline service to each and every Lifeline end user in Kentucky. HB 208 places the burden of Kentucky's statutory 911 fee for Free Lifeline Only Service plans onto the Lifeline provider, which undermines the congressional incentive's effectiveness and disrupts the economics of both the universal service contribution and the subsidization framework the FCC established.

HB 208 attempts to avoid the Fairness Act's straightforward command by shifting the 911 fee from Lifeline users to providers, and to skirt Section 254 by imposing an artificial prohibition of using federal Lifeline funds to pay Kentucky's 911 fee. But, as pointed out *supra*, "A State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos*, 568 U.S. at 636. While HB 208 is crafted to attempt to straddle two of the Act's express preemption provisions, it conflicts with the whole of the federal Communications Act embodied in Sections 151, 254 and 1510.

Defendants incorrectly focus on whether HB 208, which requires Lifeline providers to pay a monthly $0.70 per Lifeline end user 911 fee, will simply impact a carrier's **profitability**. Defendants' analysis ignores the underlying issue: by imposing a unique funding burden on carriers that choose to offer Free Lifeline Only Service, HB 208 disincentivizes providers from offering that service in Kentucky, which is detrimental to end users and is contrary to the federal goal of universal service. *See MTS and WATS*, 50 Fed. Reg. at note 1, 941-42. HB 208 serves to incentivize Lifeline providers

23051548

to cease providing service (*i.e.*, fewer Lifeline users means lower or no HB 208 Lifeline 911 fees) or to reduce the levels of service provided to Free Lifeline Only customers to offset HB 208's 911 fee by decreasing minutes and data.

A reduction in Free Lifeline Only services undermines the quality of service in direct contravention of the universal service principles articulated in Section 254 of the Communications Act and the "elimination of discrimination." *Id*. Lifeline providers will have to revise their business models to, for example, provide more plans with costs to paying end users. This impedes and burdens the goal of universal service, as the FCC has previously recognized, because it encourages subscribers to cancel their plans due to these additional costs. *Id*. Further, the "universal service principles" include ensuring "quality services … [are] available at just, reasonable, and affordable rates" and that low-income consumers have "access to telecommunications and information services." 47 U.S.C. § 254(b)(3). HB 208's shifting of the burden onto Lifeline providers only serves to divert resources that are intended to pass through to the subscriber as part of the provision of the federal universal service objective and undermines the federal contribution and subsidization framework established by the FCC. Thus, HB 208 erects a direct obstacle to the federal goal of universal service.

Defendants also incorrectly assert there is no federal support to "suggest that providers have the right to pursue" Free Lifeline Only service plans and that Congress did not intend for providers to operate under this business model. Mot., pp. 17-20. Yet, FCC regulations implementing the Lifeline program contemplate that a Lifeline provider may choose to provide exclusively Lifeline service offerings, and that those offerings may be exclusively Free Lifeline Only Service plans. *See* 47 C.F.R. § 54.201(a). Congress's enactment of the Fairness Act in 2018 further evidences the federal intent to advance and not burden Free Lifeline Only service plans and providers. The Fairness Act insulates non-resident users and providers of no-cost-to-end-user services from remitting or collecting state and local jurisdiction taxes, fees, and surcharges imposed on wireless telecommunications services.

23

47 U.S.C. § 1510(c)(1). It also demonstrates Congress's intent that a pre-existing financial transaction between a provider and user is required in order to allow a state or locality to impose a collection obligation for a telecommunications charge – and that providers should be able to offer services to consumers without requiring that consumers enter into billing arrangements with their provider. *Id.*

Free Lifeline Only Service plans are critical for advancing the universal service goal and are federally safeguarded. While all parties recognize no wireless provider now exclusively provides Free Lifeline Only service plans in Kentucky,[13] the example demonstrates the fundamental conflict between federal law and HB 208, by illustrating that a provider that chose such a business model could not comply with both federal law and HB 208. It is thus a clear example showing that "compliance with both federal and state law is in effect physically impossible." *La. PSC v. FCC*, 476 U.S. 355, 368 (1986). In such instances, a "holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design, ... because the Supremacy Clause dictates that federal law must control." *Id.* (internal citation omitted). Even Defendants now characterize such a plan as "an impossible business model." Mot., p. 17.

