**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**FRANKFORT DIVISION**

| | |
|---|---|
| CTIA - THE WIRELESS ASSOCIATION <br><br> Plaintiff <br><br> v. <br><br> KENTUCKY 911 SERVICES BOARD; <br> JOSIAH KEATS, in his official capacity as <br> Chair of the Kentucky 911 Services Board; <br> MIKE SUNSERI, in his official capacity as <br> administrator of the Kentucky 911 Services <br> Board; and <br> UNKNOWN BOARD MEMBERS, in their <br> official capacity as board members of the <br> Kentucky 911 Services Board <br><br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. 3:20-CV-00043-GFVT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF CTIA – THE WIRELESS ASSOCIATION'S
## REPLY IN FURTHERANCE OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, CTIA – The Wireless Association ("CTIA") submits this reply in furtherance of its motion for summary judgment [Doc. #62], following Defendants' response [Doc. #71].[1] Ultimately, the issues before the Court are whether HB 208 is federally preempted and whether HB 208 violates the Equal Protection Clause, the Takings Clause and due process, notwithstanding Defendants' arguments to the contrary in their response and pending motion for summary judgment [Doc. #58].

Wireless carriers must provide 911 emergency services connectivity to their users, and they do so without government funding. Kentucky, like many states, has fees on wireless customers to fund its 911 call centers (a/k/a public service answering points) ("PSAPs"); these fees are collected from sales to wireless customers by the sellers of wireless services (wireless carriers for traditional post-paid wireless service and retailers for prepaid wireless service). But, carriers do not sell services to individuals whose Lifeline services are entirely subsidized by federal universal service program

---

[1]   CTIA incorporates the definitions as used in its motion for summary judgment [Doc. #62].

23126079

funds, *i.e.*, Free Lifeline Only Service, and there is no way to collect fees from these subscribers because the carriers do not have a billing relationship with them. Defendants could simply choose to absorb a portion of the costs of providing 911 services to these low-income individuals, as the wireless carriers do with their own costs for ensuring that these customers have 911 connectivity. But, Kentucky chose a different path and enacted HB 208 which requires Lifeline wireless providers *themselves* to pay $0.70 in 911 fees per each Kentucky Lifeline subscriber. Defendants expect the Lifeline wireless providers to additionally bear these 911 costs, or recover them from other customers.

HB 208's imposition on Lifeline providers of a monthly $0.70 per Lifeline end user CMRS Charge (911 fee) erects an obstacle to the universal service goals of Sections 151, 254 and 1510 of the Communications Act and implementing FCC decisions and is thus preempted. Further, HB 208 makes compliance with these federal laws and state law impossible and is also preempted for that reason. HB 208 also violates the Equal Protection Clause, the Takings Clause and due process by treating wireless carriers differently: Lifeline providers pay the 911 fee; other wireless carriers do not.

## ARGUMENT

## I.    The Federal Objective of Universal Service Preempts KRS 65.7636's Fee on Lifeline.

"Preemption is not a matter of semantics. A State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013).

HB 208 amended KRS 65.7636 in 2020 to require Lifeline providers, rather than Lifeline users, to pay a monthly $0.70 per Lifeline end user 911 fee. On its face, HB 208 prohibits Lifeline providers from using Lifeline funds to pay the $0.70 per Lifeline end user 911 fee [KRS 65.7636(5)], thus technically avoiding a direct diversion of federal universal service funds to the state 911 fund. ***However, by increasing the cost of providing Lifeline service to each and every Lifeline end user in Kentucky***, HB 208's 911 fee stands as an ***obstacle*** to: [i] the federal universal service goals

23126079

articulated in Section 151 [47 U.S.C. § 151]; [ii] the requirement that federal Lifeline support only be used as "intended" for Lifeline services in Section 254 [47 U.S.C. § 254(e)]; *and*, [iii] the requirement of a "financial transaction" in Section 1510 [47 U.S.C. § 1510(c)(1)] to mandate that nonresident Lifeline providers "collect from, or remit on behalf of, any other person a … fee … imposed on a purchaser or user of any wireless telecommunications service".

