UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| CTIA – THE WIRELESS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:20-cv-00043-GFVT |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| KENTUCKY 911 SERVICES BOARD, | ) | **&** |
| *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

For many low-income Kentuckians, limited phone services are provided free of charge through a program known as Lifeline. Although the phone companies provide this beneficial service, Lifeline is subsidized by the Commonwealth of Kentucky and by federal taxpayers.

911 services, on the other hand, are a benefit conferred to all Kentuckians. To fund 911 services, the Kentucky 911 Services Board collects a service charge of $0.70 per month per wireless number. That fee is paid by all standard Kentucky phone customers through payment of phone bills—a quick review of an old phone bill reveals the monthly fee. The phone companies, essentially, act as collecting agents of the 911 service charge on the Commonwealth's behalf.

Previously, low-income Kentuckians subscribing to Lifeline service plans also paid for the 911 service fee—technically the phone companies providing Lifeline service plans were liable for the fee, but they were allowed to pass through the expense and collect it from each Lifeline customer. Moreover, the phone company could retain an administrative fee to reimburse itself for the cost of collecting and remitting the service fee. In 2018, however,

Congress decided that the Commonwealth could not require the phone companies to collect the service fee from low-income Kentuckians.  In response, the Kentucky legislature said, fair enough, phone companies, you no longer have to collect the 911 service fee.  But who would be on the hook for the revenue essential to fund Kentucky's 911 services?  The phone companies.  Now, rather than collecting the 911 service fee from Lifeline customers, the phone companies themselves must pay it "on behalf of the end users."  In other words, the phone companies themselves now owe the fee instead of low-income Kentuckians.

Not so fast said the phone companies—we shouldn't have to spend our own money.  Hence, this lawsuit.  After one spin around the rotary dial already, the parties are now back before this Court.  At this go-round, however, the parties present separate motions for summary judgment.  [R. 58; R. 62.]  For the reasons that follow, the Defendants' motion will **GRANTED** and the Plaintiff's motion will be **DENIED**.

## I

The federal Lifeline program was established in 1985 by the Federal Communications Commission and makes it possible for low-income families to have access to phone and communication services.[1]  Kentuckians enrolled in the Lifeline program receive "free" basic services consisting of a cellular phone connection, text messaging, and a specified amount of broadband internet access.  Several major telephone service providers, including TracFone Wireless, Inc. and T-Mobile USA, Inc., offer and provide Lifeline services at no cost to qualifying, low-income customers.  Although eligible participants do not pay any consideration for Lifeline services, both the federal and Kentucky state government provide subsidies to

---

[1] For consistency's sake, these facts are recited practically verbatim from this Court's previous Opinion and Order. [R. 14.]

service providers enrolled in the Lifeline program.[2]  Moreover, several Lifeline providers are members of CTIA—The Wireless Association, a non-profit organization which styles itself as an organization that "vigorously advocates at all levels of government for policies that foster continued wireless innovation and investment."

Separately, every Kentuckian has access to 911 emergency services.  911 services are funded by federal and state subsidies and the payment of a $0.70 monthly fee charged to each person enrolled in a phone plan in the state.  Ky. Rev. Stat. Ann. § 65.7635(1) (West 2023).  This $0.70 monthly fee is charged to the phone bill of those enrolled in a traditional cell phone service contract and is collected at the point-of-sale for those who purchase prepaid cell phone plans. Prior to 2020, those enrolled in a Lifeline plan were required to independently pay the $0.70 fee. To permit payment, Kentucky law allowed wireless service providers to act as a "conduit or 'collection agent'" to collect the fees but mandated that providers "had 'no obligation to take any legal action to enforce the collection of the service charge' against the end user."  Upon the failure of a party to pay the fee, "the State, on behalf of Defendants, was statutorily authorized to pursue a collection against end users."

In 2018, however, Congress enacted 47 U.S.C. § 1510, the Wireless Telecommunications Tax and Fee Collection Fairness Act.  The Fairness Act, in relevant part, limits the ability of a State to require an out-of-state person to collect from, or remit on behalf of, any other person a state or local tax, fee, or surcharge.  *See* 47 U.S.C. § 1510.

In response to the Fairness Act, the Kentucky legislature amended KRS 65.7636 through HB 208.  The amendment, signed into law in 2020, mandates that Lifeline providers:  (1) are now directly liable for the charge, (2) may not pass the charge on to users, and (3) may not remit

---

[2] The federal government pays up to $9.25 per month per eligible customer, while the Kentucky government pays an additional $3.50 per month per eligible customer.

the charge on behalf of anyone else.  Ky. Rev. Stat. Ann. § 65.7636(1)-(4) (West 2023).

Additionally, Lifeline providers are not permitted to use any part of the federal Lifeline subsidy

to pay the service charge.  Ky. Rev. Stat. Ann. § 65.7636(5) (West 2023).

CTIA, on behalf of its members, filed suit against the Kentucky Services 911 Board,

alleging that the amended KRS 65.7636 is preempted by the Communications Act and violates

the Equal Protection, Due Process, and Takings Clauses.  CTIA seeks a declaratory judgment

that KRS 65.7636 is invalid and a permanent injunction barring enforcement of the statute.

Additionally, CTIA seeks an award of attorneys' fees under 42 U.S.C. § 1988.