Under HB 208, a Lifeline provider offering solely Free Lifeline Only Service plans would incur a charge of $0.70 for each of its subscribers but would have no source of revenue from providing Lifeline services that could legally be used for HB 208's charge. That is because Section 254 precludes Lifeline providers from using the universal service support funds for anything other than

---

[13]   To clarify, Lifeline providers allow customers to purchase optional incremental (add-on) prepaid services in addition to those offered in the Free Lifeline Only plans. Generally, a small subset of Lifeline customers elect to do so. For example, approximately 0.4% of Assurance Wireless LLC's customers in 2022 elected to purchase these additional, incremental services. *See* CTIA, Answers to Interrogatory Nos. 9 and 12, attached as Ex. C.  The Defendants are further factually incorrect when they conflate Assurance and T-Mobile's provision of Lifeline.  Assurance Wireless USA, L.P. was formerly known as Virgin Mobile USA, LP, and this name is separately listed on USAC's website from T-Mobile. *See*, Amended Certificate of Authority of record with the Kentucky Secretary of State at https://web.sos.ky.gov/corpscans/83/0678983-16-99998-20200302-AMD-7864425-PU.pdf (attached as Ex. H).

23051548

the provision of Lifeline services.  This prohibition extends to sums received from both the federal universal service fund and Kentucky's universal service fund, which was enacted pursuant to and in accordance with Section 254. *See* Doc. #53, ¶ 14; *in re: An Inquiry Into Universal Service and Funding Issues*, Ky. P.S.C. Admin. Case No. 360 (May 22, 1998), available at https://psc.ky.gov/order_vault/Orders_1998/19000360_05221998.pdf (a copy of which is attached as Ex. I);47 U.S.C. § 254(f) (a state's regulations must be consistent the Commission's rules" and cannot "rely on or burden Federal universal service support mechanisms.").

### D.   HB 208 Does Not Advance the Federal Universal Telecommunication  Services Objective.

Defendants acknowledge "tension" between the federal Acts and HB 208, but argue it is not an obstacle supporting preemption. Mot. p. 22. This "tension" resulting from HB 208's parsing of Sections 254 and 1510 does not remove it from their federal preemptive effect. *Wos*, 568 U.S. at 636.

First, Defendants attempt to draw parallels between cases recognizing the traditional state powers such as state police powers and taxation. Mot., pp. 22-24. Much like the Defendants' arguments surrounding the applicability of a state's police power, *supra*, Defendants' analogies here are also red-herrings. As discussed *supra*, HB 208 is not an exercise of a traditional state police power, nor is the subject 911 fee a tax. *Brown v. Maryland, supra*; *Virgin, supra*. Thus, the presumptions against preemption associated with these areas of traditional state powers are wholly inapplicable as wireless telecommunications and the Lifeline program are traditionally federally regulated.

Further, CTIA's claims do not rely upon 47 U.S.C. 332(c)(3)(A) regarding regulation of rate entry into the marketplace. Preemption under Section 332(c) was a distinct issue that has already been adjudicated. CTIA's operative preemption arguments under Sections 151, 254 and 1510 are distinct from Section 332(c). Indeed, in *MTS and WATS*, the FCC acknowledged "the legitimate concern that the implementation of subscriber line charges [SLC] in conjunction with the general upward pressure on local rates could undermine universal service" that the Lifeline program was specifically intended

25

23051548

to offset these costs, and that "universal service would be threatened by rate increases of a magnitude sufficient to cause a significant number of subscribers to cancel service." *MTS and WATS*, 50 Fed. Reg. at 941-42. Defendants' Motion confirms that the cost to providers is neither minimal nor indirect. Per Defendants' calculations, HB 208 will cost Lifeline providers approximately $1,000,000 annually to operate in Kentucky. Mot., p. 24. Thus, as explained above, HB 208 strongly incentivizes providers to cease or reduce the provision of Lifeline Free Lifeline Only Services within the state, which will significantly and directly impact the federal Lifeline program, its providers, and its Kentucky users.

Defendants' argument that "no member ceased providing Lifeline when they paid the charge before 2020" is also irrelevant. Even if no provider chose to exit the market entirely, that would not demonstrate a lack of conflict between HB 208 and federal law; as noted above, one way of addressing the conflict would be to simply reduce service, contrary to federal objectives. But, perhaps most importantly, the Board has not begun enforcing HB 208's fee onto providers due to the uncertainty regarding its validity. Thus, HB 208 has not taken effect for its impacts to be measured yet.