HB 208 uses semantics to try to get around the express preemption of 47 U.S.C. § 1510(c)(1) by imposing the 911 fee on Lifeline providers, which Defendants now acknowledge "shift[s] direct responsibility for the charge from users to the providers" Response [Doc. #71], p. 14. And, HB 208 [KRS 65.7636(e)] uses semantics to try to get around the express preemption of 47 U.S.C. § 254(e) by prohibiting the use of Lifeline funds to pay that 911 fee, thus ***making it impossible*** for a provider to solely offer Free Lifeline Only Service without violating KRS 65.7636(e) or 47 U.S.C. § 254(e). But, HB 208 cannot use "semantics" to "evade the preemptive force of federal law." *Wos*, 568 U.S. at 636. As such, Sections 151, 254 and 1510 preempt HB 208's 911 fee on Lifeline providers.

**A.  Sections 151, 254 and 1510 Support the Federal Objective of Universal Service.**

Defendants do not dispute to CTIA's recitation of the facts and legislative history surrounding Sections 151, 254 and 1510. Instead, Defendants rely on the *in pari materia* canon to assert that federal intent should not be ascertained by considering them together as they are separate statutes enacted at different times. *In pari materia*, however, is "a canon of construction that statutes that are *in pari materia* may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject." IN PARI MATERIA, *Black's Law Dictionary* (11th ed. 2019). Under this doctrine, "statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006). So, this doctrine is not a bar to considering the preemptive weight of Sections 151, 254 and 1510 together. Each of these statutes relate to telecommunications, and separately and together they evidence Congress's intent,

23126079

policy and objectives relating to the broad federal goal of promoting universal telecommunications service. This objective and policy is stated in Section 151, reaffirmed and expanded in Section 254 – which requires that Lifeline universal service support be used only for the purposes for which the support is intended, and protected by Section 1510's financial transaction requirement.

Defendants attempt to paint 47 U.S.C. §§ 1501-1513, "MOBILE NOW", as wholly unrelated to MOBILE NOW's Section 1510 because Section 1510 has an additional short title. Response [Doc. #71], pp. 2-4. In doing so, Defendants attempt to downplay the division's title, "Making Opportunities for Broadband Investment and Limiting Excessive and Needless Obstacles to Wireless," which on its face demonstrates Congress's dedication to universal service. The Fairness Act has its own moniker, but it is no less a part of Congress's dedication and intent to eliminate excessive and needless obstacles to wireless telecommunication service throughout the country, *i.e.*, universal service. In the context of Lifeline, Section 1510 protects the availability of Free Lifeline Only Service by forbidding states from imposing telecommunications charges that would require carriers to establish a billing relationship with users, thus eliminating a needless obstacle to Free Lifeline Only services and furthering universal service. Section 1510's preemptive effect emanates from "provisions of the whole law" and "its object and policy." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88,98 (1992); *Wos*, 568 U.S. at 636 ("A State may not evade the preemptive force of federal law….").

By enacting a 911 fee on wireless carriers for simply providing Lifeline, HB 208 disincentivizes participation in the federal program and is at odds with the federal objective of universal service in each and all of Sections 151, 254 and 1510.

### B. The Federal Universal Service Goal Extends Beyond Solely Free Lifeline Providers.

Defendants incorrectly claim "CTIA's motion relies on a hypothetical provider offering solely Free Lifeline Only Services" presenting it as a "central premise". Response [Doc. #71], p. 4. This is wrong; the federal universal service objective and preemption, of course, extend to all Lifeline

4

providers, not just carriers exclusively providing Free Lifeline Only Service. Defendants also conflate CTIA's distinct arguments. CTIA argues HB 208's $0.70 per Lifeline end user 911 fee imposed on Lifeline providers directly increases the cost of providing Lifeline service and thus ***erects an obstacle*** to the federal goal of universal service in Section 151 & 254, as supported by Section 1510. Further demonstrating that federal preemption applies, CTIA ***also argues*** HB 208 ***makes it impossible*** for a provider to offer solely Free Lifeline Only Services without violating either 47 U.S.C. § 254(e)'s express direction to use Lifeline funds only for intended Lifeline purposes or KRS 65.7636's requirement that Lifeline providers pay a $0.70 per Lifeline end user 911 fee.