This Court previously considered CTIA's claims at the motion to dismiss stage.  *See*

*CTIA – The Wireless Ass'n v. Ky. 911 Servs. Bd.*, 530 F. Supp. 3d 680 (E.D. Ky. 2021).  There,

this Court granted in part and denied in part the Board's motion to dismiss.  *Id*. at 694.  The

Court first determined that CTIA had associational standing on behalf of its members to bring

this action.  *Id.* at 686-87.  While finding that certain federal provisions did not preempt HB 208,

the Court concluded that HB 208 conflicts with and is expressly preempted by the Fairness Act.

*Id*. at 687-94.  Having determined that the Fairness Act preempts HB 208, the Court declined to

address the merits of CTIA's remaining constitutional claims.  *Id*. at 694.  Finally, the Court

awarded attorney fees to CTIA in an amount to be determined by subsequent briefing.  *Id.*

The parties then cross-appealed.  The Sixth Circuit agreed that CTIA had associational

standing to bring its claims and that certain provisions of the Communications Act did not

preempt HB 208.  *CTIA – The Wireless Ass'n v. Keats*, Nos. 21-5435/5483, 2021 U.S. App.

LEXIS 39602 at *8-17 (6th Cir. Dec. 3, 2021).  The Sixth Circuit did not agree, however, that

HB 208 conflicts with and is preempted by the Fairness Act.  *Id.* at *13.  Thus, this Court's

declaratory judgment, permanent injunction, and award of attorney fees in favor of CTIA were

vacated, and the matter remanded.  *Id*. at *18.  Rather than give up, CTIA sought leave to amend

its original complaint via motion, which this Court granted.  [R. 32; R. 35.]  CTIA's Amended

Complaint is essentially the same as its original complaint in that it seeks to strike down KRS

65.7636 as amended by HB 208.  [R. 36.]  This time, however, CTIA specifically alleges that the

amended KRS 65.7636 is *impliedly* preempted by federal law.  *Id*.  Additionally, CTIA renews

its challenge that the amended KRS 65.7636 violates the Equal Protection, Due Process, and

Takings Clauses.  *Id*.  CTIA and the Board have now filed separate motions for summary

judgment on those claims and each litigant raises a number of arguments.  [R. 58; R. 62.]  Now

that the briefing period has concluded, the Court turns to the pending motions.

## II

Summary judgment is appropriate when the pleadings, discovery materials, and other

documents in the record show "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323-25 (1986).  A genuine dispute exists "if the evidence shows 'that a

reasonable jury could return a verdict for the nonmoving party.'"  *Olinger v. Corp. of the Pres. of

the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 255 (1986)).  The moving party has the initial burden of demonstrating the basis

for their motion and identifying the parts of the record that establish the absence of a genuine

issue of material fact.  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  The

movant may satisfy their burden by showing "that there is an absence of evidence to support the

non-moving party's case."  *Celotex Corp*., 477 U.S. at 325.  Once the movant satisfies this

burden, the non-moving party must go beyond the pleadings and come forward with specific

facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

## A

The Court first turns to the Board's renewed arguments that CTIA lacks associational standing to bring its claims. [R. 58 at 6-8.] "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union v. Brock*, 477 U.S. 274, 281 (1986). To have associational standing, an association must show that (1) one of its members would have standing to sue in its own right, (2) the relief it seeks is germane to its purpose, and (3) none of its members need to participate in their individual capacity. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As to the first element, like any Article III standing inquiry, an association must show that one of its members "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

The Board first argues that CTIA, despite "having edged over the pleading hurdle with its initial complaint," fails now to meet the requirements for associational standing. [R. 58 at 5.]

6

Previously, this Court found at the pleading stage that CTIA had associational standing, which the Sixth Circuit affirmed. *See Keats*, 2021 U.S. App. LEXIS 39602 at *10. The Board asserts that associational standing is now worth revisiting for two reasons. [R. 58 at 5.] First, CTIA amended its complaint. *Id*. Second, at the summary judgment stage, CTIA's burden to demonstrate associational standing is steeper than at the pleading stage. *Id*. at 5-6. Indeed, at summary judgment, the plaintiff must "set forth by affidavit or other evidence specific facts" supporting standing. *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 673 (6th Cir. 2022) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)). But because this consideration is drawn from the Board's motion for summary judgment, the Court must view the facts in the light most favorable to CTIA, the non-moving party. *See McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016).

The Board attacks CTIA's standing based on the second and third elements of associational standing. The Board's lead argument on standing is that CTIA has failed to show that the interests at stake in this litigation are germane to CTIA's purposes. [R. 58 at 6.] According to the Board, seeking an injunction that would bar a state agency from collecting Kentucky's Lifeline service charge is not germane to any of the purposes set forth in CTIA's bylaws. *Id*. The Board next argues that participation of CTIA's members is necessary, thus destroying CTIA's associational standing. The Board asserts that CTIA is "not equipped to represent its members" because discovery responses demonstrate that CTIA lacks knowledge about its members' specific business practices and operations. *Id*. "CTIA cannot vindicate its members' rights if it knows nothing about them." *Id*. Hence, the participation of CTIA's members is necessary so that the trier of fact can evaluate CTIA's claims. *Id*. at 7-8. Moreover, argues the Board, the participation of CTIA's members is necessary to show a requisite injury in

fact because "[t]he injuries alleged in the amended complaint are conjectural and hypothetical." *Id*.