Finally, Defendants attempt to conflate the funding of 911 services with the federal objective of universal telecommunications services. To be clear: 911 is not a federally funded universal service objective like Lifeline. While 47 C.F.R. 54.400(m) requires wireless providers to provide all mobile device users with connectivity to local 911 centers (a service for which they receive no direct governmental compensation), it does not require carriers to bear the state's funding burden to answer 911 calls. This regulation does not serve to transform the 911 fee into a federal program or federal universal service, nor does it permit the Commonwealth to siphon from the federal Lifeline subsidy to pay for its own 911 costs. While there is no question 911 services are important, so is Lifeline. It is not the state's place to alter or argue federal priorities. Ultimately, if federal revenue is necessary for 911 services, Kentucky should lobby for federal funding. Defendants cannot burden a federal program as a form of state fundraising.

26

23051548

**IV.**   **The Court Correctly Recognized It Only Previously Addressed Express Preemption.**

Defendants attempt to revive the issue of whether "the Sixth Circuit's order and mandate bars CTIA from pursuing any preemption claim on remand." Mot., p. 24. These arguments were previously raised by the Board [Doc. #33],  fully briefed [Doc. ## 32, 33, 34],  and conclusively rejected by this Court [Doc. #25]. In granting CTIA's Motion to Amend, the Court noted "[t]he Board vehemently opposes CTIA's request to amend" but determined "CTIA's implied preemption theories have not been analyzed by either this Court or the Sixth Circuit" and "neither Court clearly understood implied preemption to have been a relevant topic of discussion." Doc. #35 at 3, 5. Quoting *Wright v. Spaulding*, the Court concluded, "it must be clear that the court considered the issue and consciously reached a conclusion about it….honor[ing] 'the long-held standard that 'questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'" 939 F.3d 695, 702 (6th Cir. 2019). As neither this Court nor the Sixth Circuit considered and addressed the ways in which the full scope of federal law preempts HB 208, this Court should reject the Board's request to revisit its decision.

**V.**   **HB 208 Violates the Equal Protection Clause.**

Contrary to the Board's assertions, CTIA has properly alleged that "the [Board] made a distinction which 'burdened a fundamental right, targeted a suspect class, or ***intentionally treated one differently from others similarly situated without any rational basis for the difference*.**'" *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018) (emphasis added). CTIA has sufficiently plead and established **both** disparate treatment and violation of equal protection.

There is no difference between Lifeline wireless providers and other wireless providers, yet HB 208 unequivocally seeks to treat providers to Lifeline users differently by subjecting Lifeline providers themselves to a fee not imposed on providers that do not provide service to Free Lifeline Only users. Both Congress and the Kentucky General Assembly contemplate only one class of

27

wireless providers. 47 U.S.C. § 254; KRS 65.7621(9). And, all wireless providers provide the same types of service. The Board attempts to draw an artificial distinction between Lifeline providers and other providers by noting that "Lifeline providers offer a subsidized service to their customers." Mot., p. 25. Yet, this is a distinction without a difference as the Board has acknowledged that Lifeline services "impose a similar burden on the 911-service infrastructure" as "postpaid [and] prepaid" services. Doc. #7, p. 26; Mot., p. 28. The three types of CMRS service charges (911 fees) exist only because the method of collecting the fees from end users differ in Kentucky's CMRS statutes, not because of any real distinction or difference among CMRS providers. As such, there is no meaningful difference between Lifeline providers and other providers.

Yet, Lifeline providers are treated differently than other providers since **only Lifeline providers** "are directly liable for the [CMRS] charge." Mot., p. 3; *see also CTIA v. Keats*, No. 21-5435, 2021 WL 7209356, at *4 (6th Cir. 2021) ("HB 208 unambiguously imposes the 911 service charge on Lifeline providers and places no payment obligation on end users."). Other wireless providers pay no share of the cost "of the burden on 911 infrastructure added by…offering service in Kentucky." Mot., p. 28.[14] Rather, certain (but not all) end users pay.[15] Certain users do not pay 911 fees, including users with prepaid cell phones with expired minutes, phones under an expired contract,

---

[14]   This disparity in treatment is even more extreme when considering that KRS §65.7635 allows providers to retain 1.5% of collections of the postpaid 911 service charge. KRS §65.7635(4) ("To reimburse itself for the cost of collecting and remitting the CMRS postpaid service charge, each CMRS provider may deduct and retain from the CMRS postpaid service charges it collects during each calendar month an amount not to exceed one and one-half percent (1.5%) of the gross aggregate amount of CMRS postpaid service charges it collected that month."). In other words, non-Lifeline CMRS providers receive payment for collecting the CMRS charge while Lifeline providers must pay the entire CMRS charge out of its own funds.