Defendants invoke an assumption about carriers' profitability to attempt to distract from CTIA's preemption arguments. This distraction notwithstanding, Defendants acknowledge Lifeline "originally was designed to allow companies to be made whole for foregone revenues associated with discounts provided to eligible Lifeline/Link Up consumers." Response, [Doc. #71] p. 6, quoting *in re Lifeline & Link Up Reform & Modernization*, Notice of Proposed Rulemaking, 26 F.C.C. Rcd. 2770, 2776 (2011). Lifeline providers receive no federal compensation for providing 911 connectivity, but under HB 208 would pay $0.70 for each Free Lifeline Only customer. HB 208 stands as a direct obstacle to Lifeline by disincentivizing them from offering such Lifeline service.

### C.  Free Lifeline Only Service Is a Necessary Part of Affordable Universal Service.[2]

In subsections B and C, Defendants assert "Free Lifeline Only Service has never been a goal of Congress or the FCC," but Defendants acknowledge providing "affordable" telecommunications to low-income Americans is a federal objective and purpose of universal service. Even assuming this does not require making wireless services free for those who can afford to pay, ***many Americans cannot afford to pay anything***. So, wireless services to them must be at no cost (free) to be affordable.

---

[2]  Defendants' references to past allegations of fraud or abuse are wholly irrelevant to the questions before this Court. The federal government (and FCC) have mechanisms in place to address such questions. They have nothing whatsoever to do with HB 208's legality.

23126079

Being "free" to the Lifeline user necessarily involves no financial transaction so that Section 1510 preempts the collection of 911 fees on such Lifeline services. That Lifeline is free to some Americans is a necessary byproduct of ensuring wireless service is "affordable" to all Americans, regardless of income as set forth in the universal service objective and policy. 47 U.S.C. §§ 151 & 254(b)(1)-(3).

Free Lifeline Only Service is a recognized and valid mechanism to further the federal universal service objective. Contrary to Defendants' suggestions, CTIA has not asserted that Free Lifeline Only Service is "mandate[d] or "prefer[red]" – but there can be no doubt that the FCC has acknowledged the importance of this model in meeting the federal government's universal service objectives. Tellingly, Defendants concede that while the FCC *considered* approaches that would require consumers to pay a fee to wireless providers for Lifeline service, it has declined to adopt such a requirement. Response [Doc. #71], p. 9. The FCC's rejection of a financial transaction requirement in 2012 and 2017 confirms that Free Lifeline Only remains a valid, accepted way to further universal service, and Congress's enactment of Section 1510 in 2018 reinforces Congress's intent to protect and preserve Free Lifeline Only Services.

## II.      HB 208 Is an Obstacle to Universal Service.

Defendants' claim that CTIA "must overcome a strong presumption" against preemption is misplaced. "[A]n 'assumption' of nonpreemption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Congress and the FCC have historically regulated interstate telecommunications, including universal service offerings such as Lifeline. And the Sixth Circuit has not applied any presumption against preemption, let alone a "strong presumption," in analyzing federal telecommunications statutes, including when it held that the "TCA [the Telecommunications Act of 1996] impliedly preempts the Residents' claims based on the tower's expected radiofrequency emissions." *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017).  That

makes sense, because the federal government has long played a significant role in regulating telecommunications service – and, in interstate telecommunications service, the federal government's role is exclusive. Accordingly, the presumption Defendants assert is inapplicable here.

HB 208 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" for universal service. *Gade*, 505 U.S. at 98. Requiring Lifeline providers to pay $0.70 per Lifeline end user, directly increases the cost of providing Lifeline service in Kentucky. There could be no more direct of a connection.

Defendants concede universal service is a federal policy and objective, but try to downplay HB 208's impact by arguing it will "increase[] providers' costs in a de minimis fashion and could have at most an incidental effect on Congress' objectives." Response [Doc. #71], p. 12. These costs are not "trifling, negligible" and thus "so insignificant that a court may overlook it in deciding an issue or case." DE MINIMIS, *Black's Law Dictionary* (11th ed. 2019). Whether this 911 fee is "de minimis" must "be determined with reference to the purpose of the standard." *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 232 (1992). Defendants' calculations recognize HB 208 will cost Lifeline providers roughly $1 million more annually to operate in Kentucky, and of the entire federal subsidy, HB 208's $0.70 per Lifeline user 911 fee represents 8% (of $9.25, Lifeline plans including broadband) or 16.4%  (of $5.25, voice-only Lifeline plans) – a consequential sum. *See MTS and WATS Market Structure, and Establishment of a Joint Board, Amendment*, Report and Order, 50 Fed. Reg. 939-01 (1985); Doc. #53, ¶ 1, 3, 8 & 9 (finding a $1.00 per month charge could "cause a significant number of subscribers to cancel service"). HB 208's 911 fee does not have an "incidental effect" as Defendants suggest, and their cases involving incidental impacts – especially in areas traditionally regulated by the states, like taxes – are inapplicable here. Rather, the $0.70 911 fee is a material and ***direct***, one-for-one cost on providers for each and every Free Lifeline Only subscriber in Kentucky. It is far from trivial. *See Wrigley*, 505 U.S. at 231-32.