CTIA, of course, disagrees. According to CTIA, challenging the validity of the 911 fee is within CTIA's purview, and is wholly consistent with its organizational purposes set forth in CTIA's Bylaws at Article 2(b) and 2(e). [R. 73 at 11.] Moreover, argues CTIA, this litigation "directly furthers CTIA's mission and purpose of presenting, advocating and serving as a voice for the wireless communications industry" and is specifically aimed to ensure that CTIA members can continue to provide Lifeline services. *Id*. at 11-12. CTIA asserts that it is "patently adversarial" to the Defendants, as shown through previously submitted amicus briefs in prior actions, and that litigation is encompassed by "any other lawful trade association activity" authorized by CTIA's bylaws and contemplated by its mission. *Id*. at 12.

In response to the Board's assertion that participation of CTIA's members is necessary, CTIA argues that its action is a prima facie statutory challenge that seeks uniform relief that will benefit all of CTIA's members providing Free Lifeline Only Service. *Id*. CTIA also disputes the Board's claim, or CTIA's interpretation thereof, that CTIA is only seeking relief for carriers who *exclusively* provide Free Lifeline Only Service. [*See* R. 58 at 7.] According to CTIA, it is seeking relief on behalf of *all* members and member-affiliates who provide Free Lifeline Only Service in Kentucky. [R. 73 at 12.] CTIA argues that it is well-equipped to represent its members, and that "minute details regarding its members' businesses are unnecessary and irrelevant to determine if HB 208 is federally preempted and unconstitutional." *Id*. at 12-13.

The Board counters CTIA's response by reiterating CTIA's higher burden of proof at the summary judgment stage. [R. 78 at 2.] The Board reasserts its argument that CTIA has failed to show that the "interests at stake are germane to the organization's purpose." *Id*. According to

the Board, this litigation does not fall under any of CTIA's purposes as outlined by CTIA's bylaws. *Id*. at 2-3. And, argues the Board, CTIA's reliance on its mission statement is misplaced because CTIA's bylaws outline its purposes. *Id*. The Board cites the Code of the District of Columbia, where CTIA is incorporated, to support the Board's argument that corporate formalities matter here. *Id*. Because CTIA's bylaws "do not include suing on behalf of its members without [CTIA's] board's approval", CTIA's failure to provide proof "that [CTIA's] board, under its bylaws, directed it to act on behalf of its members" is a failure by CTIA to show that this litigation is germane to its "purpose" for standing. *Id*.

Finally, the Board argues that CTIA mischaracterizes the Board's motion for summary judgment when it comes to whom CTIA is seeking relief for. *Id*. Rather than claiming that CTIA is seeking relief only for carriers who *exclusively* provide Free Lifeline Only Services, the Board argues that CTIA's preemption claims are premised on the hypothetical carrier that provides *only* free Lifeline. *Id*. According to the Board, CTIA fails to show that any of CTIA's carriers provide *only* Free Lifeline as their business model, and that CTIA is thus using a "hypothetical entity to springboard into a remedy for all Lifeline providers—including those with non-Lifeline subsidy revenue and other available funds." *Id*. at 3-4. This "hypothetical entity," argues the Board, "serve[s] only to confirm that CTIA lacks knowledge of HB 208's impact on its members and thus cannot substitute for wireless carriers' participation in this suit." *Id.* at 4.

The Court agrees with CTIA that standing exists here. First, CTIA is able to show that this litigation is within CTIA's purview, and consistent with its bylaws. [*See* R. 73 at 11-12; R. 59.] The relief CTIA seeks is declaratory action and a permanent injunction against a law which requires its member providers to pay money that otherwise would be invested into innovation. [*See* R. 36 and R. 73.] The Board would have the Court dispose of this action based upon a

9

theory that CTIA's board must approve this litigation as "an[] other lawful trade association activit[y]" under the language of CTIA's bylaw at Article 2(f) .  The Court does not discount the fact that corporate formalities matter a great deal.  *See e.g.*, *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  But the Court considers it a stretch to argue that advocating for its members is beyond the purposes set forth in other subsections of CTIA's bylaws.  The Court will abstain from performing a hypertextual examination of CTIA's bylaws at Article 2 and will instead rely on this fact:  that CTIA regularly participates in litigation on behalf of its members across the United States.  *See e.g.*, *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019); *Telecomms. Reg. Bd. v. CTIA-The Wireless Ass'n*, 752 F.3d 60 (1st Cir. 2014); *CTIA-The Wireless Ass'n v. FCC*, 466 F.3d 105 (D.C. Cir. 2006).  While it might be the case that CTIA's board took action in these past instances where CTIA filed complaints to direct CTIA's participation in litigation, the 911 Board has not presented any evidence of such.  Nor has the 911 Board asserted any arguments as to why the Court should not consider CTIA's past actions as evidence that advancing its members' interests through litigation is germane to CTIA's purpose.  Viewing the facts in a light most favorable to CTIA, the Court believes that advancing its members' interests through litigation is in fact germane to CTIA's purpose.