[15]   The Board ignores there are other options to fund 911 services. To the extent the Board needs additional funding, they are free to lobby and seek additional state or federal funding. Indeed, the Board's Motion illustrates an ability to modify its own funding approach when practical challenges in collection apply without imposing the fee on the provider. Mot., p. 27 (discussing the change in CMRS fee imposition for prepaid wireless service). There is no necessity for the Board to single out Lifeline and its providers, or to otherwise siphon from the Lifeline program.

donated cell phones, and certain "911-only" phones that are configured solely to make emergency calls, as discussed *supra*, 30 F.C.C. Rcd. 3449, 3449-50 & n.2. Yet, providers – Lifeline providers and other providers – provide 911 connectivity without charge to all users. 47 C.F.R. § 9.4. Thus, CTIA clearly established disparate treatment between Lifeline providers and other providers since Lifeline providers themselves are subject to a fee to which other providers are not, in violation of the constitutional guarantee of equal protection.[16]

Contrary to the Board's arguments, there is no basis, much less a rational basis, for placing an additional burden on Lifeline providers who provide the same services as other wireless carriers. The three types of CMRS service charges (911 fees) exist only because the statutorily designed method of collecting the fees from the end users differ, not because of any real distinction or difference among CMRS providers. Requiring Lifeline providers to pay the CMRS service charge (911 fees) singles them out and places them at a distinct disadvantage over other wireless providers and penalizes them for offering Lifeline, in contravention of equal protection.[17]

Finally, the Board is flatly wrong that "CTIA failed to plead that no rational basis for HB 208 exists." Mot., p. 26. CTIA's Amended Complaint states "HB 208 **singles out** and **treats Lifeline providers differently**" [¶ 132] and "[t]here **is no inherent difference** between Lifeline wireless providers and other wireless providers [¶ 133] (emphasis added). *See* Am. Compl. Doc. # 36 ¶¶ 129-137. These averments provided the Board ample notice of CTIA's equal protection claims as the Civil Rules require. Fed. R. Civ. Pro. 8(a)(2) ("A pleading that states a claim for relief must contain… a

---

[16]   *See, e.g., GTE Sprint v. Wis. Bell*, 454 N.W.2d 797 (Wis. 1990) ("[T]o tax the transfer of access services to inter-LATA carriers but not the same transfer to local exchange carriers and resellers denies inter-LATA carriers the constitutional guarantee of equal protection …. We … declare unconstitutional the tax imposed upon the transfer of access services to an inter-LATA carrier.").

[17]   The Board ignores the fact that regardless of whether a service connection exists, all wireless providers remain obligated to provide a 911 connection if dialed. The Board must have a mechanism for funding such "burden" when there is no end user, such that there is no rational basis for treating Lifeline providers differently for providing an actual service.

23051548

short and plain statement of the claim showing that the pleader is entitled to relief."); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (U.S. 2002) ("a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (internal quotation omitted)); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012).[18] The Board seeks to impose requirements above and beyond the Rules, solely based on CTIA not using the phrase "rational basis". Mot., p. 26. Yet, under the Civil Rules, "No technical form is required." FED. R. CIV. PRO. 8(d)(1). CTIA's complaint thus "easily satisfies the requirements of Rule 8(a) because it gives [the Board] fair notice of the basis for [CTIA]'s [Equal Protection] claims." *Swierkiewicz*, 534 U.S. at 514.

## VI.    HB 208 Violates the Takings and Due Process Clauses.

The Takings Clause of the Fifth Amendment provides "Nor shall private property be taken for public use, without just compensation." The Takings Clause, "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United State*s, 364 U.S. 40, 49 (U.S. 1960). Here, HB 208 prohibits Lifeline providers from using the Lifeline subsidy to pay 911 fees, and the Board is essentially arguing that Lifeline providers use their own private funds to shoulder the burden of provide funding for "911 service throughout Kentucky." Mot., p. 1. The Board recognizes that "[t]he state's 911 system is…an essential tool for preserving public safety…" – *i.e.*, a system for public use. Mot., p. 12. And, the Board points to "[a]mple non-Lifeline revenue" as "available from which the service charge could be paid." Mot., p. 19. Thus, the Board undoubtedly seeks to take Lifeline providers' private funds for public use in violation of the Takings Clause.