7

23126079

Defendants argue CTIA's harm is speculative and no provider has entirely exited the market. But these are red herrings. First and foremost, the Board has not yet begun enforcing HB 208's fee onto providers due to the uncertainty regarding its validity. Because HB 208 has not taken effect, its impacts cannot yet be measured. Moreover, the market impact is not determined solely by a provider exiting the market. Providers may instead reduce their offerings, which would still be in conflict with the federal objective that the service not only affordable, but also of quality. 47 U.S.C. § 254(b)(3).

Defendants acknowledge that HB 208 is not a new charge, but rather is in effect the same charge that was paid by the customer, because HB 208 "shift[s] direct responsibility for the charge from users to the providers." Response [Doc. #71], p. 14. Here, Defendants give the game away; HB 208 was intended as a clever, semantical way of continuing to collect fees from end users without imposing the fee directly on these end users, and is thus preempted. *Wos*, 568 U.S. at 636.  And, to the extent HB 208 *is intended for the benefit of end users, it is expressly preempted by Section 1510.*

Nor can Defendants escape the practical reality that money is fungible. While HB 208 offers lip service to avoiding preemption by precluding providers from using the Lifeline fund, the reality is that wireless carriers are forced to either find 8-16.4% more revenue from other sources to cover the fee or not provide Free Lifeline Services in Kentucky. The hard truth is that HB 208 diverts funds intended to make the provider whole for providing federal universal service and undermines the federal contribution and subsidization framework.

**III.    <u>Impossibility as an Additional Basis for Preemption.</u>**

Preemption occurs, *inter alia*, "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," as well as "where compliance with both federal and state regulation is a physical impossibility." *Gade*, 505 U.S. at 98. Just as CTIA has demonstrated that HB 208 is an obstacle to the federal purpose and objective of universal service,

8

CTIA has procedurally and substantively demonstrated that HB 208 is additionally preempted because compliance with state and federal law is impossible.

### A.  CTIA Sufficiently Pled Impossibility as Grounds for Preemption.

Defendants first attack impossibility preemption on a procedural ground, alleging CTIA only raised this claim in its motion for summary judgment. But this is wrong. CTIA specifically amended its Complaint to assert both obstacle and impossibility preemption theories. The Complaint specifically discusses impossibility preemption at length, detailing that HB 208 renders "it impossible to operate as a Lifeline-only, no-cost-to-end-user provider in Kentucky." Am. Complaint [Doc. #36] ¶¶ 83, 101. Defendants also addressed impossibility in their own motion for summary judgment [Doc. #58], leaving no doubt that they were on notice that CTIA was asserting this theory.

Defendants' attempt to fault CTIA for not tying impossibility to a specific objective or purpose misconstrues that obstacle and impossibility preemption are independent bases for preemption. *Gade* at 98 (preemption occurs "where compliance with both federal and state regulation is a physical ***impossibility*, *or*** where state law stands as an ***obstacle to*** the accomplishment and execution of the full ***purposes and objectives*** of Congress.") (emphasis added). As Defendants acknowledge, "CTIA's use of 'impossible' in its amended complaint is a premise of its claims." Response [Doc. #71], p. 16.

### B.  HB 208 Is Preempted Since Compliance with HB 208 and Federal Law Is Impossible.

Participating Lifeline providers are made directly responsible for the CMRS fee under HB 208, yet are precluded from using the Lifeline subsidy for any purpose other than as permitted by FCC rules [47 C.F.R. § 54.7]. This is a clear example of "where compliance with both federal and state law is in effect physically impossible.*" Louisiana PSC v. FCC*, 476 U.S. 355, 368 (1986), citing *Florida Lime Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963). A Lifeline provider faces a difficult choice because it is barred by both state and federal law from using Lifeline revenue to pay the CMRS fee – either exit the market entirely, or find a wholly separate line of business to use to