As to the third element of associational standing, the Court treads carefully.  As explained by the Seventh Circuit, "the application of [associational standing's] various prongs has . . . produced a caselaw that does not lend itself to easy distillation."  *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 600 (7th Cir. 1993).  Ultimately, the Court finds that CTIA is also able to show that the relief it seeks does not require its members to participate in their individual capacities.  The Board's argument that this action requires the participation of CTIA's members

10

to show injury in fact relies on CTIA's complaint and CTIA's answers to interrogatories relayed during discovery.  [R. 58 at 7-8.]  The Board draws attention to CTIA's amended complaint, which pleads that the effect of HB 208 will "make it impossible to operate as a Lifeline-only, no-cost-to-end user provider in Kentucky."  [*See* R. 58 at 8; R. 36 at ¶ 83.]  The Board interprets this paragraph of CTIA's complaint to mean that "CTIA's pre-emption *claims* are premised on the hypothetical (and admittedly nonexistent) carrier that provides only free lifeline."  [R. 78 at 3] (emphasis in original).  Because CTIA cannot show that any of its members operate under a Lifeline-only business model, the Board argues that CTIA has failed to show that any of its members have suffered an injury in fact.

Admittedly, the Court "recognize[s] that the record in this case leaves much to be desired in terms of specificity for purposes of determining . . . standing . . . ."  *Pennell v. San Jose*, 485 U.S. 1, 8 (1988).  CTIA contends that it is seeking declaratory and injunctive relief on behalf of all its members and member-affiliates who provide Free Lifeline Only Service in Kentucky, yet does not provide anything more specific beyond its pleadings detailing the danger of injury to its members.  But as explained by the Supreme Court, "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can be reasonably supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."  *Warth v. Seldin*, 422 U.S. 490, 515 (1975);  *see also Keats*, 2021 U.S. App. LEXIS 39602 at *9 (explaining that "the participation of individual members is not normally necessary when an association seeks prospective or injunctive relief for its members[]" (internal quotes omitted)).  Regardless, then, of whether CTIA has any particular knowledge of its members' individualized business practices, the Court concludes that it is not "unadorned speculation" to conclude that HB 208 will be enforced against CTIA's members.  *See Pennell*, 485 U.S. at 8.

HB 208's fee, and threat of enforcement for failure to comply, undoubtedly presents a sufficient

threat of harm to CTIA's members and member-affiliates who operate within Kentucky.  And

because CTIA is seeking prospective declaratory and injunctive relief on behalf of all its

members, the individual participation of CTIA's members is not necessary.  Thus, CTIA has

satisfied the third element of associational standing.  Consequently, upon analysis of each

challenged element, the Court finds that CTIA has associational standing on behalf of its

members to bring forth this action.

**B**

The Court next returns to the substantive question:  whether HB 208 is preempted by

federal law.  "There are two basic flavors of preemption, express and implied."  *Mitchell v. Lupin*

*Pharms., Inc.*, NO. 5:16-CV-00058-GNS, 2016 U.S. Dist. LEXIS 155987 at *4 (W.D. Ky. Nov.

9, 2016).  This Court and the Sixth Circuit previously considered whether the Communications

Act, the Fairness Act, and the Telecommunications Act expressly preempt HB 208.  [R. 14];

*Keats*, 2021 U.S. App. LEXIS 39602.  The Sixth Circuit, disagreeing with this Court, found that

HB 208 was not expressly preempted.  *Keats*, 2021 U.S. App. LEXIS 39602 at *10-18.  CTIA

now argues that HB 208 is *impliedly* preempted because HB 208 conflicts with the federal

statutory regime governing the Lifeline program.[3]

Whether a federal law preempts a state law is purely a question of law.  *Nickels v.*

*Grand Trunk W. R.R.*, 560 F.3d 426, 429 (6th Cir. 2009).  The Supremacy Clause provides that

federal law is "the supreme Law of Land . . . any Thing in the Constitution or Laws of any State

---

[3] On leave of the Court [R. 35], CTIA amended its Complaint to plead implied preemption following the Sixth Circuit's decision to remand.  [R. 36.]  The Board opposed CTIA's Motion for Leave to File an Amended Complaint, arguing that the issue of implied preemption was already adjudicated by this Court and the Sixth Circuit. [R. 33.]  This Court subsequently found that the Sixth Circuit had not reached the issue of implied preemption.  [R. 35.]  The Board now urges the Court to reconsider that previous decision.  [R. 58 at 24-29.]  The Court rests on the reasoning of its previous decision and declines to reconsider whether the Sixth Circuit's order and mandate bars CTIA from pursuing an implied preemption claim.

to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.  Implied preemption has been divided into two categories: "field" preemption and "conflict" preemption.  *Fulgenzi v. PLIVA, Inc.*, 711 F.3d 578, 583-84 (6th Cir. 2013).  On one hand, field preemption exists "where 'pervasive' federal regulation 'preclude[s] enforcement of state laws on the same subject[.]'"  *Id.* at 583-84 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Conflict preemption, on the other hand, "nullifies state law 'to the extent that it actually conflicts with federal law[.]'"  *Id.* at 584 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).  CTIA's argument of implied preemption rests solely on the conflict theory.

Conflict preemption, under the implied preemption umbrella, arises in one of two ways. "A state law actually conflicts with federal law if either 1) compliance with both is impossible or 2) the state requirement is an obstacle to the full purposes and objectives of Congress[.]"  *Id.* (internal quotations and citations omitted).  "In any preemption analysis, the 'purpose of Congress is the ultimate touchstone,' as discerned from the statutory language and structure of the statute as a whole."  *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)). Recognizing federalism concerns, courts have typically applied a presumption against preemption.  *Id.*  But "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring)).