The Board also argues that "the takings claim fails as a matter of law" because "HB 208…does not seize or otherwise impair an identifiable fund of money." Mot., p. 29. Yet, this is

---

[18]    Moreover, CTIA was awarded fees by District Court in finding for CTIA on its Equal Protection Claim. See Doc. # 14. The Board was undoubtedly properly noticed if the issue was pled so sufficiently as to be decided by the Court.

23051548

directly contrary to HB 208's language in KRS 65.7636(5), which requires the Lifeline provider to pay a charge calculated and based upon the number of Kentucky Lifeline end users "for which the Lifeline provider received reimbursement from the universal service fund during the immediately preceding month." HB 208's 911 fee *is directly tied* to a Lifeline provider's receipt of funds in connection with Lifeline and to the payment of funds sought by the 911 Board, *i.e.*, an unequivocally identified fund of money that Defendants seek to take – **$0.70 per month for each Lifeline user**.

In defense of these fees imposed solely on Lifeline providers, the Board broadly asserts that "a regulatory fee, like the HB 208 charge, is not a taking and thus does not implicate the Takings Clause." Mot., p. 29. Yet the Board fails to articulate how the fee imposed upon the provider confers any benefit on the provider itself, instead agreeing that it is the *Kentucky wireless users* who enjoy the benefit of 911 service even though out of state Lifeline providers pay the charge. Mot., p. 31. The Board also fails to acknowledge Kentucky and federal due process rights are co-extensive. *See Pigeons' Roost, Inc. v. Commonwealth*, 10 S.W.3d 133 (Ky. App. 1999). As such, there is no rational relationship between the 911 fee imposed on providers and the benefit, or lack thereof, received.

The Board again claims that "CTIA fails to plead that no rational basis exists." Mot., p. 30. But this is again, wrong. CTIA clearly pled that "Assessments and fees **charged without a relationship** to a benefit received by the payor are arbitrary and capricious, and they violate due process and the constitutional prohibition in the Fifth Amendment of the United States Constitution against a taking of private property without just compensation" and that "Lifeline providers receive no benefit…" Am. Comp. at ¶¶ 140-41. These averments plainly provided the Board notice of CTIA's due process and takings claims in satisfaction of the Federal Rules of Civil Procedure. FED. R. CIV. PRO. 8(a)(2); *Swierkiewicz*, 534 U.S. at 512; *Keys*, 684 F.3d at 609.

Thus, the Board seeks to impose an unequal share of the burden of the 911 infrastructure on Lifeline providers. Providers on non-Lifeline contracts, *i.e.*, paid service contracts, are able to pass

23051548

on the 911 fee to the customer, an option foreclosed to Lifeline providers. Because Lifeline providers are neither able to pass on the 911 fees to customers nor use the subsidies it receives for Lifeline service, HB 208's direct imposition of the fee on provider's "ample non-Lifeline revenues" [Mot., p. 19] constitutes a violation of the Fifth and Fourteenth Amendment.

## **CONCLUSION**

HB 208 attempts to avoid the simple command of the Fairness Act by shifting the 911 fee from Lifeline users, and to skirt Section 254 by an artificial prohibition of using federal Lifeline funds to pay Kentucky's 911 fee. But, Kentucky can "not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos*, 568 U.S. at 636. HB 208's imposition on Lifeline providers of a monthly $0.70 per Lifeline end user 911 fee conflicts with and erects an obstacle to the universal service goals of Section 151, 254 and 1510 of the Communications Act and implementing FCC decisions and is thus preempted. It also violates the Equal Protection Clause, the Takings Clause, and due process. Accordingly, for the foregoing reasons, the Defendants' Motion should be denied, and instead CTIA's motion for summary judgment should be granted.

Dated: September 1, 2023.

Respectfully submitted,

*/s/ Mark. A. Loyd*
Mark A. Loyd
Lauren R. Nichols
DENTONS BINGHAM GREENEBAUM LLP
101 South Fifth Street, Ste. 3500
Louisville, Kentucky 40202
(502) 587-3552
COUNSEL FOR PLAINTIFF
CTIA – THE WIRELESS ASSOCIATION

23051548

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of September, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

/s/ Mark A. Loyd
COUNSEL FOR PLAINTIFF

23051548