9

subsidize the CMRS fee. Since the KRS 65.7636 911 fee is tied directly to the number of customers served by Free Lifeline Only Service plans, the more customers a Lifeline provider serves with Free Lifeline Only Service, the bigger this impermissible burden on the Lifeline provider becomes. Where a Lifeline provider does not have a separate set of customers to use to subsidize these fees, it is impossible to provide Lifeline service and pay the fee that Kentucky demands. This impossibility is more than mere "speculation." Response [Doc #71], p. 17. While all parties recognize no wireless provider now exclusively provides Free Lifeline Only service plans in Kentucky, the example demonstrates *the fundamental conflict* between federal law and HB 208 by illustrating that a provider choosing such a business model could not comply with both federal law and HB 208.

To this point, Defendants assert affirmative defense that "as a matter of law, other sources of funds are available to pay the Lifeline charge." But, Defendants' focus on providers' access of other funding for the 911 fee ignores the underlying issue: by imposing a unique funding burden on providers choosing to offer Free Lifeline Only Service, HB 208 disincentivizes providers from offering such Lifeline service in Kentucky, to the detriment of Lifeline end users and contrary to the federal goal of universal service. *See MTS and WATS*, 50 Fed. Reg. at note 1, 941-42.[3]

Defendants also misstate CTIA's argument to try to support their point and incorrectly characterize HB 208's impact as "minor." Response [Doc #71], p. 19. CTIA recognizes that general taxes and fees equally imposed on all taxpayers, like income taxes, are permissible, but what HB 208 does is require Lifeline providers (*i.e.*, singled out taxpayers) to pay a monthly $0.70 per Lifeline end user 911 fee (*i.e.*, a direct fee based on Lifeline users). The burden of this 911 fee has the significant effect (*i.e.*, the opposite of minor) of disrupting the entire incentive structure for participation in the Lifeline program, wholly undermining its effectiveness.

HB 208 makes it impossible for a carrier to solely offer Free Lifeline Only Service without

---

[3]   Defendants also ignore that Defendants are free to lobby for more funds.

23126079

violating Section 254(e)'s express direction to use Lifeline funds only for providing Lifeline services or KRS 65.7636's requirement that Lifeline providers pay a $0.70 per Lifeline end user 911 fee.

**IV.** **HB 208 Violates the Equal Protection Clause.**

Disparate treatment in violation of equal protection exists when the government treats a person disparately as compared to similarly situated persons. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Defendant cites no authority for the notion that "47 U.S.C. 254...concerns the funding mechanisms for universal service, not equal protection." Response [Doc. #71], p. 21. In actuality, both Congress and the Kentucky General Assembly recognize ***only one class of wireless providers***, as evidenced in 47 U.S.C. § 254 and KRS 65.7621(9).[4] CTIA has thus established disparate treatment among providers because Lifeline providers are subject to a fee that other providers are not, even though all providers are similarly situated as they provide the same wireless services[5] and place an equal "burden" on the 911 infrastructure by providing wireless service in Kentucky. This is in violation of equal protection.

The sole "difference" Defendants highlight is Lifeline providers' provision of "subsidized service" which, as mandated by United States law, "cannot be required to recover [fees] from Lifeline users without a financial transaction." Response [Doc. #71], p. 22. Avoidance of federal preemption such as Section 1510 by classifying Lifeline providers as distinct from other wireless carriers is ***not*** a legitimate state interest.[6] Moreover, H.B. 208's distinction among providers is really one without a

---

[4]   As Section 254 evidences, Congress contemplates one class of wireless providers ("every telecommunications carrier"), statutorily requiring contributions wireless providers to be on an "equitable and nondiscriminatory basis." KRS 65.7621(9) also recognizes one class of wireless provider, "CMRS provider," defined as "a person or entity who provides CMRS to an end user."

[5]   This disparity in treatment is even more extreme considering KRS 65.7635(4) allows providers to retain 1.5% of collections of postpaid 911 fees. So, non-Lifeline wireless providers get paid for collecting 911 fees whereas Lifeline providers must pay the entire 911 fee out of their own funds.

[6]   *See City of Cleburne*, 473 U.S. at 440; *Graham v. Richardson*, 403 U.S. 365, 379 (1971) (Continued...)