**1**

In its conflict preemption analysis, the Court first considers whether HB 208 presents an obstacle to "the full purposes and objectives of Congress."  *Fulgenzi*, 711 F.3d at 584.  "An actual conflict analysis should be narrow and precise, 'to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.'"  *Downhour*

*v. Somani*, 85 F.3d 261, 266 (6th Cir. 1996) (quoting *Northwest Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 515 (1989)). "What is a sufficient obstacle [to Congress' purposes and objectives] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished – if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect – the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id*. (citations omitted).

As it wades forward into this legal quagmire, the Court is mindful that the founding generation disfavored repeals by implication. *Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (Thomas, J. and Gorsuch, J., concurring in judgment) (citing *Warder v. Arell*, 2 Va. 282, 299, 2 Wash. 282 (1796) (opinion of President Judge); 2 T. Cunningham, A New and Complete LawDictionary (2d ed. 1771) (defining "Statute"); 4 M. Bacon, A New Abridgment of the Law 638 (3d ed. 1768)). A "purposes and objectives" preemption analysis inevitably rests, as Justice Thomas cautions, "on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law.'" *Garcia*, 140 S. Ct. at 808 (quoting *Wyeth v. Levine*, 555 U. S. at 587) (Thomas, J., concurring in judgment). Without some conscious restraint, this guesswork might tempt judges to "engage in a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Id*. (citations and quotations omitted). Such is especially true where, as here, the federal scheme in question has been added to and subtracted from over the course of nearly a

century.  Thus, heeding Justice Thomas's cautions, the Court finds it most appropriate to "use the accepted methods of interpretation to ascertain whether the ordinary meaning of federal and state law 'directly conflict.'"  *Id*. (quoting *Wyeth*, 555 U. S. at 590).  This method of approach will ensure that the Court "let[s] the chips fall where they may," *see id.* at 807 (citation omitted) rather than unnecessarily, or unconsciously, imposing its own dispositions.  Accordingly, the Court will find that federal law impliedly preempts HB 208 "only if the two are in logical contradiction."  *See id*. at 808 (citing *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U. S. ___, ___, 139 S. Ct. 1668, 1681 (2019) (Thomas, J., concurring)).

The Communications Act of 1934 was explicitly enacted "[f]or the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, . . . a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges," and "for the purpose of promoting safety of life and property through the use of wire and radio communications."  47 U.S.C. § 151.  Congress reaffirmed this federal objective when it enacted Section 254 of the Communications Act in 1996, which required the FCC to establish universal service contribution and support mechanisms.  Indeed, Section 254 affirmatively articulates "universal service principles" on which the FCC must base universal service policies.  *See* 47 U.S.C. § 254(b).  These "universal service principles" include making "quality services ... available at just, reasonable, and affordable rates" and ensuring "access to telecommunications and information services" by low-income consumers.  *Id*.

CTIA's position is that HB 208 presents an "obstacle" to the federal government's Universal Service goal expressed by the Communications Act.  CTIA argues that HB 208's amendments to KRS 65.7636, which imposes a monthly $0.70 per end user fee upon service

providers, conflict with the objective to provide universal service because the fee directly increases the cost of providing Lifeline service to each and every Lifeline end user in Kentucky. In essence, "KRS 65.7636 places the burden of Kentucky's statutory 911 fee for these Free Lifeline Only Service plans onto the Lifeline provider, which undermines the effectiveness of congressional incentive and disrupts the economics of both the universal service contribution and subsidization framework established by the FCC."  [R. 62 at 17.]

According to CTIA, HB 208's imposition of fees on Lifeline service providers incentivizes carriers to substantially revise their business models.  Short of ceasing business within Kentucky entirely, service providers could (a) provide more plans that have a cost to end users and increasing the costs to those paying end users or (b) reduce the level of service provided to Free Lifeline Only customers to offset HB 208's per Lifeline end user 911 fee, thereby reducing the services offered by decreasing minutes and data.  All of these options, says CTIA, undermine the federal objective prescribed by the Communications Act to provide quality universal service.  CTIA further argues that KRS 65.7636 is now inconsistent with federal law because it mandates that Lifeline providers use money other than the Lifeline subsidy to pay the 911 fees.  As explained above, Lifeline providers receive a subsidy of either $5.25 or $9.25 per month for each eligible Lifeline household, and the Lifeline providers use that subsidy to provide their services to low-income consumers at reduced costs.  CTIA asserts that HB 208's practical effect is to reduce the total revenue available to the Lifeline provider associated with serving each Lifeline subscriber.  This effect, in turn, shifts the burden onto Lifeline providers and only serves to divert resources that are intended to pass through to the Lifeline subscriber as part of the provision of the federal universal service.   Thus, the federal contribution and subsidization framework established by the FCC is undermined.

16

The Board does not dispute CTIA's premise that Congress created a universal service goal, which is evidenced by § 254. The Board does allege, however, that CTIA reads that goal too broadly, and that CTIA cannot show that HB 208 stands as an obstacle to that goal. The Board argues that Congress's universal service objectives do not extend to allowing providers to profit or even to necessarily recover their costs. Any increased costs would be "de minimis," and could have, at most, an incidental effect on federal objectives. Moreover, argues the Board, CTIA's claim that HB 208 incentivizes providers to decrease the amount of service provided must fail because, pursuant to 47 C.F.R. § 54.408, providers must offer a minimum level of service to participate in Lifeline.