23126079

difference as Defendants have represented that "all three *types of service* – postpaid, prepaid *and subsidized Lifeline – impose a similar burden* on the 911-service infrastructure." (Doc. #7, p. 26). Thus, the "burden on the 911 infrastructure" by Lifeline providers is anything but "unique." Response [Doc. #71], p. 23. Lifeline providers are thus wholly similar to the litigants in *GTE* since Lifeline providers provide *the same services* as other providers, including voice minutes, text messaging, and data packages, which are all used "in the same manner and for the same purpose." *GTE Sprint v. Wis. Bell*, 454 N.W.2d 797, 803 (Wis. 1990). As such, "there is nothing unique about the [provision] of access services [from one] carrier as opposed to the … by [another carrier] which justifies the disparate treatment." *Id.* As such, the disparate treatment here violates equal protection. *Id.* at 799.

Defendants essentially argue that Lifeline providers must compensate the 911 Board for offering federal Lifeline service in Kentucky,[7] even though *no other wireless providers pay for the "burden" they impose on the 911 infrastructure*. For this reason, KRS 65.7636(5) is also "not rationally related" to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. Rather, it is Defendants own "special interest." *Craigmiles*, 312 F.3d at 224. Defendants' assert "HB 208 has nothing to do with universal service funding" [Response, Doc #71, p. 21], yet ignore the *direct* burden HB 208's 911 fee on Lifeline providers for each Lifeline user places on universal service.

Finally, the Board cannot impose requirements above and beyond the Rules. FED. R. CIV. P. 8. CTIA has sufficiently plead and established *both* disparate treatment and violation of equal protection. *See* Am. Compl. Doc. #36 ¶¶ 129-137 (stating "HB 208 singles out and treats Lifeline

---

("[R]easonable classification implies action consistent with the legitimate interests of the state, and it will not be disputed that these cannot be so broadly conceived as to bring them into hostility to exclusive Federal power."); *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (discussing illegitimate governmental purposes, including providing a benefit to special interests).

[7]   CTIA does not assert that Defendants cannot recover their cost, just that they are not constitutionally permitted to do so by singling out Lifeline providers. The Board ignores there are other options to fund 911 services. There is no necessity for the Board to single out Lifeline.

23126079

providers differently" [¶ 132] and "[t]here is no inherent difference between Lifeline wireless providers and other wireless providers" [¶ 133]).[8] These averments provided the Board ample notice of CTIA's equal protection claims as required. FED. R. CIV. P. 8(a)(2); *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (U.S. 2002); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012).

**V.      HB 208 Violates Both the Takings and Due Process Clauses.**

The Takings Clause is also indisputably implicated by HB 208. "[A] fee must fairly match the [user's] use"; Lifeline users use 911, not Lifeline providers, and thus, the 911 fee here is an unconstitutional taking. *U.S. v. U.S. Shoe Corp.*, 523 U.S. 360, 370 (1998). Defendants attempt to refute this by claiming the calculation of the Lifeline service charge does not create "an identified fund of money" and the 911 fee is a "mere imposition of an obligation to pay money" that "does not give rise to a claim under the Takings Clause." Response [Doc #71], p. 24. But Defendants' claims cannot be reconciled with the irrefutable fact that HB 208's language in KRS 65.7636(5) literally requires Lifeline providers to pay a charge calculated and based upon the number of Kentucky Lifeline end users "for which the Lifeline provider received reimbursement from the universal service fund during the immediately preceding month." HB 208's 911 fee is *directly* tied to a Lifeline provider's receipt of funds in connection with Lifeline and to the payment of funds sought by the 911 Board, *i.e.*, an unequivocally identified fund of money. This is not a user fee; this is a taking. *See U.S. v. Sperry Corp.*, 493 U.S. 52, 62 (1989). And, *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2010), which Defendants cite for the premise that "identifiable fund of money…refers to things like pension funds," is yet another misdirection. Response [Doc #71], p. 24. Indeed, *McCarthy* refers to multiple "identifiable funds of money." *Id.* Thus, HB 208 violates the Fourteenth Amendment.[9]

---

[8]     CTIA addresses Defendant's arguments in full in its Response to Defendants Motion for Summary Judgment [Doc. #73], pp. 29-30.

[9]     Defendant addressed CTIA's takings and due process claims in its own motion. Doc. #58. And, CTIA responded to these arguments in full in its Response Doc. #73.