The Board's remaining arguments can be summed up as follows: (1) CTIA's suggestion that HB 208 could drive providers out of the Lifeline market in Kentucky is speculative and does not demonstrate an obstacle to congressional objectives; (2) HB 208's per end user charge is not "new," it simply shifts responsibility for that fee from consumers to service providers; (3) CTIA's assertion that HB 208 will undermine congressional objectives by diverting the Lifeline subsidy is false because there exist no independent, free only Lifeline providers, which means that Lifeline subsidy funds would not need be used to pay the charge; and (4) CTIA cannot sustain a putative facial challenge to HB 208 because CTIA lacks evidence of how HB 208 would affect its members, and relies on supposed "practical effects" and hypothetical impacts.

Ultimately, the Court finds that HB 208 does not frustrate the full purposes and objectives of Congress. As an initial matter, the Court agrees with both sides on what appears to be an undisputed point—that Congress, evidenced by the express language it ratified, intended universal service to be widely accessible throughout the entirety of the United States. Since 1934, "[u]niversal service has been a fundamental goal of federal telecommunications

17

regulation." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 778 (6th Cir. 2023) (citation omitted). "The Communications Act requires that universal service support be 'explicit and sufficient,' 47 U.S.C. § 254(e), and it articulates several guiding principles to govern universal service. *id.* § 254(b)(2)-(5)." *Alenco Communs., Inc. v. FCC*, 201 F.3d 608, 614 (5th Cir. 2000). "Among other things, § 254 of the Telecommunications Act (codified in 47 U.S.C. § 254) recognized preexisting and additional priorities of universal service and called for 'specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" *Consumers' Rsch.*, 67 F.4th at 779 (citing 47 U.S.C. § 254(b)(5)). Thus, there should be no doubt that "Congress passed § 254 to ensure the facilitation of broad access to telecommunications services across the country." *Id.* (citation omitted).

A clear Congressional purpose to advance Universal Service does not mean, however, that any state action which might potentially burden service providers is automatically deemed an obstacle. CTIA alleges that the reassignment of the 911 service free from end user to service providers undermines quality of service because it incentivizes providers to provide less service or to restructure plans that might end up causing end users to pay higher costs. But a service provider's economic dilemma does not create an instance of conflict preemption. HB 208 does not itself stand as an impediment to the sufficient facilitation of universal service across the Commonwealth or the nation. Rather, it merely means that service providers will have to reassess the way in which they allocate resources, while still achieving the Congressional mandate to provide universal service. As a sister court noted, "[t]he Supreme Court has never held that a state law affecting a business's revenues is preempted merely because the law would make it unprofitable to operate a business in accordance with federal requirements." *Parsad v.*

18

*Granholm*, Case No. 1:08-cv-962, 2009 U.S. Dist. LEXIS 146267 at *31-32 (W.D. Mich. March 30, 2009).

Moreover, Lifeline's subsidy framework is not frustrated either, as CTIA alleges.  One of CTIA's qualms is that Lifeline service providers receiving universal service support such as the Lifeline subsidy are proscribed from using the subsidized funds for anything other than providing Lifeline services.  47 U.S.C. § 254(e).  In other words, Lifeline subsidy money cannot be used to pay the $0.70 per end user 911 service charge—in fact, Kentucky law specifically prohibits as much.  *See* Ky. Rev. Stat. Ann. § 65.7636(5) (West 2023).  But as the Board points out, CTIA has not shown that any wireless provider currently provides solely Free Lifeline Only Service plans in Kentucky.  That is to say, there exists no wireless providers that would be strong-armed into paying the $0.70 fee with Lifeline subsidy money or else withdraw service from the Commonwealth.

Rather, all of the wireless providers currently providing service would be able to pay the $0.70 fee using non-subsidy revenue.  This Court's inquiry is "whether there exists an irreconcilable conflict between the federal and state regulatory schemes." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).  "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Id*.  As the chips fall, it appears that federal law and state law are actually in harmony.  The Supreme Court "has observed repeatedly that pre-emption is ordinarily not to be implied absent an 'actual conflict.'" *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (citation omitted).  The "teaching of this Court's decisions . . . enjoins seeking out conflicts between state and federal regulation where none clearly exists." *Id*. (quotations omitted).  Accordingly, the Court will abstain from hypothesizing a conflict that may or may not materialize as a means to find preemption.  Because HB 208 does not ultimately

present an obstacle to the full purposes and objectives of Congress as related to the Communications Act, there is no implied preemption via a conflict theory.

2

Having found that Kentucky's law does not frustrate Congress' purposes and objectives, the Court must now consider whether HB 208 is impliedly preempted due to impossibility. Impossibility preemption will be found where it is "impossible for a private party to comply with both state and federal requirements." *Fulgenzi*, 711 F.3d at 584 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). Here, CTIA's argument relies on the language of § 254(e) and on FCC rules, which preclude Lifeline service providers from using Lifeline subsidized funds for anything other than providing Lifeline services. *See* 47 U.S.C. § 254(e); 47 C.F.R. § 54.7. As stated above, Kentucky law recognizes these federal limitations and explicitly prohibits service providers from using Lifeline subsidized funds to pay the $0.70 per end user fee. Ky. Rev. Stat. Ann. § 65.7636(5) (West 2023). CTIA argues, as it did in regard to the purposes and objectives analysis, that service providers providing solely Free Lifeline Only Service Plans—in other words, service providers whose revenue solely derives from the Lifeline subsidy—cannot possibly comply with federal law while paying Kentucky's $0.70 fee. Put another way, providers solely offering Free Lifeline Only Service are obligated to pay Kentucky's 911 service charge but have no alternative source of revenue that may be legally used to pay the charge.