23126079

As to Due Process claims, Defendants again claim there is a rational basis for the imposition of an additional burden on Lifeline service providers. But, as articulated, *supra*, there is no rational basis for treating similarly situated wireless providers differently. In disputing the application of *Ky. River Auth. v. City of Danville*, 932 S.W.2d 374, 376 (Ky. 1996), Defendants fail to acknowledge Kentucky and federal due process rights are co-extensive. *See Pigeons' Roost, Inc. v. Commonwealth*, 10 S.W.3d 133 (Ky. App. 1999). The 911 fee is undoubtedly a "special assessment and user fee" without any relationship to the benefit supplied to Lifeline providers. *Ky. River Auth.*, 932 S.W.2d at 376. *See Sperry*, 493 U.S. at 60-61 (holding a user fee must be a fair approximation of the cost of benefits supplied). Defendants, without support, posit that the 911 fee is neither a special assessment nor a user fee, even though it is obviously a fee charged per Lifeline user using Lifeline service.

Defendants further claim that "there is no requirement that the payor of a fee and the beneficiary be the same person or entity", but that does not prove that there is a rational relationship here between the fee and the benefit. In *Klein v. Flanery* the issue was whether the funds were "private," not whether there was a rational relationship between the fee and the benefit. 439 S.W.3d 107 (Ky. 2014). And, there is no dispute here that the funds at issue are private funds held by private entities. *Greater Cincinnati* also offers no support to Defendants since that court affirmed *Kentucky River Authority*'s holding that "[t]he validity of special fee assessments and users fees depends on an analysis of the charge and the benefits received" before concluding that  there *was* a rational relationship between "the 911 emergency service fee… levied upon *occupied* residential and commercial properties" and the benefits received "people who occupy properties covered by the ordinance in question" *Greater Cincinnati/N. Ky. Apartment Assoc., Inc. v. Campbell Cnty. Fiscal Ct.*, 479 S.W.3d 603, 606 (Ky. 2015) (emphasis added). No such logical or rational relationship exists here. Unlike *Greater Cincinnati*, the Board fails to articulate how the fee imposed upon out-of-state provider confers ___**any**___ benefit, or even potential benefit, on such out-of-state Lifeline providers.

14

23126079

Lastly, Defendants again wrongly claim "CTIA never pleaded a lack of rational basis and its motion does not claim there is none." Response [Doc #71], p. 24. CTIA clearly pled "Assessments and fees charged without a relationship to a benefit received by the payor are arbitrary and capricious, and they violate due process and the constitutional prohibition in the Fifth Amendment … against a taking of private property without just compensation" and that "Lifeline providers receive no benefit…" Am. Comp. at ¶¶ 140-41. CTIA's averments plainly provided Defendants notice of CTIA's due process and takings claims in satisfaction of the Federal Rules of Civil Procedure. FED. R. CIV. P. 8(a)(2); *Swierkiewicz*, 534 U.S. at 512; *Keys*, 684 F.3d at 609. Accordingly, HB 208's direct imposition of the fee on Lifeline providers violates the 5th and 14th Amendments.

## CONCLUSION

HB 208 is preempted despite its semantical attempt to circumvent preemption by 47 U.S.C. §§ 1510(c)(1) & 254(e). *Wos*, 568 U.S. at 636. This is because HB 208's imposition on Lifeline providers of a monthly $0.70 per Lifeline end user 911 fee erects an obstacle to the federal universal service goals of Sections 151, 254 and 1510 of the Communications Act and implementing FCC decisions and further because HB 208 makes compliance with these federal laws and state law impossible. HB 208 also violates the Equal Protection Clause because its imposition of a fee solely on Lifeline providers in an attempt to circumvent federal law is an illegitimate state interest. HB 208 also violates the Takings Clause and due process. So, for the foregoing reasons, as well as those stated in CTIA's motion [Doc. #62] and response to Defendants' pending motion [Doc. #73], CTIA's motion for summary judgment should be granted and fees awarded pursuant to 42 U.S.C. § 1983.

Dated: September 22, 2023                        Respectfully submitted,

/s/ Mark A. Loyd
Mark A. Loyd
Lauren R. Nichols
DENTONS BINGHAM GREENEBAUM LLP
COUNSEL FOR PLAINTIFF

23126079

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.


/s/ Mark A. Loyd
COUNSEL FOR PLAINTIFF

23126079