For the same reasons as already explained above, CTIA's argument fails. CTIA has not shown, nor alleged, that there are wireless providers servicing the Commonwealth that operate solely on a Free Lifeline Only business model. Thus, the "conundrum" that CTIA posits as evidence of impossibility is not actually one that currently exists for any of CTIA's members. Concededly, the *potential* for conflict does exist—but that potential for conflict relies on a

20

presumption that wireless providers will at some point begin operating exclusively on a Free Lifeline Only Service Plan model within the Commonwealth.  A hypothetical presumption of what may come to be cannot support a finding of preemption at this juncture where there is no actual enmity between federal and state law.  *Rice*, 458 U.S. at 659.

C

Because the Communications Act does not impliedly preempt HB 208, the Court now must consider CTIA's claim that HB 208 violates Equal Protection.  The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV § 1.  The purpose of the Fourteenth Amendment is "to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Sadie v. City of Cleveland*, 718 F.3d 596, 602 (6th Cir. 2013) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).  "The basis of any equal protection claim is that the state has treated similarly-situated individuals differently."  *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F. 2d 1031, 1036 (6th Cir. 1992).  For a valid claim under the Equal Protection Clause, a plaintiff must allege that the state made a distinction which "burden[ed] a fundamental right, target[ed] a suspect class, or intentionally treat[ed] one differently from others similarly situated without any rational basis for the difference."  *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)).

Here, CTIA alleges that HB 208 treats Lifeline providers differently than other service providers because only Lifeline service providers are required to pay the $.070 per end user service charge.  According to CTIA, there is no difference between Lifeline wireless providers

21

and other wireless providers.  Thus, singling out Lifeline providers places them at a distinct disadvantage under other wireless providers and penalizes them for offering Lifeline.  This disparity, argues CTIA, violates Equal Protection.  The Board counters by arguing that no disparate treatment exists because Lifeline providers are not similarly situated to other wireless providers and, even so, CTIA cannot overcome rational basis scrutiny.

Unfortunately for CTIA, the Court agrees with the Board on the latter point.  Because HB 208 is economic legislation, it is subject only to rational basis review.  *See FCC v. Beach Commc'ns*, Inc., 508 U.S. 307, 313 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (citations omitted).  So long as the classification drawn by the statute is rationally related to a legitimate government interest, "[t]he general rule is that legislation is presumed to be valid and will be sustained."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."  *Id*.  A statute will survive rational basis scrutiny if it can be upheld "under any plausible justification offered by the state, or even hypothesized by the court[.]"  *Am. Express Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011).

Under this review framework, HB 208 easily passes the rational basis test.  Kentucky undoubtedly has an interest in recovering its 911 service costs—indeed, the FCC has recognized that "the adequate funding of [public-safety answering point's] is a critical element in ensuring timely E911 implementation."  *See In re Revision of the Comm'n's Rules to Ensure*

*Compatibility with Enhanced 911 Emergency Calling Sys*., 14 F.C.C. Rcd. 20850, ¶ 66 (1999).

As the Board explains more precisely on this point, "[e]ach wireless connection imposes an

incremental added cost to the state, in that the 911 system must either be able to field calls from

those customers and respond with emergency services or be expanded until it is able to do so.

Each 911 call made from a wireless phone imposes a further added cost in terms of equipment

and manpower.  Thus, providing Lifeline service adds to the burden and cost of 911 in

Kentucky."  [R. 58 at 26.]

    CTIA argues that it is not rational to put Lifeline providers at a disadvantage by placing

an additional burden on them.  But someone must bear the burden of the 911 system's cost, and

the Fairness Act proscribes end users from paying.  Accordingly, Kentucky made the rational

decision to impose a fee collection structure that requires Lifeline service providers operating

within the Commonwealth to pay instead.  Is this inherently fair?  Our nation is full of mandates

that discrepantly require some to bear more economic burdens than others.  Nevertheless, they do

not violate equal protection.  Thus, neither does HB 208.

### D

    Finally, the Court turns to CTIA's claim that HB 208 violates Due Process and the

Takings Clause.  In addition to Equal Protection, the Fourteenth Amendment to the U.S.

Constitution confers the right to not be deprived of life, liberty, or property without process of

law.  U.S. Const. amend. XIV § 1.  The Fifth Amendment provides that "nor shall private

property be taken for public use, without just compensation."  U.S. Const. amend. V.  A taking in

violation of the Fifth Amendment does not occur when the statute in question imposes a

monetary assessment that does not affect a specific interest in property.  *McCarthy v. City of*

*Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010).  "The Takings Clause is not an appropriate vehicle

to challenge the power of [a legislature] to impose a mere monetary obligation without regard to an identifiable property interest." *Id*. at 256 (internal quotations and citations omitted).

According to CTIA, Lifeline providers are essentially being deprived of their private funds without any compensation or conferred benefit, and that those funds are being taken for public use, *i.e.*, 911 service throughout Kentucky.  In support of its argument, CTIA cites *Kentucky River Auth. v. City of Danville*, which asserts that "[a]ssessments and fees charged without a relationship to a benefit received by the payor are arbitrary and capricious and violate due process and the constitutional prohibition against the taking of private property without just compensation."  932 S.W.2d 374, 377 (Ky. Ct. App. 1996) (citations omitted).  CTIA argues that this Kentucky state court standard applies in this Court's analysis of CTIA's federal claims because "Kentucky's due process is aligned with federal due process rights."  [R. 62 at 24] (quoting *Pigeons' Roost, Inc. v. Commonwealth*, 10 S.W.3d 133 (Ky. App. 1999)).  Because they receive no benefit from the 911 service fee, it must follow that the fee imposed on Lifeline providers violates due process and the taking clause.

But CTIA's argument on this point fails.  First, it appears that the Court in *Kentucky River Auth*. was considering whether the fee at issue in that case violated the Kentucky Constitution, not the U.S. Constitution.  *See generally* 932 S.W.2d 374.  Although Kentucky's due process may be aligned with federal due process, it does not necessarily follow that federal due process is congruent in all means with Kentucky's due process.  CTIA cites no federal case law that espouses the Kentucky court's fee/benefit relationship line of reasoning.  Thus, the Court is reluctant to premise its conclusions on such microscopic grounds.[4]  In fact, Sixth Circuit

---

[4] Even if the Court were to find Kentucky's due process considerations persuasive, later Kentucky precedent erodes CTIA's initial point.  The Kentucky Supreme Court has explained that "the nexus required to sustain a fee . . . need not necessarily be direct.  Rather, a fee that bears a reasonable relationship to the benefit received is sufficient." *Greater Cincinnati/Northern Ky. Apt. Ass'n v. Campbell County Fiscal Court*, 479 S.W.3d 603, 607 (2015).

24

precedent indicates that state legislative actions that deprive "life, liberty, or property" must only possess some rational basis. *See Pearson v. Grand Blanc*, 961 F.2d 1211, 1223 (6th Cir. 1992). As explained above in its Equal Protection analysis, the Court has already found that HB 208 passes muster under rational basis scrutiny because the state has a legitimate interest in funding its 911 service program. CTIA's argument on due process grounds, therefore, fails.

CTIA's Takings Clause claim fails too because HB 208's fee assessment does not seize or impair an identifiable fund of money. CTIA challenges this conclusion by arguing that HB 208 requires Lifeline providers "to pay a charge calculated and based upon the number of Kentucky Lifeline end users 'for which the Lifeline provider received reimbursement from the universal service fund during the immediately preceding month.'" [R. 73 at 31] (citing Ky. Rev. Stat. Ann. § 65.7636(2)(a) (West 2023)). According to CTIA, "HB 208's 911 fee is directly tied to a Lifeline provider's receipt of funds in connection with Lifeline and to the payment of funds sought by the 911 Board, *i.e.*, an unequivocally identified fund of money that Defendants seek to take – $0.70 per month for each Lifeline user." *Id*.

But CTIA's argument misses the point. A Takings Clause challenge must be premised on an adverse effect to a specific interest in property. *McCarthy*, 626 F.3d at 285. The mere obligation to pay money does not necessitate recovery under the Fifth Amendment. *See Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001); *see also Longshore v. United States*, 77 F.3d 440, 443-45 (Fed. Cir. 1996) (where the Court found that the required payment of fees as a prerequisite to participating in a lottery for a radio cellular systems license is not a taking). In this case, there is no property interest at stake. HB 208 does not tap into the Lifeline subsidized funds that CTIA's members receive—again, HB 208 specifically prohibits the use of Lifeline subsidy money to pay the 911 service charge. Thus, although the

accrued amount eventually owed by Lifeline providers will be determined by the number of Lifeline customers, that amount owed would be paid from revenue generated (or from whatever other non-Lifeline subsidized source of funds the Lifeline provider deems appropriate).  Because there is no property interest at stake, CTIA's Takings Clause challenge fails.

### E

As a housekeeping matter, the Court will address the United States' notice of intervention filed in this matter to defend the constitutionality of Section 1510(c)(1) of the Fairness Act and Sections 254(f) and 254(i) of the Communications Act.  [R. 81.]  The United States intervened as a result of the Board's argument that Section 1510(c)(1) of the Fairness Act and Sections 254(f) and 254(i) of the Communications Act are unconstitutional because they commandeer the States in violation of the Tenth Amendment.  *Id*; [*see also* R. 58.]  In seeking to adhere to principles of constitutional avoidance, the Court first considered whether any of the Board's other defenses were dispositive.  *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision.").  Seeing as the relationship between federal law and state law in this matter has been effectually resolved, the Court finds it unnecessary, and indeed unwise, to reach the Board's Tenth Amendment arguments.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. The Board's Motion for Summary Judgment [**R. 58**] is **GRANTED;**

2. CTIA's Motion for Summary Judgment [**R. 62**] is **DENIED;** and

3. Judgment in favor of the Board **SHALL** be entered promptly.

This the 29th day of March 2024.

Gregory F. Van Tatenhove
United States District Judge